*17*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BORDER SHIPYARDS, INC.,  §
JORGE GONZALEZ,  §
CARL "JOE" GAYMAN,  §
RUBEN BARRERA and  §
BUSTER HARRIS, and  §
FOR WILLIAM E. KENON  §
 §
VS.  §   CIVIL ACTION NO. B-99-019
 §
 §
ST. PAUL MERCURY INSURANCE  §
COMPANY  §

United States District Court
Southern District of Texas
FILED

MAR 2 2 2001

Michael N. Milby
Clerk of Court

## DEFENDANT St. PAUL'S THIRD-PARTY COMPLAINT
## and REQUEST FOR DECLARATORY JUDGMENT
## against RICARDO RIVERA a/k/a RICK RICARDO d/b/a *LA NEGRITA*

TO THE HONORABLE DISTRICT COURT JUDGE:

Having first requested leave of this Court, Defendant/Third-Party Plaintiff St. Paul Mercury

Insurance Company complains of Ricardo Rivera a/k/a Rick Rivera d/b/a *La Negrita*, Third-Party

Defendant, and would show this honorable Court the following:

### PARTIES

1.      Third-Party Plaintiff St. Paul Mercury Insurance Company ("St. Paul") is the

Defendant in the instant insurance coverage case.  St. Paul is a Minnesota corporation and already

a party to the instant litigation, and is represented by the undersigned counsel for all matters germane

to this litigation.

2.      The original Plaintiffs herein are Border Shipyards, Inc. and several shareholders of

the corporation.  Border Shipyards, Inc. is the named insured under a St. Paul marine general liability

insurance policy more fully described below.

1

3. Third-Party Defendant Ricardo Rivera a/k/a Rick Rivera d/b/a *La Negrita* (generally referred to herein as "Mr. Rivera") is the owner and operator of a steel-hulled shrimp trawler known as *La Negrita*. He did business with the Plaintiffs herein, and in his pleadings in the underlying personal injury lawsuit which spawned this coverage lawsuit, he purports to be a third-party beneficiary of the St. Paul insurance policy at issue herein.

4. Mr. Rivera is believed to be a resident of and to conduct business in Cameron County, Texas, and may be served at his home and/or place of business, or wherever he may be found. Mr. Rivera is already represented by counsel in the underlying lawsuit and may be amenable to accepting service of process through his counsel.

## JURISDICTION, VENUE, CAUSE of ACTION

5. Jurisdiction in this case is based upon complete diversity of citizenship, and an amount in controversy exceeding $ 75,000.00. *See* 28 U.S.C. § 1332. Jurisdiction would also be available pursuant to the Court's inherent power to exercise ancillary jurisdiction. The case is already pending in this Court and the venue should prove no hardship to Mr. Rivera.

6. This case involves the interpretation of an insurance policy. St. Paul seeks declaratory relief pursuant to 28 U.S.C. § 2201.

## FACTUAL BACKGROUND and UNDERLYING LAWSUIT

7. St. Paul issued a Maritime General Liability policy, No. 342ZT5561 ("the Policy"), to Border Shipyards, Inc. with effective dates April 28, 1998 to April 28, 1999. A copy of the Policy is attached hereto as Exhibit "B-1" and incorporated for all purposes.

8. On May 11, 1998, Mr. Ernesto Garcia Lopez, an employee of Border Shipyards, Inc., was electrocuted while in the course and scope of his employment with Border Shipyards. On information and belief, at the time of this tragic accident Mr. Lopez was welding a propellor in the course of repairing Mr. Rivera's vessel *La Negrita*.

2

9.      **The first underlying lawsuit.** Shortly thereafter, Mr. Lopez's widow, Petra Lopez, and others brought suit in the 197th Judicial District Court of Cameron County, Texas, cause no. 98-3040-A. Following amendment, this lawsuit had as its defendants Border Shipyards, Inc. and several of the corporation's shareholders. The defendants sought coverage from St. Paul, which was denied with respect to the corporation and provided but qualified with respect to the individual shareholders. (A copy of the First Amended Petition in cause no. 98-3040-A, which is no longer pending, is attached as an Exhibit to Plaintiffs' Original Petition in the instant action.)

10.     **The instant coverage suit.** Border Shipyards, Inc. and the individual shareholders then commenced the instant lawsuit against St. Paul in January of 1999, originally in the 357th Judicial District Court of Cameron County, Texas, cause no. 99-01-00035-E. St. Paul answered and removed the case to this Court, and thereafter filed a First Amended Answer (following the federal court format). To St. Paul's knowledge, the Original Petition first filed in state court continues to be Plaintiffs' live pleading before this Court.

11.     In mid-1999, the Lopez plaintiffs dismissed their underlying lawsuit, without prejudice. In response, the Plaintiffs herein and St. Paul asked this Court to stay the instant coverage action pending the anticipated re-filing of Ms. Lopez *et al.*'s lawsuit.

12.     **The new underlying lawsuit.** On February 16, 2000, Petra Lopez *et al.* filed a new lawsuit, cause no. 2000-02-758-D in the 103rd Judicial District Court of Cameron County, Texas. A copy of the Original Petition in this cause is attached hereto as Exhibit "B-2." In addition to Border Shipyards, Inc. and four of the individual shareholders, the new underlying petition named Rick Rivera, Individually and d/b/a *La Negrita*, as a Defendant. In a brand new and unusual allegation, the new petition alleges the existence of "oral and/or written contracts" between Border Shipyards and Mr. Rivera. These contracts purportedly provided that Border Shipyards, Inc. would indemnify Mr. Rivera for certain accidents, including the accident which took Mr. Lopez's life.

13.    On September 25, 2000, Mr. Rivera answered the (new) underlying Lopez lawsuit, asserting a cross-claim against Border Shipyards, Inc. on numerous grounds. A copy of Mr. Rivera's Answer and Cross-claim is attached hereto as Exhibit "B-3," and is discussed more fully below.

### THIRD-PARTY COMPLAINT and
### REQUEST FOR DECLARATORY JUDGMENT

14.    In his cross-claim against Border Shipyards, Mr. Rivera alleges the existence of an "implied agreement, benefit and representation," ¶ 1.03 of cross-claim, by which Border Shipyards undertook the potential liability of Mr. Rivera for certain accidents, including the accident which took Mr. Lopez's life. While Border Shipyards never requested that St. Paul present Mr. Rivera with a certificate of insurance, Mr. Rivera's cross-claim asserts that as part of the "implied agreement," he is entitled to be defended and indemnified in the Lopez lawsuit by "Border Shipyards, Inc. and its [CGL] insurance carrier." ¶ 3.02 of cross-claim. In addition, the "implied agreement" was apparently to be in force only "up to the limits of [Border Shipyard's] comprehensive general liability and insurance coverages in effect[.]" ¶ 6.01. In essence, a portion of Mr. Rivera's cross-claim attempts to bring a Louisiana-style direct action claim against an unnamed insurance carrier.

15.    Mr. Rivera's cross-claim apparently asserts that he was entitled to coverage as an additional insured, or that coverage would be provided to him pursuant to what is often called "incidental contracts" coverage. As do most CGL-style insurance policies, the St. Paul Policy at issue provides coverage (subject of course to other terms, conditions and exclusions) for certain "incidental contracts" -- oral or written agreements by which the named insured, in the course of its business, agrees to indemnify other persons for accidents relating to the work performed by the insured. Of course, such agreements must be entered into prior to any accident for which coverage is sought. And of course such an agreement must be valid pursuant to the applicable law (state, federal or maritime) before it will bind the insured and, derivatively, the insurance company.

16.     St. Paul would show, and asks this Court to declare, that Mr. Rivera was never an additional insured under the Policy.

17.     Additionally, St. Paul would show, and asks this Court to declare, that

(a) the purported "implied agreement" never existed;

(b) the purported "implied agreement" never existed prior to Mr. Lopez's May 11, 1998 accident and subsequent death;

(c) the purported "implied agreement" never existed in writing prior to Mr. Lopez's May 11, 1998 accident and subsequent death; and/or

(d) if in fact the "implied agreement" existed prior to Mr. Lopez's accident and death, orally, implied, or in writing, it is and was completely void and invalid to indemnify Mr. Rivera with respect to the accident which took Mr. Lopez's life.

18.     If an *oral* or *implied* agreement was entered into prior to the accident, the agreement would have been completely void *ab initio*. Given the nature of the business relationship between Border Shipyards, Inc. and Mr. Rivera, Mr. Rivera could never be vicariously liable to Mr. Lopez for the negligence of Border Shipyards; any tort liability Mr. Rivera could possibly have toward Mr. Lopez would have been predicated upon his own (Mr. Rivera's) acts or omissions. Since any contract by which Party A agrees to indemnify Party B for Party B's own tortious liability must, at a bare minimum, be in writing, any purported oral or implied agreement between the parties herein is null and void. St. Paul asks this Court to declare that Border Shipyards, Inc. could not have validly entered into an unwritten agreement to indemnify Mr. Rivera with respect to Mr. Lopez's unfortunate death, and that consequently St. Paul can have no derivative obligation to Border Shipyards, Inc., its Shareholders, or to Mr. Rivera thereby.

19.     Even if the purported agreement was in writing -- and Mr. Rivera has already judicially admitted it was not, by virtue of his pleading in the underlying lawsuit, ¶ 1.03 of his cross-claim -- such an agreement would be completely void with respect to the accident claiming Mr. Lopez's life.  Mr. Lopez was a harbor worker as defined by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.,* and subsection 905(b) of the Act specifically invalidates, in suits by a covered employee or his representatives against a vessel, any agreement by which the employer purports to indemnify the vessel for the employee's injuries.  St. Paul asks this Court to declare that Border Shipyards, Inc. could not have validly entered into an agreement -- even if in writing -- to indemnify Mr. Rivera with respect to Mr. Lopez's unfortunate death, and that consequently St. Paul can have no derivative obligation to Border Shipyards, Inc., its shareholders, or to Mr. Rivera thereby.

### Eight Corners Rule

20.     St. Paul fully expects Mr. Rivera to argue that St. Paul is obliged to provide "incidental contract" coverage, at least with respect to the duty to defend, by the mere fact that the current Lopez petition alleges the existence of a purported "incidental contract" between Border Shipyards, Inc. and Mr. Rivera.  This argument is flawed on several counts.  First, as noted above (paragraph 18), any implied or oral agreement would be void, because any "indemnitee's own negligence" agreement must be in writing.  Second, as noted in paragraph 19, even if the agreement was in writing, it is absolutely null and void as a matter of federal law.  Accordingly, Border Shipyards and/or its shareholders can have no valid obligation to Mr. Rivera, and St. Paul has no derivative obligation.

21.     Additionally, while St. Paul acknowledges the usual application of the "complaint allegation rule" or "eight corners rule," in this instance the Court is entitled to, and indeed must,

determine the true facts of the matter. This is so because Ms. Lopez's unusual allegation of "incidental contracts" between Border Shipyards and Mr. Rivera is not an allegation which speaks to the Defendants' tort liability to her late husband and his representatives; if that were the case the Court *would* be limited to an inspection of the "eight corners" (although the arguments advanced in paragraphs 18 and 19 would still preclude coverage). However, the allegation has nothing to do with the parties' tort liabilities in the Lopez lawsuit; it speaks only to the question of the various Defendants' contractual obligations as between themselves (and realistically, whether or not there is insurance coverage). In this instance the Court can and should dispense with the mere allegations and determine the real facts.

22.     (St. Paul does not expect Mr. Rivera to argue that *his own* allegations can create coverage. Should the Court accept the proposition that a Defendant may trigger a defense merely by asserting "I was insured by ABC Company" or "I was an additional insured of ABC Company," Texas will in effect have become a "direct action and then some" state, in which insurers are stripped of the ability to contest coverage that is accorded to insurers in the "real" direct action states.)

## Occurrences

23.     Additionally or alternatively, the Policy only obliges St. Paul to defend or indemnify an insured for claims of bodily injury arising out of an "occurrence." The Policy defines occurrence as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The current Lopez lawsuit alleges that the Defendants were "guilty of gross negligence and malice" in causing Mr. Lopez's death. As would be interpreted by the Texas Supreme Court, evidence which would justify a finding of gross negligence or malice on the part of Mr. Rivera would also place his acts and omissions outside the scope of the term "occurrences" as defined in the Policy.

Accordingly, St. Paul seeks a declaration by this Court that there is no coverage under the Policy, to the extent it is found that Mr. Lopez's death arose from Mr. Rivera's gross negligence or malice.

### St. Paul has no Duty to Defend or Indemnify

24.     As has been determined by the Texas Supreme Court, once an insurer has conclusively established that there is no duty to defend its insured (or additional insured) against a third party lawsuit, there can be no residual liability to provide indemnity to its insureds (or additional insureds). Accordingly, if and as St. Paul negates any obligation to provide a defense to Mr. Rivera (in his own right as an additional insured or on behalf of the named insured Border Shipyards, Inc. and/or its shareholders) for the lawsuit arising out of the death of Mr. Lopez, St. Paul asks this Court to also declare that St. Paul has no indemnity coverage obligations whatsoever to Mr. Rivera for this tragic accident.


**WHEREFORE**, ST. PAUL MERCURY INSURANCE COMPANY respectfully requests that this Court declare, pursuant to 28 U.S.C. § 2201, that St. Paul has no duty to provide a defense to or indemnify Mr. Rivera (in his own right or on behalf of Border Shipyards, Inc. and/or its shareholders) in connection with any loss, damages, settlement, judgment, or any finding of liability whatsoever arising from the death of Mr. Ernesto Lopez, and that Mr. Rivera has  no rights under the Policy with respect to this accident, either as an additional insured or otherwise. St. Paul further asks that the Court award St. Paul its attorney fees and other expenses reasonably incurred to contest this lawsuit, and that the Court grant such other and further relief to which St. Paul may be entitled.

Respectfully submitted,

BY: _Philip D. Nizialek_____

Philip D. Nizialek
State Bar no. 15045250
S.D. Bar no.  14582
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas  77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

ATTORNEY-IN-CHARGE FOR
ST. PAUL MERCURY INSURANCE COMPANY

Of counsel:
RATHWELL & NIZIALEK, P.C.
Richard Virnig
State Bar no. 20593220
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas  77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

Enclosures:
Exhibit "B-1":  Insurance Policy no. 342ZT5561
Exhibit "B-2":  Original Petition, Cause no. 2000-02-758-D in 103rd Judicial District Court
Exhibit "B-3":  Mr. Rivera's Answer and Cross-claim in same case

# EXHIBIT "B-1"

CutePDF – www.fastio.com

<u>342ZT5561</u>
Policy No.

<u>342ZT5468</u>
Former Policy No.

## INSURANCE IS PROVIDED BY THE COMPANY DESIGNATED BELOW

# The St Paul

### The St. Paul Mercury Insurance Company
A CAPITAL STOCK COMPANY HEREIN CALLED THE COMPANY

**DECLARATIONS:**

NAME AND ADDRESS OF ASSURED'

BORDER SHIPYARDS, INC.
400 'D' ROAD
BROWNSVILLE, TEXAS 78520

NAME AND ADDRESS OF AGENCY

CENTURY SURPLUS LINES AGENCY, INC.
2925 BRIARPARK, SUITE 550
HOUSTON, TEXAS 77042

Does hereby insure according to the form and clauses attached:

| Amount Insured | Rate | Premium |
|---|---|---|
| $ 1,000,000 | 3.30% | $ 12,000.00 MINIMUM & DEPOSIT |

Loss, if any, payable to

ASSURED OR ORDER

| From | To | Beginning and ending with (Time) |
|---|---|---|
| APRIL 28, 1998 | APRIL 28, 1999 | 12:01 A.M., C.D.T. |

Upon

SHIP REPAIRER'S LEGAL LIABILITIES/MARINE GENERAL LIABILITIES/WHARFINGERS LEGAL LIABILITY

COVERING MARINE GENERAL LIABILITIES/SHIP REPAIRER'S LEGAL LIABILITIES/WHARFINGER'S LEGAL LIABILITY AS STATED HEREIN:

1. GENERAL CONDITIONS (SECTION I)
2. COVERAGE (SECTION II)
3. ADDITIONAL COVERAGES (SECTION III)
4. AMERICAN INSTITUTE SHIP REPAIRER'S LIABILITY CLAUSES (SECTION IV)
5. WHARFINGERS LEGAL LIABILITY CLAUSES (SECTION V)

ST. PAUL FIRE AND MARINE INSURANCE COMPANY ONLY:
PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY: - "This Policy is issued under and in pursuance of the laws of the State of Minnesota, relating to Guaranty Surplus and Special Reserve Funds." Chapter 437, General Laws of 1909. This provision does not apply in Texas:

IN WITNESS WHEREOF, the Company designated on the Declarations page has caused this Policy to be signed by its President and Secretary and countersigned on the Declarations page by a duly authorized representative of the Company.

_Paul D. Ziccarelli_
Secretary

_[signature]_
President

_[signature]_
President

<u>APRIL 28, 1998</u>
Countersigned Date

<u>HOUSTON, TX</u>
Countersigned At

_____
Authorized Representative

STPAULFS.DOC

# The St Paul

## SECTION I

## MARINE GENERAL LIABILITY

## GENERAL CONDITIONS

(1)    NAMED INSURED:                          BORDER SHIPYARDS, INC.

(2)    THE NAMED INSURED IS:                   CORPORATION

(3)    ADDRESS OF THE INSURED:                 400 'D' ROAD
                                               BROWNSVILLE, TEXAS 78320

(4)    LOSS, IF ANY PAYABLE TO:                ASSURED OR ORDER

(5)    POLICY PERIOD:

Subject to its terms and conditions, this policy shall cover all occurrences on or after *April 28, 1998* and prior to *April 28, 1999* beginning and ending at 12:01 A.M. Central Daylight Time unless sooner terminated as hereinafter provided.

(6)    PREMIUM:     $ 12,000.00     MINIMUM & DEPOSIT PREMIUM

The Assured, by acceptance of this Policy, agrees to keep an accurate record of all Gross Charges for operations covered under the terms and conditions of this Policy, which record shall be open to examination by representatives of this Company at all times during business hours, during the term of this Policy or thereafter, and further agrees to report to this Company on or before May 28, 1999, the total amount thereof (collected and uncollected) for the preceding period or such period of time as is within the term of this Policy. If gross receipts exceed $280,000 the earned premium hereunder to be computed thereon at the rate of $3.30 per each $100.00 and applied against the Deposit Premium until same is exhausted, following which all further earned premium shall be due and payable to this Company at time of filing the report on which the earned premium is due. This Company shall have the right of setoff against the claims payable under this Policy of any premiums due hereunder. It is agreed that, except in the event of cancellation of this Policy by this Company, the Minimum Premium hereunder shall be $12,000.00. The Deposit Premium, payable upon attachment of this Policy, shall be $12,000.00.

1

# The St Paul

**(7)    LIMIT OF LIABILITY:**

It is understood and agreed the liability of this company shall not exceed $1,000,000 any one occurrence, including all claims, costs and expense regardless of the number of coverages involved and $ 2,000,000 any one policy period with respect to liability included within the products hazard or completed operations hazard, including all claims, costs and expense regardless of the number of coverages involved. Any applicable deductible amount is to be included within the occurrence or aggregate limit.   Notwithstanding the above any limit or sublimit contained elsewhere herein, or added by endorsement shall apply but in no event shall any limit or sublimit contained elsewhere herein increase the occurrence or aggregate limit as stated above.

**(8)    DEDUCTIBLE:**

No claim shall be payable hereunder unless the aggregate liability for any one occurrence, including claims, costs and expense exceeds the sum of $10,000.00 and this sum shall be deducted from the amount payable hereunder for each occurrence, including claims, costs and expense.

**(9)    AUTOMATIC COVERAGE-NEWLY ACQUIRED ORGANIZATIONS (90 DAYS):**

The word "insured" shall include as Named Insured any organization which is acquired or formed by the Named Insured and over which the Named Insured maintains ownership or majority interest, other than a joint venture, provided this insurance does not apply to bodily injury, property damage, personal injury or advertising injury with respect to which such new organization under this policy is also an insured under  any other similar liability or indemnity policy or would be an insured under any such policy but for exhaustion of its limits or liability.   The insurance afforded hereby shall terminate  Ninety (90) days from the date any such organization is acquired or formed by the named insured and shall not increase this company's limit of liability as set forth in paragraph 7, Limit of Liability.

**(10)   CANCELLATION:**

This policy may be canceled by the Named Insured by surrender thereof to this company through the Named Insured's authorized agent or broker or by mailing to this company, through the Named Insured's authorized agent or broker, written notice stating when thereafter the cancellation shall be effective.

This policy may be canceled by this company by mailing to the named insured at the address shown in this policy, written notice stating when not less than **thirty (30) days** thereafter such cancellation shall be effective except for ten (10) **days** in the event of non-payment of premium.  Such notice sent to the Named Insured in care of the agent or broker who negotiated this policy shall have the same effect as if sent directly to the named insured.

2

# The St Paul

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the company shall be equivalent to mailing.

If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either practicable after cancellation becomes effected or as soon as practicable after cancellation becomes effective, but payment or tender or unearned premium is not a condition of cancellation .

**(11)   POLICY TERRITORY:**

United States of America and as per "Limited Worldwide Liability Coverage" clause as described on Paragraph IX of Section III Marine General Liability Additional Coverage.

**(12)   PERSONS INSURED:**

Each of the following is an insured under this insurance to the extent set forth below:

(A)   If the Named Insured is designated in the General Conditions as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor and the spouse of the Named Insured with respect to the conduct of such a business;

(B)   If the Named Insured is designated in the General Conditions is a partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(C)   If the Named Insured is designated in the General Conditions as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(D)   Any person (other than an employee of the Named Insured) or organization while acting as real estate manager for the Named Insured; and

(E)   With respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law:

1.   An employee of the Named Insured while operating any such equipment in the course of his employment, and

3

# The St Paul

2. Any other person while operating with the permission of the Named Insured any such equipment registered in the name of the Named Insured and any person or organization legally responsible for such operation, but only if there is no other valid or collectible insurance available, either on a primary or excess basis, to such person or organization;

Provided that no person or organization shall be an insured under this paragraph E with respect to:

3. Bodily injury to any fellow employee of such person injured in the course of his employment, or

4. Property damage to property owned by, rented to, in charge of or occupied by the Named Insured or the employer of any person described in subparagraph 2.

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a Named Insured;

(F) ADDITIONAL PERSONS INSURED:

As respects bodily injury, property damage and personal injury and advertising injury coverage under the provision *"Persons Insured"*, the following are added as insureds:

1. Spouse/Partnership - If the Named Insured is a partnership, the spouse of a partner but only with respect to the conduct of the business of the Named Insured;

2. Employee - Any employee (other than executive officers) of the Named Insured while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

   a) To bodily injury or personal injury to another employee of the Named Insured arising out of or in the course of his employment;

   b) To personal injury or advertising injury to the Named Insured or, if the Named Insured is a partnership or joint venture, any partner or member thereof, or the spouse of any of the foregoing;

4

The St Paul

c)   To property damage to property owned, occupied or used by, rented to, in the care, custody or control of or over which physical control is being exercised for any purpose by another employee of the Named Insured, or by the Named Insured or, if the Named Insured is a partnership or joint venture, by any partner or member thereof or by the spouse of any of the foregoing;

**(13)   DEFINITIONS:**

When used in this policy (including endorsements forming a part hereof):

(A)   *"Automobile"* means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

(B)   *"Bodily Injury"* means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

(C)   *"Collapse Hazard"* includes *"Structural Property Damage"* as defined herein and property damage to any other property at any time resulting therefrom. "Structural Property Damage" means the collapse of or structural injury to any building or structure due to (1) Grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work or (2) Moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) Arising out of operations performed for the named insured by independent contractors, or (2) Included within the completed operations hazard or the underground property damage hazard, or (3) For which liability is assumed by the insured under an incidental contract.

(D)   *"Completed Operations Hazard"* includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, part or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

1.   When all operations to be performed by or on behalf of the named insured under the contract have been completed.

2.   When all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

5

# The St Paul

3. When the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed;

The completed operations hazard does not include bodily injury or property damage arising out of:

4. Operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

5. The existence of tools, uninstalled equipment or abandoned or unused materials, or

6. Operations for which the classification stated in the policy or in the company's manual specifies *"including completed operations".*

(E) *"Elevator"* means any hoisting or lowering device to connect floors or landings whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery, but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls or a hold or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

(F) *"Explosion Hazard"* includes property damage arising out of blasting or explosion. The explosion hazard does not include property damage (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the named insured by independent contractors, or (3) included within the completed operations hazard or the underground property damage hazard, or (4) for which liability is assumed by the insured under an incidental contract;

(G) *"Incidental Contract"* means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement;

6

# The St Paul

(H)     *"Insured"* means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

(I)     *"Mobile Equipment"* means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types of forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills, concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

(J)     *"Named Insured"* means the person or organization named in the General Conditions of this policy;

(K)     *"Named Insured's Products"* means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "Named Insured's Products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

(L)     *"Occurrence"* means an accident, including continuous or repeated exposure in conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

The definition of occurrence includes any intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protection persons or property;

(M)     *"Policy Territory"* means (1) the United States of America, its territories or possessions, or Canada, or (2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation;

(N)     *"Products Hazard"* includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

7

# The St Paul

(O)  *"Property Damage"* means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

(P)  *"Underground Property Damage Hazard"* includes underground property damage as defined herein and property damage to any other property at any time resulting therefrom, "Underground Property Damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving.  The underground property damage hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard, or (3) for which liability is assumed by the insured under an incidental contract.

**(14)  CONDITIONS:**

(A)  *Financial Responsibility Laws*

When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law.  The insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

(B)  *Insured's Duties in the Event of Occurrence, Claim or Suit*

1)  In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereto, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company as soon as practicable;

If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative;

2)  The insured shall cooperate with the company and, upon the company's request assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy;

8

# The St Paul

and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

(C)   *Action Against Company*

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

(D)   *Other Insurance*

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

1. Contribution By Equal Shares: If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

9

CSHPDF - www.faxina.com

# The St Paul

2. Contribution By Limits: If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

(E)  *Subrogation*

In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

(F)  *Changes*

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

(G)  *Assignment*

Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon, if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, by only until the appointment and qualification of the legal representative.

(H)  *Declarations*

By acceptance of this policy, the named insured agrees that the statements in the application on file with this company are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

10

**The St Paul**

# SECTION II

# COVERAGE

(1)  The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

| | |
|---|---|
| **COVERAGE A** | **Bodily Injury** |
| **COVERAGE B** | **Property Damage** |

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claims or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments, settlements, or related expenses.

## EXCLUSIONS

(2)  The insurance afforded hereunder is subject to the following exclusions:

(A)  To liability assumed by the insured under any contract or agreement except an incidental contract, but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(B)  To bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

   1.  Any automobile or aircraft operated by any person in the course of his employment by any insured,

   2.  Any automobile or aircraft owned or operated by or rented or loaned to any insured, or

   but this exclusion does not apply to the parking of any automobile on premises owned by, rented to or controlled by the named insured or by the ways immediately adjoining, if such automobile is not owned by or rented or loaned to any insured;

(C)  To bodily injury or property damage arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

1

CVisPDF - www.fastio.com

**The St Paul**

(D)    To bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to any insured;

(E).    To bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

    1.    Any watercraft owned or operated by or rented or loaned to any insured, or

    2.    Any other watercraft operated by any person in the course of his employment by any insured;

but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured. Notwithstanding anything contained above, this exclusion does not apply to operations covered under <u>Section 4, Ship Repairer's Legal Liability Clauses and Section 5, Wharfinger's Liability Clauses</u> of this policy;

(F)    This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, radioactive substances, acids, alkalis, toxic irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water;

(G)    To bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to liability assumed by the insured under an incidental contract;

(H)    To bodily injury or property damage for which the insured or his indemnitee may be held liable:

    1.    As a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

    2.    If not so engaged, as an owner or lessor of premises used for such purposes; if such liability is imposed:

        a)    By, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

        b)    By reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

But part b of this exclusion (H) does not apply with respect to liability of the insured or his indemnitee as owner or lessor described in 2 above;

CMxPDF - www.twsio.com

# The St Paul

(I)  to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(J)  to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured under an incidental contract;

(K)  to property damage to:

    1.  property owned or occupied by or rented to the insured,

    2.  property used by the insured, or

    3.  property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

Notwithstanding anything contained above, this exclusion does not apply to operations covered under Section IV of this policy;

(L)  to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(M)  to loss of use of tangible property which has not been physically injured or destroyed resulting from:

    1.  a delay in or lack of performance by or on behalf of the named insured or any contract or agreement, or

    2.  the failure of the named insured's products of work performed by or on behalf of the named insured to meet the level of performance after such products or work have been put to use by any person or organization other than an insured.

but this exclusion does not apply to loss or use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(N)  to property damage to the named insured's products arising out of such products or any part of such products;

3

The St Paul

(O)  to property damage to work performed by or on behalf of the named insured arising out of the work of any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(P):  to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property to which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(Q)  to property damage included within:

1.      the explosion hazard Amp

2.      the collapse hazard Amp

3.      the underground property damage hazard;

(R)  for bodily injury or property damage, including loss of use thereof, arising out of the manufacturing, processing, handling, distribution, sale application or use of asbestos, or asbestos related products(s).

4

The **St Paul**

# SECTION III

# MARINE GENERAL LIABILITY

# ADDITIONAL COVERAGE

I.  **CONTRACTUAL LIABILITY COVERAGE**

    A.  The definition of <u>incidental contract</u> is extended to include any oral or written contract or agreement relating to the conduct of the Named Insured's business.

    B.  The insurance afforded with respect to liability assumed under an incidental contract is subject to the following <u>additional exclusions</u>:

        1.  To bodily injury or property damage for which the insured has assumed liability under any incidental contract, if such injury or damage occurred prior to the execution of the incidental contract.

        2.  If the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of the rendering of or the failure to render professional services by such insured, including:

            a.  The preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

            b.  Supervisory, inspection or engineering services.

        3.  If the indemnitee of the insured is an architect, engineer or surveyor, to the liability of the indemnitee, his agents or employees, arising out of:

            a.  The preparation of approval of maps, drawings, opinions reports, surveys, specifications, or

            b.  The giving of or the failure to give directions or instructions by the indemnitee, his agents or employees, provided such giving or failure to give is the primary cause of the bodily injury or property damage.

        4.  To any obligation for which the insured may be held liable in an action on a contract by a third party beneficiary for bodily injury or property damage arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project.

CNAPDF - www.texas.com

5.      To bodily injury or property damage arising out of construction or demolition operations, within 50 feet of any railroad property, and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; but this exclusion does not apply to sidetrack agreements.

C.      Section Two Bodily Injury and Property Damage Exclusions "2B, C, D and E, (applicable under Section Two), are not applicable under this Section Three (III), Contractual Liability Coverage.

D.      The following additional condition applies:

*Arbitration*
The company shall be entitled to exercise all of the insured's rights in the choice of arbitrators and in the conduct of any arbitration proceeding.

## II.      PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

A.      The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay damages because of personal injury or advertising injury to which the insurance applies sustained by any person or organization and arising out of the conduct of the named insured's business within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

B.      This insurance <u>does not</u> apply:

1.      To liability assumed by the insured under any contract or agreement;

2.      To personal injury or advertising injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge of consent of the insured;

3.      To personal injury or advertising injury arising out of a publication or utterance of a libel or slander, or a publication or utterance in violation or an individual's right of privacy. If the first injurious publication or utterance of the same or similar material by or on behalf of the named insured was made prior to the effective date of this insurance;

4.      To personal injury or advertising injury arising out of libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the insured with knowledge of the falsity thereof;

2

**The St Paul**

5.  To personal injury or advertising injury arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in the declarations of the policy as a named insured;

6.  To advertising injury arising out of:

    a.  Failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract, or

    b.  Infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised, or

    c.  Incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised

7.  With respect to advertising injury:

    a.  To any insured in the business of advertising, broadcasting, publishing or telecasting, or

    b.  To any injury arising out of any act committed by the insured with actual malice.

C.  Limit of Liability

Regardless of the number of (1) insureds hereunder, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of personal injury or advertising injury, the total limit of the company's liability under this coverage for all damages shall not exceed the limit of liability, as outlined in Section I, General Conditions Clause 7.

D.  Additional Definitions

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the name insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright title or slogan.

"Personal Injury" means injury arising out of one or more of the following offenses committed during the policy period:

1.  False arrest, detention, imprisonment, or malicious prosecution;

2.  Wrongful entry or eviction or other invasion of the right of private occupancy;

3

The St Paul

3.　　A publication or utterance:

　　　　a.　　Of a libel or slander or other defamatory or disparaging material, or

　　　　b.　　In violation of an individual's right of privacy; except publications or utterances in the course of or related in advertising broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

## III.　PREMISES MEDICAL PAYMENTS COVERAGE

The company will pay to or for each person who sustains bodily injury caused by accident all reasonable medical expense incurred within one year from the date of the accident on account of such bodily injury, provided such bodily injury arises out of (a) a condition in the insured premises, or (b) operations with respect to which the named insured is afforded coverage for bodily injury liability under the policy.

The insurance does not apply:

　　A.　　To bodily injury

　　　　1.　　Arising out of the ownership, maintenance, operation, use, loading or unloading of

　　　　　　a.　　Any automobile or aircraft owned or operated by or rented or loaned to any insured, or

　　　　　　b.　　Any other automobile or aircraft operated by any person in the course of his employment by any insured;

　　　　　　but this exclusion does not apply to the parking of an automobile on the insured premises, if such automobile is not owned by or rented or loaned to any insured;

　　　　2.　　Arising out of

　　　　　　a.　　The ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity, or

　　　　　　b.　　The operation or use of any snowmobile or trailer designed for use therewith;

　　　　　　　　(i)　　Owned or operated by or rented or loaned to any insured.

4

**The St Paul**

          (ii)     Operated by any person in the course of his employment by any insured;

3.     Arising out of the ownership, maintenance, operation, use, loading or unloading of

     a.     Any watercraft owned or operated by or rented or loaned to any insured, or

     b.     Any other watercraft operated by any person in the course of his employment by any insured but this exclusion does not apply to watercraft while ashore on the insured premises;

4.     Arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the named insured;

B.     To bodily injury

1.     Included within the completed operations hazard or the products hazard.

2.     Arising out of operations performed for the named insured by independent contractors other than:

     a.     Maintenance and repair of the insured premises, or

     b.     Structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

3.     Resulting from the selling, serving or giving of any alcoholic beverage

     a.     In violation of any statute, ordinance or regulation;

     b.     To a minor;

     c.     To a person under the influence of alcohol, or;

     d.     Which causes or contributes to the intoxication of any person.

     if the named insured is a person or organization engaged in the business of manufacturing, distribution, selling or serving alcoholic beverages, or if not so engaged is an owner or lessor of premises used to such purposes but only part (a) of this exclusion (b) (3) applies when the named insured is such an owner or lessor.

4.     Due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing.

5

**The St Paul**

C.   To bodily injury

    1.   To the named insured, any partner thereof, any tenant or other person regularly residing on the insured premises or any employee of any of the foregoing if the bodily injury arises out of and in the course of his employment therewith;

    2.   To any other tenant if the bodily injury occurs on that part of the insured premises rented from the named insured or to any employee of such a tenant if the bodily injury occurs on the tenant's part of the insured premises and arises out of and in the course of his employment for the tenant;

    3.   To any person while engaged in maintenance and repair of the insured premises or alteration, demolition or new construction at such premises;

    4.   To any person if any benefits for such bodily injury are payable or required to be provided under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

    5.   To any person practicing instructing or participating in any physical training sport, athletic activity or contest whether on a formal or informal basis;

    6.   If the named insured is a club, to any member of the named insured;

    7.   If the named insured is a hotel, motel, or tourist court, to any guest of the named insured.

D.   To any medical expense for services by the named insured, any employee thereof or any person or organization under contract to the named insured to provide such services.

*Limit Of Liability*

The limit of liability for Premises Medical Payments Coverage is $1,000.00 each person.   The limit of liability applicable to "each person" is the limit of the company's liability for all medical expense for bodily injury to any one person as the result of any one accident; but subject to the above provision respecting "each person", the total liability of the company under Premises Medical Payments Coverage for all medical expense for bodily injury to two or more persons as the result of any one accident shall not exceed the limit of bodily injury liability stated in the policy as applicable to "each occurrence".

When more than one medical payments coverage afforded by the policy applies to the loss, the company shall not be liable for more than the amount of the highest applicable limit of liability.

CWPDF - www.fesvia.com

# The St Paul

### Additional Definitions

When used herein:

"Insured Premises" means all premises owned by or rented to the named insured with respect to which the named insured is afforded coverage for bodily injury liability under this policy, and includes the ways immediately adjoining on land;

"Medical Expense" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral service.

### Additional Condition

Medical Reports:  Proof and Payment of Claim

As soon as practicable the insured person or someone on his behalf shall give to the company written proof of claim, under oath if required, and shall, after each request from the company, execute authorization to enable the company to obtain medical reports and copies of records.  The injured person shall submit to physical examination by physicians selected by the company when and as often as the company may reasonably require.  The company may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder to such injury.  Payment hereunder shall not constitute an admission of liability of any person or except hereunder, of the company.

Notwithstanding anything contained herein to the policy deductible as outlined in Section I Clause No. 8 of the General Conditions does not apply as respect to this section only.

## IV.    HOST LIQUOR LAW LIABILITY COVERAGE

Section II, exclusion (H) does not apply with respect to liability of the insured on his indemnitee arising out of the giving or serving of alcoholic beverages at functions incidental to the named insured's business, provided the named insured is not engaged in the business of manufacturing, distributing, selling, or serving of alcoholic beverages.

## V.    FIRE LEGAL LIABILITY COVERAGE - REAL PROPERTY

With respect to property damage to structures or portions thereof rented or leased to the named insured, including fixtures permanently attached thereto, if such property damage arises out of fire;

a.    All of the exclusions of the policy, other than the Nuclear Energy Liability Exclusion (Broad Form), are deleted and replaced by the following:

This insurance does not apply to liability assumed by the insured under any contract or agreement.

7

CShPDF - www.fawiw.com

# The St Paul

b.   The limit of property damage liability as respects this Fire Legal Liability Coverage-Real Property is $50,000. each occurrence.

c.   The Fire Legal Liability Coverage-Real Property shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof), available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage, and the Other Insurance Condition of the policy is amended accordingly.

## VI. BROAD FORM PROPERTY DAMAGE LIABILITY COVERAGE (INCLUDING COMPLETED OPERATIONS)

(A)   Section II, exclusions K and O are replaced by the following:

1.   To property owned or occupied by or rented to the insured, or, except with respect to the use of elevators, to property held by the insured for sale or entrusted to the insured for storage or safekeeping.

2.   Except with respect to liability under a written sidetrack agreement or the use of elevators:

a.   To property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured,

b.   To tools or equipment while being used by the insured in performing his operations,

c.   To property in the custody of the insured which is to be installed, erected or used in construction by the insured,

d.   To that particular part of any property, not on premises owned by or rented to the insured,

(i)    Upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out such operations, or

(ii)   Out of which any property damage arises, or

(iii)  The restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;

3.   With respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.

8

CimPDF - www.fastio.com

# The St Paul

B.   The Broad Form Property Damage Liability Coverage shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage and other Insurance Condition of the policy is amended accordingly.

## VII.   INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE

The definition of bodily injury is amended to include Incidental Medical Malpractice Injury.

Incidental Medical Malpractice Injury means injury arising out of the rendering of or failure to render during the policy period, the following services:

a.   Medical, surgical, dental x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith, or

b.   The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

This coverage does not apply to:

1.   Expenses incurred by the insured for first-aid to others at the time of an accident and the "Supplementary Payments" provision and the "Insured's Duties in the Event of Occurrence, Claim or Suit" Condition are amended accordingly;

2.   Any insured engaged in the business or occupation of providing any of the services described under VII (A) and (B) above;

3.   Injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under VII (A) and (B) above.

## VIII.   NON-OWNED WATERCRAFT LIABILITY COVERAGE

Section II Exclusion (E) does not apply to any watercraft herein provided such watercraft is neither owned by the name insured nor being used to carry persons or property for a charge.

Where the insured is, irrespective of this coverage, covered or protected against any loss or claim which would otherwise have been paid by the company under this endorsement, there shall be no contribution or participation by this company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise.

CVAPDF - www.fastio.com

**The St Paul**

## IX.   LIMITED WORLDWIDE LIABILITY COVERAGE

The definition of policy territory is amended to include the following:

Anywhere in the world with respect to bodily injury, property damage, personal injury or advertising injury arising out of the activities of any insured permanently domiciled in the United States of America though temporarily outside the United States of America, its territories and possessions or Canada, provided the original suit for damages because of any such injury or damage is brought within the United Sates of America, its territories or possessions or Canada.

Such insurance as is afforded above shall not apply:

      a.      To bodily injury or property damage included within the completed operations hazard or the products hazard;

      b.      To Premises Medical Payments Coverage.

## X.   IN REM ENDORSEMENT

It is agreed that any loss, otherwise covered by this policy, shall be considered covered thereby even though asserted by an action "In Rem" instead of action "In Personam" all limitations, exclusions and other provisions of the policy shall be applicable to this endorsement.

## XI.   TRAVELING WORKMEN ENDORSEMENT

This insurance is extended to cover work performed by persons employed by or on behalf of the Assured whenever they are aboard the vessel and/or drilling rig at sea or in any port for the purpose of effecting repairs and/or other work entrusted to the Assured notwithstanding that such persons may be signed on as members of the vessel's crew.

## XII.   BLANKET WAIVER/ADDITIONAL ASSUREDS ENDORSEMENT

It is agreed that the Underwriters waive their rights of subrogation against any person or company to whom the Named Assured is obligated by written contract to provide such waiver with respect to third party vessels while being repaired/constructed by the Named Assured.

It is further agreed that to the extent that the Named Assured is obligated by written contract to name any one person(s) or company as Additional Assured hereunder, the Underwriters agree that such person(s) or company shall be considered as additional Assureds but only with respect to and while said third party additional assured's party vessels are being repaired or constructed.

## XIII.   GULF OF MEXICO EXTENSION

It is agreed that the coverage afforded by this policy is extended to cover operations of the named insured in the Gulf of Mexico.

CMxPDF - www.fesine.com

# The St Paul

## XIV.   INDEPENDENT AND/OR SUB-CONTRACTORS ENDORSEMENT

It is agreed to include the liability of Independent and/or sub-contractors whilst doing work for the assured, subject to such work being normal and/or incidental to that of the assured.

Excluding liability to the employees and/or equipment of such independent and/or sub-contractors, but this exclusion shall not exclude liability for claims made against the Assured's principal by such Independent and/or subcontractors employees for which the assured is responsible under a normal contractual agreement made between the assured and his principal.

It is a condition of this insurance that the assured gives no waiver of rights of subrogation against such independent and/or sub-contractors; all receipts relating to such operations are declared and the premium as stated in the policy paid thereon; subject otherwise to all terms and conditions of the assured policy.

## XV.   RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

(A)   ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

(B)   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

(C)   any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

## XVI.   GAS-FREEING AND SIMILAR ACTIVITIES EXCLUSION CLAUSE

This policy will not indemnify the Assured for any loss, damage, liability or expense including legal fees as a result of gas-freeing operations, including stripping, blowing and other similar activities related to gas-freeing.

11

# The St Paul

## XVII.   LEASED WORKER EXCLUSION

Notwithstanding anything contained elsewhere herein to the contrary, including but not limited to Section I of the Marine General Liability Form, this coverage specifically excludes, does not provide coverage for and will not pay in any circumstance, in whole or in part, in contribution, in excess of or otherwise, any sum(s) for which the Insured is or may become liable including but not limited to, the duty and/or the costs of defense with respects to tort and/or contractual liability for bodily injury and/or personal injury to LEASED WORKERS.

Further, this exclusion modifies the duty to defend obligation hereunder. To the extent that underwriters hereon can prove that this exclusion applies, there will be no duty to defend the Named Insured(s) and/or Additional Named Insured(s) regardless of what allegations and/or pleadings are made by the LEASED WORKER.

The term "LEASED WORKER(S)" as used in this endorsement is defined as any WORKER(s) which is engaged through an EMPLOYEE LEASING ARRANGEMENT with the named insured.

A WORKER means any person in the course or scope of employment.

EMPLOYEE LEASING ARRANGEMENT means an arrangement under lease, contract or other agreement made orally or in writing whereby an EMPLOYEE PROVIDER FIRM provided and/or intended and/or intends to provide one or more LEASED WORKERS to named assured for any period of time regardless of duration.

EMPLOYER PROVIDER FIRM means an entity or any affiliates whose principal business is providing WORKERS, as distinct from providing non-personnel services, to another entity to perform activities in furtherance of the business, trade or profession of the other entity at the business premises of or at locations designated by the other entity.

Notwithstanding the above, this endorsement does not exclude properly insured subcontractors. Properly Insured subcontractors are considered to include temporary employee service contractors which are both defined as worker(s) who are furnished to an entity to substitute for a permanent worker on leave or to meet seasonal or short term work load conditions. Properly insured is defined as being a subscriber to the workers compensation act for the state in which they are domiciled and those states in which they do business and/or any applicable federal workers compensation acts and liability insurance with limits at least equal to the limits of this policy. It is further agreed that said subcontractors shall require their underwriters to name the named insured herein as an additional insured and shall waive all rights of subrogation against the named insured herein and its principal. For the purposes of this endorsement the "principal" is defined as any party for whom the named insured is performing work.

CMFPDF - www.fenito.com

To be attached to and form a part of Policy No. _____ of the _____ 1

_____ 2

The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the 3
er being hereby waived, except provisions required by law to be inserted in the policy. 4

This Policy insures _____ 5

_____ 6

_____ (hereinafter referred to as the Assured). 7

Policy Period: From _____ to _____ 12:01 A.M. Standard Time at the Assured's 8
premises as stated in Clause 3. 9

In consideration of the payment of premium as hereinafter provided, and subject to the limits of liability, exclusions, conditions and other terms 10
of this Policy, this Company agrees to pay on behalf of the Assured all sums which the Assured, as Ship Repairer, shall become legally obligated 11
to pay: 12

A. By reason of the liabilities imposed upon the Assured by law for physical loss of or damage to watercraft and their equipment, cargo, or 13
   other interests on board, occurring only while such watercraft are in the care, custody or control of the Insured for the purpose of repair or 14
   alteration at _____ 15

   _____ 16
   or while such watercraft are being moved via inland waters for a distance not in excess of _____ miles in connection with repairs or 17
   alteration; 18

B. By reason of the liabilities imposed upon the Insured by law as damages because of property damage caused by a watercraft covered under "A" 19
   above while in the care, custody, or control of the Assured and being navigated or operated away from premises described in "A" above 20
   within permitted waters by an employee or employees of the Assured or in tow of a tug not owned by or demise chartered to the Assured. 21
   It is a condition of this Clause 3B that any employee of the Assured engaged in the navigation of a watercraft described herein shall possess 22
   such license as is required by the United States Coast Guard or any other applicable regulatory authority to perform the duties being carried 23
   out by said employee; 24

C. For the cost of defending any suit against the Assured on any claim based on a liability or an alleged liability of the Assured covered by this 25
   insurance if the amount of the claim hereunder exceeds the amount deductible under this Policy, but this Company shall not be liable for the cost 26
   or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of this Company. This 27
   Company, however, reserves the right to conduct the defense of any actions or suits at its own expense. The cost and expense of prosecuting 28
   any claim in which the Assured shall have an interest by subrogation or otherwise, shall be divided between the Assured and this Company, 29
   proportionately to the amounts which they would be entitled to receive, respectively, if the suit should be successful. 30

The maximum liability of this Company on account of any one occurrence shall be: 31

A. $_____ with respect to each watercraft including its equipment, cargo, and other interests on board covered by Clause 3A; 32

B. $_____ any one occurrence with respect to liability covered by Clause 3B; 33

C. The legal costs, fees and expenses covered by Clause 3C. 34
The maximum aggregate liability of this Company on account of any one occurrence with respect to the coverage afforded under Sections 4 A, 35
B and C above shall be $_____ 36

The Assured, by acceptance of this Policy, agrees to keep an accurate record of all Gross Charges for operations covered under the terms and 37
conditions of this Policy, which record shall be open to examination by representatives of this Company at all times during business hours, dur- 38
ing the term of this Policy or thereafter, and further agrees to report to this Company on or before the last day of each month the total amount 39
thereof (collected and uncollected) for the preceding month or such period of time as is within the term of this Policy: the earned premium 40
hereunder to be computed thereon at the rate of $_____ per each $100.00 and applied against the Deposit Premium until same is 41
exhausted, following which all further earned premium shall be due and payable to the Company at time of filing the report on which the earned 42
premium is due: and any unearned premium, being the amount by which the Deposit Premium exceeds the earned premium, shall be refunded 43
upon expiration or cancellation of this Policy. This Company shall have the right of setoff against the claims payable under this Policy of any 44
premiums due hereunder. It is agreed that, except in the event of cancellation of this Policy by this Company, the Minimum Premium hereunder 45
shall be $_____ The Deposit Premium, payable upon attachment of this Policy, shall be $_____ 46

. NOTWITHSTANDING THE FOREGOING, it is hereby expressly understood and agreed that this Policy does not cover against nor shall any liability 47
  attach hereunder for: 48

A. The first $_____ of any claim or claims, including legal fees and expenses, arising out of the same occurrence and incurred against 49
   hereunder; 50

B. Death or personal injury; 51

C. Any liability assumed under contract or otherwise in extension of the liability which would have been imposed upon the Assured by law in the 52
   absence of contract; 53

D. Loss, damage or expense arising in connection with work on any vessel which has carried flammable or combustible liquid in bulk as fuel 54
   or cargo or any vessel which has carried flammable compressed gas in bulk, unless such work is done in accordance with the requirements of the 55
   rules and regulations of the National Fire Protection Association applicable to such work; 56

E. Demurrage, loss of time, loss of freight, loss of charter and/or similar and/or substituted expenses; 57

F. Loss, damage or expense which may be recoverable under any other insurance inuring to the benefit of the Assured except as in excess over 58
   and above the amount recoverable thereunder; 59

: 9 3 Pri ' ' U.S '

# The St Paul

## SECTION V

# *WHARFINGERS LIABILITY CLAUSES*

## *(BROAD FORM)*

**ASSURED:**          BORDER SHIPYARDS, INC.

**ST. PAUL**
**POLICY NO.:**        342ZT5561

**TERM:**             April 28, 1998 to April 28, 1999

**LOCATION(S):**      400 'D' Road
                      Brownsville, Texas 78320

**POLICY LIMIT:**     $1,000,000

**DEDUCTIBLE:**       $10,000

**PREMIUM:**          $ 12,000 Minimum & Deposit

**PREMIUM RATES:**    Per page 1 of Section I

**REPORTING**
**BASIS:**            Per page 1 of Section I

# The St Paul

## TERMS AND CONDITIONS

### *I.* *COVERAGE*

This policy covers the legal liability of the Assured as Wharfingers (whether arising from negligence or otherwise) for:

1.  Loss, damage and/or expense, including demurrage and loss of use, to vessels and/or barges, their apparel or equipment, their freight and cargoes and other interests on board (but excluding wear and tear), the property of others (including the cost or expense of removal of wreck of such property provided said wreck situation was brought about as a result of an accident or occurrence arising during the term of this insurance), whilst docked and/or moored and/or tied up at the Assured's docks and/or landing and/or fleeting sites at the locations named above or whilst approaching or departing therefrom.

2.  Death or injury to any persons (except as excluded herein) and loss, damage and/or expense to other vessels and/or barges, their apparel or equipment, their freights and cargoes and other interests on board, and to cargoes, wharves, piers, docks, jetties, bridges, lighters, elevators, cars, carfloats or any other property or thing (not owned by or chartered to the Assured), resulting from or growing out of the Assured's operation as a Wharfinger.

### *II.* *LIMIT OF LIABILITY*

The liability of underwriters hereunder is limited to the amount shown above as the Policy Limit per any one accident, casualty or occurrence or series of accidents, casualties or occurrences arising directly or indirectly, from the same cause, incident or event.

### *III.* *ATTACHMENT*

This insurance attaches from the moment the said vessels and/or barges become at the risk of the Assured at the locations specified herein and covers continuously thereafter, during the term of this insurance, until removed from said locations of until no longer at the risk of the Assured, whichever shall first occur. However, in the event of temporary removal of a barge and/or vessel to within five (5) miles of the locations specified herein in an emergency or other unusual situation and provided that the Assured remains in the position of custodian or bailee of such barge and/or vessel, this policy will continue to cover the Assured's liabilities.

# The St Paul

## IV.  DEDUCTIBLE

No claim shall be payable under this policy unless the aggregate liability of the Assured arising out of the same accident or occurrence and insured hereunder, plus any costs and expenses incurred in investigating and defending said accident or occurrence, exceeds the amount of the deductible shown above and this sum shall be deducted from the amount payable hereunder on account of liability arising from each such accident or occurrence.

## V.  PREMIUM

In consideration of the payment of the annual minimum and deposit premium shown above this policy provides Wharfinger's Liability insurance as defined herein.  The Assured, by the acceptance of this policy, agrees to keep a complete and accurate record of vessels and/or barges in respect of which insurance is provided by this policy and to report to the Company at the end of each *Reporting Basis* period shown above, the number of vessel/barge days (a vessel/barge day being defined as a period of 24 consecutive hours or part thereof during which a vessel and/or barge is at risk at the Assured's facility described above during that period).  Premium shall be assessed at the rates shown above and applied to the minimum and deposit until such deposit is exhausted.  Thereafter additional premium, if any, shall be payable as invoiced upon reporting.

## VI.  EXCLUSIONS

Notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that this insurance does not cover against nor shall any liability attach hereunder for loss, damage, injury or expenses arising from:

1.  Liability assumed under contract, express or implied, or otherwise in extension of the liability imposed upon the Assured by law.

2.  Death, personal injury, sickness, maintenance, cure or wages of any employee of the Assured or the Assured's sub-contractors or any person in the event that the occurrence takes place on shoreside premises owned or leased or used by the Assured.

3.  Vessel repair, construction, conversion or gas-freeing performed by the Assured.

3

# The St Paul

4. Loss, damage or expense resulting from loading or unloading of vessels and/or barges.

5. Loss or damage to cargo during loading, unloading or handling.

6. Loss, damage or expense which may be recoverable under any other insurance in the Assured's favor. *(see also* OTHER INSURANCE *herein)*.

7. Loss, damage or expense caused by or attributable to vessels owned by or chartered to the Assured.

8. Loss or damage to property owned by or leased or chartered to the Assured or utilized by the Assured in its business.

9. Loss or damage to vessels or craft stored ashore.

10. Liability arising directly or indirectly in consequence of the actual or potential discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, petroleum products or derivatives, liquids or gases, waste materials, sewerage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere or any water course or body of water except as provided for under POLLUTION COVERAGE herein.

11. Fines or penalties of any kind or nature whatsoever levied against the Assured.

12. Loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt threat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but the foregoing shall not exclude collision, explosion or contact with any fixed or floating object (other than a torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power, and for the purpose of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power; also warranted free, whether in time of peace or war, from all loss or damage caused by any weapon of war employing atomic fission or radioactive force. Further warranted free from the consequences of civil war, revolution, rebellion, insurrection or civil strife arising therefrom, or piracy.

4

# The St Paul

13. Any loss or damage caused by or resulting from strikes, lock-outs, labor disturbances, riots, civil commotions or the acts of any person or persons taking part in any such occurrence or disorder.

## VII. *POLLUTION COVERAGE*

### (A)   WITH RESPECT TO POLLUTION EMANATING FROM WATERCRAFT:

This policy, subject otherwise to all its terms, limitations and conditions is extended to cover any loss, damage, cost, liability or expense the Assured, as Wharfingers, shall become liable to pay and shall pay in consequence of the actual or potential discharge, emission, spillage or leak upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever; provided, however, that notwithstanding anything to the contrary contained herein, the Company shall not be liable to indemnify the Assured:

1. For any loss, damage, cost, liability or expense paid or incurred in consequence of any such actual or potential discharge, emission, spillage or leakage unless proximately caused by fault on the part of the Assured.

2. For any loss, damage, liability or expense incurred by the Assured, under the provisions of any federal, state or local legislation regulating or controlling the discharge, emission, spillage or leakage of oil or any other substance into navigable waters or elsewhere and/or the removal of or liability for such discharge, emission, spillage or leakage. . The phrase "federal, state or local legislation" shall include laws or regulations of any foreign nation or political subdivision thereof, or of the District of Columbia, the Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the Virgin Islands and the Trust Territory of the Pacific Islands.

3. For any loss, damage, liability or expense which would have been payable according to the terms of a Policy written on the current form issued by the Water Quality Insurance Syndicate.

4. For any fine or penalty arising out of the actual or potential discharge, emission, spillage, or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

5

# The St Paul

**(B)    WITH RESPECT TO POLLUTION EMANATING FROM ANY OTHER SOURCE:**

This insurance shall be free from liability or expense arising directly or indirectly in consequence of the actual or potential dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalies, petroleum products or derivatives, liquids or gases, waste materials, sewerage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere or any watercourse or body of water; but this exclusion does no apply if such discharge, dispersal, release or escape is sudden and accidental.

*This insurance afforded by this section shall not increase the limit of the Company's liability under the policy with respect to any one accident or occurrence, which shall be the Policy Limit.*

## VIII.    REMOVAL OF WRECK

With respect to the Assured's liability for the cost of expense of removal of wreck it is agreed that such cost or expense shall be reduced by the proceeds of any salvage that may inure to the benefit of the Assured.  It is also a condition of this coverage that every reasonable effort shall be made to have the U.S. Army Corps of Engineers assume the responsibility and expense for removal of such wreck before claim is made hereunder.

## IX.    OTHER LOCATIONS

In addition to the locations named above this insurance is extended to automatically hold the assured covered in respect to additional docks, landings or fleeting sites bought, leased or otherwise acquired or taken over the Assured for Wharfingers operations after inception of this insurance, provided prompt notice is given to the Company and subject to payment of additional premium as may be required.  In the event that notice as above is not given to the Company, within 30 days of the acquisition of the additional location, this extension becomes null and void.

6

# The St Paul

## X.   SUE AND LABOR

In case of loss or damage, for which the Assured may be liable as a Wharfinger, it shall be lawful and necessary for the Assured, his or their factors, servants and assigns, to sue, labor and travel for , in and about the defense, safeguard and recovery of the lost or damaged property, or any part thereof without prejudice to this insurance. The expenses properly incurred shall be borne by the Assured and this Company proportionately to the extent of their respective interests. It is especially agreed that any expense or charge incurred by the Assured in minimizing, or attempting to minimize a claim shall not be deemed to be an admission of liability by the Assured and shall not invalidate any coverage provided by this policy, the Company to reimburse the Assured for any such expenses or charges, if incurred.

## XI.   NOTICE OF LOSS

In the event of any occurrence which may give rise to a claim under this policy, immediate notice shall be given to the Company and every process, pleading and paper of any kind relating to such occurrence shall be forwarded promptly to the Company.

Further, whenever required by the Company, the Assured shall aid in securing information, evidence, obtaining of witnesses and co-operate with the Company in all matters which the Company may deem necessary in the defense of any claim or suit or appeal from any judgment in respect to a claim under this policy.

## XII.   LEGAL COSTS

In the event of the liability of the Assured being contested, with the consent of this Company in writing, this insurance is also to pay its proportion of the costs which the Assured shall thereby incur and be compelled to pay.

## XIII.   ATTORNEYS

The Company shall have the option of designating the attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and Third Parties concerning any Claims, Loss or Interest covered by this Insurance, and the Company shall have the direction of such litigation or negotiations.

# The St Paul

### XIV.   ADMISSION OF LIABILITY

The insurance hereunder shall be voidable, in respect of any occurrence in the event the Assured shall make or shall have made any admission of liability either before or after such occurrence or in the event of the Assured shall interfere in any negotiations of the Company for settlement or in any legal proceedings in respect of any claim for which the Company is or may be liable under this insurance.

### XV.   SUBROGATION

Upon payment of any loss or damage the Company is to be subrogated to all the rights of the Assured to the extent of such payments.

### XVI.   TIME OF ACTION

No action shall lie against the Company for the payment of any claim under this insurance until the amount of damage for which the Assured is liable has been determined either by a   final judgment against the Assured or by agreement between the Assured and the claimant with the consent of the Company nor, in any event, unless such action is brought against the Company *within one year* after final judgment is entered in said litigation, provided however, that where such limitation of time is prohibited by the laws of the State wherein this insurance is issued.  Then and in that event, no suit or action under this insurance shall be sustainable unless commenced within the shortest limitation permitted under the laws of such state.

### XVII.   OTHER INSURANCE

In the event there is other insurance covering the same loss, this insurance shall be considered as excess insurance and shall not apply or contribute to the payment of any loss until the amount collectible from all such specific insurance shall have been exhausted and then shall be liable, subject to the terms and conditions of this policy, only for the difference between the amount collectible from such other insurance and the total liability of the Assured. But notwithstanding anything contained herein to the contrary this insurance excludes all losses recoverable under the standard form or Comprehensive General Liability policy.

8

# The St Paul

## XVIII.    _CANCELLATION_

This policy may be cancelled upon request of the Assured in which case any earned premium will be due and payable. This policy may be cancelled by the Company with ten (10) days written notice to the Assured, such cancellation to be deemed accomplished upon the lapse of ten (10) days from the date of mailing.

ATTACHED TO AND FORMING A PART OF POLICY NO. 342ZT5561

OF THE **ST. PAUL MERCURY INSURANCE COMPANY**

ISSUED TO: BORDER SHIPYARDS, INC.

# EXHIBIT "B-2"

CitiPDF – www.fastio.com

Case 1:99-cv-00019   Document 17   Filed in TXSD on 03/22/2001   Page 49 of 67

CAUSE NO. 2000-02-758-D

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY | § | IN THE DISTRICT COURT OF |
| AND AS REPRESENTATIVE | § | |
| OF THE ESTATE OF ERNESTO | § | |
| LOPEZ, DECEASED, AND AS NEXT | § | |
| FRIEND OF PERLA IVON LOPEZ | § | |
| AND ERNESTO LOPEZ, MINORS | § | |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, WILLIAM | § | |
| KENON, RUBEN BARRERA, AND | § | |
| CARL GAYMAN, RICK RIVERA, | § | |
| INDIVIDUALLY, AND DBA | § | |
| LA NEGRITA | § | 103rd JUDICIAL DISTRICT |

FILED 12:30 O'CLOCK P M
AURORA DE LA GARZA DIST. CLERK

FEB 16 2000

DISTRICT COURT OF CAMERON COUNTY, TEXAS
JANIE WOLFE DEPUTY

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, PETRA LOPEZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE

ESTATE OF ERNESTO LOPEZ, DECEASED, AND AS NEXT FRIEND OF PERLA IVON

LOPEZ AND ERNESTO LOPEZ, MINORS, Plaintiffs and complaining of Defendants, files this their

Plaintiffs' Original Petition, and for cause of action would respectfully show the court as follows:

I.

Plaintiffs intend to conduct Discovery under Level 3, pursuant to 190.1 and 190.3 of the

Texas Rules of Civil Procedure.

II.

PARTIES

Plaintiffs are all of the beneficiaries entitled to bring this action pursuant to §71.004 of the

Texas Civil Practices and Remedies Code. Their names and relationship to ERNESTO LOPEZ,

1

Decedent (hereinafter referred to as "Decedent") are:

| NAME | RELATIONSHIP TO DECEDENT |
|------|--------------------------|
| Petra Lopez | Spouse |
| Perla Ivon Lopez | Minor Daughter |
| Ernesto Lopez | Minor Son |

Defendant, BORDER SHIPYARDS, INC., is a Texas corporation duly organized and existing and doing business in the State of Texas and may be served with citation by serving its registered agent, JOHN P. MARREN, 914 W. Price Road, Brownsville, Texas 78520. Service is requested at this time.

Defendant, JORGE GONZALEZ, is a resident of Cameron County, the State of Texas, during all relevant times hereto. Defendant may be served wherever he may be found.

Defendant, WILLIAM KENON, is a resident of Cameron County, the State of Texas, during all relevant times hereto. Defendant may be served wherever he may be found.

Defendant, RUBEN BARRERA, is a resident of Cameron County, the State of Texas, during all relevant times hereto. Defendant may be served wherever he may be found.

Defendant, CARL GAYMAN, is a resident of Cameron County, the State of Texas, during all relevant times hereto. Defendant may be served wherever he may be found.

Defendant, RICK RIVERA, INDIVIDUALLY , DBA LA NEGRITA, is a resident of Cameron County, the State of Texas, during all relevant times hereto. Defendant may be served wherever he may be found.

2

## II.

### VENUE

Venue of this lawsuit is proper Cameron County, Texas for the reasons that this accident accrued in Cameron County and Defendant is doing business in Cameron County, Texas at all relevant times hereto.

## III.

### FACTS

On or about May 11, 1998, ERNESTO LOPEZ, Decedent while in the course and scope of his employment as a welder with Defendant BORDER SHIPYARDS, INC., was asked by said Defendant, to weld the propeller shaft on a ship with a shoddy and defective arc welder, and without the assistance of a helper. Said arc welder was a Lincoln Arc Welder, Model No. AG 250, Code 6930, Serial No. ACA23166. The condition of the equipment provided by said Defendant to Mr. Lopez was such that the metal element on the handle was exposed due to the plastic sheath having been broken off. Additionally, although the appropriate procedure to weld a propeller shaft is to cut an opening in the ship's hull to access the propeller from below, said Defendant forced Mr. Lopez to work on the propeller shaft from an unsafe location, which forced him to have to hold the propeller shaft as he welded it. Unknown to Mr. Lopez, the M/V Negrita and its owners, masters and crew, failed to disclose that in fact the vessel was in a dangerous and unsafe condition in that, its vessel's systems including the shaft, were not properly grounded. Additionally, the shaft did not have a proper grounding wire connected to the vessel's copper grounding strip and/or such connection was worn to such a degree that such grounding became ineffective and thus Mr. Lopez became the bridge of the circuit created during his work/welding activities.

3

Such hazardous acts or conditions by Defendant Rick Rivera d/b/a The M/V Negrita, its agents, masters, servants and employees, were a proximate cause of the serious, permanent and deadly injuries suffered by Mr. Lopez and damages incurred by Plaintiffs, which these Defendants knew, or, in the exercise of ordinary care, should have known existed and, as such, created a likelihood of someone being, injured, burned, electrocuted and/or killed, as in fact happened in this case.

Upon information and belief, Defendant Border Shipyards, Inc. and Jorge Gonzalez, William Kenon, Ruben Barrera, and Carl Gayman, operate a yard engaged in hauling out vessels and performing inspection, maintenance, repairs and other work upon them. Prior to May 11, 1998, Border Shipyards, Inc. hauled out the M/V Negrita and performed work on her, including but not limited to the inspection, repair, attachment and/or testing of the electrical grounding systems of the vessel including its shaft. During prior repairs, Border Shipyards inspected and tested, or in the exercise of reasonable care, should have inspected and tested, the electrical and/or grounding systems to verify they were in reasonably safe conditions and in good working order.

Defendant Border Shipyards, Inc. was negligent in its repair, installation, maintenance, and/or inspection and testing of the electrical and/or grounding systems of the M/V Negrita. Defendant Border Shipyards  negligently installed and/or failed to warn against a dangerous electrical and/or grounding system of such vessel. Defendant Border Shipyard was aware, or in the exercise of reasonable care should have been aware, of the dangerous condition of the electrical and/or grounding system of the M/V Negrita.

Upon further information and belief and based upon civil proceedings filed by Defendant Border Shipyards, Inc., Jorge Gonzalez, Carl "Joe" Gayman, Ruben Barrera and Buster Harris, and

4

for William E. Kennon in cause number 99-01-35-E, originally pending in the 357th Judicial District Court of Cameron County, Texas, there existed incidental, oral and/or written contracts between Defendant Border Shipyard, Inc. and Rick Rivera d/b/a The M/V "Negrita, pertaining to leased premises and/or rental of property for the space used by the M/V Negrita. The oral and/or written contracts also proscribed that any claim of injury or death on board the M/V Negrita by any employee, agent, servant, invitee and/or trespasser would be paid for by Defendant Border Shipyards, Inc., under indemnity and agreements to hold harmless claims made against or between these Defendants. Such incidental contracts were entered into prior to Mr. Lopez's, injury and death and prior to Plaintiffs being damaged as a result of such injury or death.

IV.

## NON-SUBSCRIBER

Defendant, BORDER SHIPYARDS was not a subscriber, and thus not covered by any worker's compensation scheme or law, at the time ERNESTO LOPEZ was injured and killed while in the course and scope of his employment with Defendant, and is, therefore, denied any and all defenses under common law with regard to the Plaintiffs' causes of action.

V.

## ALTER EGO

Defendants JORGE GONZALEZ, WILLIAM KENON, RUBEN BARRERA, and CARL GAYMAN, are the sole shareholders of this closely held corporation known as BORDER SHIPYARDS, INC., and further, these Defendants have knowingly, willingly, and with intent, operated the business known as BORDER SHIPYARDS, INC. was insufficient amount of capital, and that there is such a unity between said corporation and each individual, that the separateness of

5

the corporation has ceased, and that holding only the corporation liable for the death of Plaintiff Decedent, would result in a severe injustice, would sanction fraud and/or promote injustice. Furthermore, Plaintiffs assert the doctrine of alter ego as a result of said corporate fiction when said corporation is organized and operated as a mere tool or business conduit of said individuals. Furthermore, Plaintiffs assert that said corporation, in its current state of financial weakness and/or financial inability to respond to claims, is no less than a shell and perpetrates fraud upon this Court. Moreover, Plaintiffs assert that the activities for which said corporation operates, has created an extreme risk of harm upon the corporation's employees, and, said corporation has not reasonably calculated its finances to claims in light of the nature and risk and of the business, and as such, the piercing of the corporate veil and holding the individual shareholders liable for the tort liability of the corporation is appropriate under these circumstances. Therefore, for purposes of these pleadings, Plaintiffs allege that each such Defendant, including Defendant BORDER SHIPYARDS, INC. are an alter ego, and/or piercing of the corporate veil and holding the individual shareholders liable for the debts, obligations, and liabilities of said corporation is afforded to the plaintiffs under these tort circumstances.

## VI.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

Plaintiffs allege that Defendants, acting through their servants, agents and/or employees were negligent, jointly and severally, in the following particulars:

1.      Failing to implement and enforce safety policies regarding working under dangerous conditions, such as the policy to weld on propeller shafts only after the hull has been opened to have

proper access to the shaft;

2.     Failing to train its agents, servants, and/or employees on proper safety procedure for working under dangerous conditions;

3.     Failing to provide its agents, servants and/or employees with adequate equipment, including arc welders that are fully insulated;

4.     Failing to provide safety equipment such as insulated welding gloves to its agents, servants and/or employees;

5.     Failing to supervise its agents, servants, and/or employees to ensure that their safety was properly guarded;

6.     Failing to warn ERNESTO LOPEZ, Decedent of the dangerous condition and/or hazards known to Defendant;

7.     Failing to provide tools and equipment that were safe and free from defects or defective condition such as to create a danger of electrocution;

8.     Failing to maintain a safe place to work;

9.     Failing to provide adequate assistance to the Decedent;

10.    In failing to exercise that degree of care as would have been exercised by a person of ordinary prudence under the same or similar circumstances.

11.    In failing to maintain the M/V La Negrita and its electrical grounding system in a reasonably safe condition;

12.    In failing to perform work in a good and workmanlike manner;

13.    In failing to install a proper and safe electrical grounding system;

7

14.     In failing to properly instruct employees as to the proper use of equipment and tools and the proper inspection, maintenance, testing and repair of vessels including but not limited to their electrical grounding systems;

15.     In failing to eliminate unsafe methods of operation, in particular where it knew or should have known of unsafe methods;

16.     In failing to maintain the electrical grounding systems in good condition and repair;

17.     In failing to use ordinary care in installing, working on, inspecting and testing the electrical grounding system; and,

18.     In failing to follow standard marine engineering practices.

Plaintiffs allege that each and every of the foregoing acts and/or omissions in combination or singularly on the part of the Defendants constituted negligence which was and is a direct and proximate result of the injuries and damages sustained by the Plaintiffs.

## VI.

## SECOND CAUSE OF ACTION

## MARITIME VIOLATIONS

Plaintiffs assert a claim and causes of action against Defendant Rick Rivera and the M/V La Negrita under various Maritime laws and statutes, as well as the common and statutory laws of the State of Texas, and that Defendant M/V La Negrita is liable for the fatal injuries sustained by Plaintiffs' decedent.

## VII.

## DECEDENT'S CONSCIOUS PAIN AND SUFFERING

As a direct and proximate result of the negligence of Defendants, Decedent suffered great

8

electrical shock to the vital organs of his body. Decedent's entire body was burned internally by electricity, and Decedent suffered great shock to his entire nervous system. The Decedent suffered great pain and suffering at the time of his electrocution.

## VIII.

## DEATH OF DECEDENT

Decedent died on May 11, 1998, as a proximate result of the electrical shock and injuries inflicted upon him by the negligence and carelessness of the Defendants, as described above.

## IX.

## DAMAGES

Decedent was forty-three (43) years of age at the time of his death. He was in good health, with a reasonable life expectancy of at least 32 more years. Decedent was married to Plaintiff PETRA LOPEZ. Of the marriage, two (2) children were born, being those named above and joined as Plaintiffs. Plaintiff suffered serious and permanent bodily injuries as a direct result of the burns proximately cause by the hazardous condition on board the M/V La Negrita which Defendant, his agents, servants, or employees knew, or in the exercise of ordinary care, should have known existed. Plaintiff further alleges that Defendant, his agents, servants, or employees negligently caused and/or negligently permitted such condition to exist and negligently failed to warn Plaintiff of the hazardous condition of the electrical grounding systems, despite the fact that Defendant, his agents, servants, or employees knew, or in the exercise of ordinary care, should have known of the existence of the condition and that there was a likelihood of someone being injured as happened to Plaintiff.

During his lifetime, Decedent was industrious and energetic, a good father, husband and provider. He performed numerous and usual tasks in and about the family residence, and gave

9

advice, counsel, comfort, care and protection to his wife and family. In all reasonable probability, he would have continued to do so, providing for and supporting his wife for the remainder of her natural life and caring for and supporting his children at least until they attained adulthood, and probably thereafter, as he planned to provide each with all the costs incident of attending college in accordance with their desires and goals in life. At his death, Decedent possessed assets and accumulated savings from his past earnings, which, in all reasonable probability, he would have continued to accumulate for the remainder of his natural life.

As a result of the untimely death of Decedent, PETRA LOPEZ, suffered pecuniary loss from the death of her husband, ERNESTO LOPEZ, including losses of care, maintenance, support, services, advice, counsel, and contributions of a pecuniary value that she would, in reasonable probability, have received from her husband during his lifetime had he lived. In addition, she has suffered loss of consortium and damage to the husband-wife relationship, including loss of affection, solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and felicity necessary to a successful marriage. She has suffered mental anguish, grief, and sorrow as a result of the death of her husband, ERNESTO LOPEZ, and is likely to continue to suffer for a long time in the future. For these losses, PETRA LOPEZ seeks damages within the minimum jurisdictional limits of the Court.

PERLA IVON LOPEZ and ERNESTO LOPEZ have suffered pecuniary loss from the death of their father, ERNEST LOPEZ, including losses of care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that they would, in all reasonable probability, have received from their father during his lifetime had he lived. They have suffered additional losses by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace,

10

comfort, companionship, society, emotional support, and happiness. They have suffered severe mental depression and anguish, grief and sorrow as a result of the death of their father, ERNESTO LOPEZ, and are likely to continue to suffer for a long time in the future. For these losses, PERLA IVON LOPEZ and ERNESTO LOPEZ seek damages in excess of the minimum jurisdictional limits of the Court.

Plaintiffs have suffered a loss of inheritance that, in all reasonable probability, Decedent would have left to them by will or inheritance. For these losses, PERLA IVON LOPEZ and ERNESTO LOPEZ seek damages in a sum within the jurisdictional limits of the Court.

## X.

### GROSS NEGLIGENCE

The negligence of the Defendants as aforesaid was of such a character as to make Defendants guilty of gross negligence and malice. The conduct of the Defendants was in heedless and reckless disregard of the rights of plaintiffs and involved such an entire want of care as to indicate that it was the result of conscious indifference to the rights, welfare, and safety of Decedent.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendants be cited to appear and answer, and that on final trial, Plaintiffs have judgment against these Defendants, jointly and severally, for:

1.  Damages in the amount of SIX MILLION DOLLARS ($6,000,000) in recompense for the wrongful death of ERNEST LOPEZ, husband, father, son and for the loss of affection and companionship of the Decedent, as described above, and the loss of the pecuniary support from the Decedent, as described above, together with prejudgment interest from May 11, 1998, as provided by law, and post-judgment damages as provided by law from the date of judgment until paid;

11

CISAPDF - www.fenno.com

2.    Damages in amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000) or within the jurisdictional limits of this Court, in recompense for the loss of pecuniary support from the Decedent, as described above, for as many years as the Decedent would likely have lived in the future, together with pre-judgment interest thereon from May 11, 1998, as provided by law, and post-judgment damages as provided by law from the date of judgment until paid;

3.    Damages in the amount of FOUR MILLION DOLLARS ($4,000,000.00) or within the jurisdictional limits of this Court, to punish the acts and/or omissions of Defendants for the willful, wanton, with malice and gross negligent conduct that resulted in the death of Decedent, and to set these Defendants as an example to society;

4.    Costs of suit; and,

5.    Any and all such other relief to which Plaintiffs may show themselves justly entitled.

Respectfully submitted this the ____16th____ day of February, 2000.

> GUERRA & MOORE, L.L.P.
> 4201 N. McColl Road
> McAllen, Texas 78504
> Telephone No. (956) 618-3000
> Telecopier No. (956) 686-4200
>
> BY: _____
>       /Carlos L. Guerra
> ATTORNEYS FOR PLAINTIFF

12

# EXHIBIT "B-3"

CutePDF – www.fxeiso.com

## CAUSE NO. 2000-02-758-D

| | |
|---|---|
| PETRA LOPEZ, INDIVIDUALLY § | IN THE DISTRICT COURT OF |
| AND AS REPRESENTATIVE THE § | |
| ESTATE OF ERNESTO LOPEZ, § | |
| DECEASED, AND AS NEXT § | |
| FRIEND OF PERLA IVON LOPEZ § | |
| AND ERNESTO LOPEZ, MINORS § | |
| § | |
| VS. § | CAMERON COUNTY, TEXAS |
| § | |
| BORDER SHIPYARDS, INC. § | |
| JORGE GONZALEZ, WILLIAM § | |
| KENON, RUBEN BARRERA, AND § | |
| CARL GAYMAN, RICK RIVERA, § | |
| INDIVIDUALLY, AND DBA § | |
| LA NEGRITA § | 103RD JUDICIAL DISTRICT |

### DEFENDANT'S, RICARDO RIVERA aka RICK RIVERA DBA *LA NEGRITA* ORIGINAL ANSWER AND CROSS-CLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Ricardo Rivera aka Rick Rivera DBA *La Negrita*, Defendant herein, and in response to the Original Petition of Plaintiffs **Petra Lopez, Individually and as Representative of the Estate of Ernesto Lopez, Deceased, and as next friend of Perla Ivon Lopez and Ernesto Lopez, minors,** would respectfully show unto this Court the following:

### 1.
### General Denial

Reserving the right to file other and further pleadings, exceptions, objections, and denials, the Defendant denies each and every material allegation in Plaintiffs' Original Petition and demands that the Plaintiffs be required to prove the same by a preponderance of the evidence in accordance with the laws and the Rules of Civil Procedure of the State of Texas.

## Affirmative Defense
### 2.

The accident, personal injury and death of Ernesto Lopez on the occasion in question was not caused by any fault, negligence or conduct on the part of this defendant, but to the contrary, was proximately caused by the negligence, inattention, and lack of care for his safety by said Ernesto Lopez, which bars, or alternatively mitigates, any recovery by Plaintiffs.

### 3.

The cause of action asserted by Plaintiffs against this defendant was proximately caused by the acts, omissions, negligence, breach of contract and breach of warranty on the part of third parties for whom this defendant is not liable.

## II.
## ORIGINAL CROSS-CLAIM

Separately from the foregoing answer, Defendant **Ricardo Rivera aka Rick Rivera DBA** *La Negrita*, as Cross-Plaintiff, complains of Border Shipyards, Inc., Cross-Defendant, which has appeared and answered herein, by way of cross-claim.

### 1.

1.01   At all material times Cross-Defendant Border Shipyards, Inc. operated a shipyard engaged in hauling out vessels and performing inspections, maintenance repairs, welding and other work upon them.

1.02   Prior to May 11, 1998, Cross-Defendant Border Shipyards, Inc. had hauled out Cross-Plaintiff's steel-hulled shrimp trawler F/V *Negrita* and performed work on her, including, but not limited to, the inspection, repair, attachment and/or testing of the electric systems, shaft and necessary welding. During such prior repairs, Cross-Defendant inspected and tested or in the exercise of reasonable care and workmanship should have inspected and tested the electrical and/or grounding systems of the vessel to ascertain and confirm they were in reasonably safe condition and good working order.

DEFENDANT'S RICARDO RIVERA AKA RICK RIVERA
DBA *LA NEGRITA* ORIGINAL ANSWER                                    Page - 2

1.03  Prior to May 11, 1998 Cross-Plaintiff Ricardo Rivera entered into a contract with and engaged Cross-Defendant Border Shipyards, Inc. for the purpose of hauling out, leasing premises and/or rental of property for the space used by his F/V *Negrita* and for the performance of maintenance, repair, welding work and other services.  Such contract provided and/or included the implied agreement, benefit and representation that any claim for injury or death of employees, workers, agents, invitees, and/or sub-contractors of Cross-Defendant performing work on board the F/V *Negrita* would be insured, defended and paid for by said Cross-Defendant, and that Cross-Plaintiff would be held harmless and indemnified by said Cross-Ddefendant from any liability for claims asserted against Cross-Plaintiff and for losses and damages suffered by Cross-Plaintiff, as a result of any such claims for death or personal injury, including attorney fees incurred by Cross-Plaintiff in defending against such claim.  Such contract and representations were in force and effect at the time of the personal injury and death of **Ernesto Lopez** on or about May 11, 1998.

1.04  On or about May 11, 1998, **Ernesto Lopez**, while in the course and scope of his employment as a welder with Cross-Defendant Border Shipyards, Inc., was directed by said Cross-Defendant to weld the propeller shaft of the F/V *Negrita*, and in the course of welding the propeller shaft on board the F/V *Negrita* suffered personal injuries and died as a result of the alleged negligence and the faulty equipment provided to him by Cross-Defendant Border Shipyards, Inc.

## 2.
## Non-Subscriber

At all times Cross-Defendant Border Shipyards allegedly was not a subscriber of any workers compensation plan pursuant to the Texas Workers Compensation statutory program and laws, and thus not covered by any worker's compensation program or law, when Ernesto Lopez was injured and killed while in

DEFENDANT'S RICARDO RIVERA AKA RICK RIVERA
DBA *LA NEGRITA* ORIGINAL ANSWER AND CROSS-CLAIM                                    **Page - 3**

the course and scope of his employment with Cross-Defendant. Accordingly, Cross-Defendant is denied any and all defenses under common law with regard to the Plaintiffs' causes of action to the prejudice of Cross-Plaintiff.

### 3.
### Claim for Indemnity

3.01   At all material times including May 11, 1998, Cross-Defendant Border Shipyards, Inc. provided comprehensive general liability (CGL) and/or indemnity insurance for the benefit and protection of tis customers including Cross-Plaintiff providing coverage for claims of bodily injury and death arising out of accidents occurring on the premises of Cross-Defendant and/or in the conduct of Cross-Defendant's operations.

3.02   Accordingly, Cross-Plaintiff is entitled to be defended, held harmless and indemnified against any claim, judgment or loss by Cross-Defendant Border Shipyards, Inc. and its insurance carrier arising out of any claim, judgment or loss for the bodily injury and death of Ernesto Lopez on or about May 11, 1998.

### 4.
### Breach of Contract

The failure and omission of Cross-Defendant to defend and hold harmless and indemnify Cross-Plaintiff against the claims arising out of the personal injury and death of Ernesto Lopez on or about May 11, 1998 constitutes a breach of the contract and representations made by Cross-Defendant Border Shipyards, Inc. with Cross-Plaintiff.

### 5.
### Breach of Warranty

Further, the failure and omission of Cross-Defendant to properly and safely repair the F/V *Negrita* on the occasion, in question with the result that Cross-Plaintiff suffered substantial property loss and lost earnings, constitutes a breach of

the express and/or implied warranty that such repairs would be performed in a diligent and workmanship manner.

## 6.
### Damages

6.01   As a result of the breach of contract by Cross-Defendant as stated in Paragraph 4 above, and the assertion of the claims by Plaintiffs in this cause for the personal injury and death of Ernesto Lopez, Cross-Plaintiff is entitled to be defended, held harmless and indemnified up to the limits of the comprehensive general liability and indemnity insurance coverages in effect issued to Cross-Defendant for the benefit and protection of Cross-Plaintiff.

6.02   Further, as a result of the occurrence of the accident to Ernesto Lopez and the breach by Cross-Defendant of its warranty to exercise due care and good workmanship in performance of repairs and services, Cross-Plaintiff suffered property damage to his vessel F/V *Negrita* and loss of earnings.

6.03   Further, Cross-Plaintiff is entitled to recover reasonable attorney fee and expenses in defending this lawsuit.

6.04   The aforesaid damages suffered by Cross-Plaintiff exceed the minimum jurisdictional limits of the Court.

## 7.
### Prayer

WHEREFORE, premises considered, Defendant Ricardo Rivera requests judgment of the Court that Plaintiffs Petra Lopez, et. al. take nothing by this suit, and that this defendant recover all costs incurred in defending Plaintiffs claims, and further that Defendant Ricardo Rivera, as Cross-Plaintiff, have the following judgment by way of cross-claim against Cross-Defendant Border Shipyards, Inc.:

1)   For indemnity against any claim asserted and/or judgment entered against him by Plaintiffs in the main cause;

2)  For compensatory damages in a sum within the minimum jurisdictional limits of the Court;

3)  Prejudgment and postjudgment interest as provided by law;

4)  Reasonable attorney fees;

5)  Costs of suit; and

6)  Such other and further relief to which Defendant/Cross-Plaintiff may be justly entitled.

Respectfully submitted,

Jack G. Carinhas, Jr.
S.B. No. 03795000
302 Kings Highway, Suite 109
Brownsville, Texas 78521
Telephone:  956/542-9161
Telefax:    956/542-3651

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing pleading was served upon Mr. Carlos Guerra of Guerra & Moore, L.L.P., 4201 N. McColl Road, McAllen, Texas 78504, Mr. James H. Hunter of Royston, Rayzor, Vickery & Williams, L.L.P., P. O. Box 3509, Brownsville, Texas 78523-3509, and Mr. Norton A. Colvin, Jr. of Rodriguez, Colvin & Chaney, L.L.P., 1201 E. Van Buren Street, Brownsville, Texas 78522, by Certified Mail, Return Receipt Requested, postage prepaid and properly addressed on this 25-74 day of September, 2000.

Jack G. Carinhas, Jr.

DEFENDANT'S RICARDO RIVERA AKA RICK RIVERA
DBA *LA NEGRITA* ORIGINAL ANSWER                                    Page - 6