23



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 2 0 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR WILLIAM | § | |
| E. KENON | § | |
| | § | CIVIL ACTION NO. B-99-019 |
| VS. | § | |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| VS. | § | |
| | § | |
| RICARDO RIVERA | § | |

PLAINTIFFS' AND THIRD PARTY DEFENDANT'S RESPONSE
IN OPPOSITION TO ST. PAUL MERCURY INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT

*Court's
copy*

# TABLE OF CITATIONS

<u>CASES</u>

*American Alliance Ins. Co. v. Frito-Lay, Inc.*, 788 S.W.2d 152, 153-154 . . . . . . . . . . . . . . . . p. 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510,
    91 L.Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 6

*Blaylock v. American Guarantee Bank Liability Ins. Co.*,
    632 S.W.2d 719, 721 (Tex. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25,
    106 S.Ct. 2548, 2552-54, 91 L.Ed. 2d 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 6

*Fidelity and Guaranty Insurance Underwriters, Inc. v. McManus*,
    633 S.W.2d 787, 788 (Tex. Supp. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 14

*Gibson and Associates, Inc. v. Home Insurance Co.*,
    966 F. Supp. 468 (N.D. Texas 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 15

*Gulf States Ins. Co. v. Alamo Carriage Serv.*, 22 F.3d 88, 90 (5th Cir. 1994) . . . . . . . . . . . . p. 9

*Gulf Chem. and Metallurgical Corp. v. Associated Metals and Minerals Corp.*,
    1 F.3d 365, 369 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 8, 9

*LaFarge Corp. v. Hartford Cas. Ins. Co.*, 61 F3d 389, (5th Cir. 1995) . . . . . . . . . . . . . . . . p. 16

*Lujan v. National Wildlife Fed'n.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188,
    111 L.Ed. 2d 695 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 6

*Marshall v. Victoria Transp. Co.*, 603 F.2d 1122, 1123 (5th Cir. 1979) . . . . . . . . . . . . . . . . p. 6

*National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*,
    939 S.W.2d 139, 140 (Tex. Sup. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 9

*Pro-Tech Coatings, Inc. v. Union Standard Ins. Co.*,
    897 S.W.2d 885, 887 (Tex. App. - Dallas, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 9

*Sekel v. Etna Life Ins. Co.*, 704 F.2d 1335, 1338 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . p. 15

*State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 736
    (Tex. App. - Ft. Worth 1996, writ requested) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 6, 7

*United States v. Diebold*, 369, U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed. 2d 176 (1962) . . . . . p. 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR WILLIAM | § | |
| E. KENON | § | |
| | § | CIVIL ACTION NO. B-99-019 |
| VS. | § | |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| VS. | § | |
| | § | |
| RICARDO RIVERA | § | |

PLAINTIFFS' AND THIRD PARTY DEFENDANT'S RESPONSE
IN OPPOSITION TO ST. PAUL MERCURY INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

PLAINTIFF, BORDER SHIPYARDS, INC., et al. ("Border") joined herein by Third

Party Defendant, RICARDO RIVERA ("Rivera"), file this their Response in Opposition to

the Motion for Summary Judgment heretofore filed by St. Paul Mercury Insurance Company

("St. Paul"). This Response is based upon the pleadings and evidence introduced in this

cause and those exhibits attached hereto. In opposition to St. Paul's motion, Border and

Rivera would respectfully show the Court as follows:

I.

## Statement of the Nature and Stage of the Proceedings

1.01.   This suit involves an interpretation of the maritime general liability policy number 342CT5561 issued by St. Paul with effective date April 28, 1998 to April 28, 1999, and with Border Shipyards, Inc. being the named insured.  A true and correct copy of the policy is attached as Exhibit A to Border's Third-Party Petition (marked hereto as Exhibit B and incorporated herein by reference for all purposes).

1.02.   Ernesto Lopez was employed as a welder by Border Shipyards.  He died on May 11, 1998, while welding on the F/V Negrita, a shrimp trawler owned by Rivera.  His death occurred while he was working in the course and scope of his employment for Border.

1.03.   On February 16, 2000, suit was filed again by the Lopez family against Border and Rivera in the state court after a similar lawsuit had been filed and dismissed in 1998.  A true and correct copy of the Lopez family's Second Amended Petition (which is the active pleading in the underlying state lawsuit) is attached hereto as Exhibit A and incorporated herein for all purposes.

1.04.   On January 4, 2001 co-defendant Rivera filed his First Amended Cross-claim against Border Shipyards, Inc., a true and correct copy of which is attached as Exhibit B to Border's Third-Party Petition (marked hereto as Exhibit B and incorporated herein by reference for all purposes).

1.05.   In the Lopez lawsuit the plaintiffs sued Border, its directors and shareholders, and Rivera. Plaintiffs allege that the defendants are jointly and severally negligent, and that such negligence is a proximate cause of the death of Mr. Lopez.   The Lopez petition also contains claims of gross negligence, and additionally seeks to "disregard the corporate entity of Border Shipyards in order to attach personal liability upon its shareholders and directors."

1.06.   Rivera's cross-claim against Border Shipyards refers to a contract and agreement that "any claim for injury or death of employees, workers, agents, invitees and/or subcontractors of cross-defendant performing work onboard the F/V Negrita would be insured, defended and paid for by said cross-defendant and/or its insurance carrier, and that cross-plaintiff would be held harmless and indemnified by said cross-defendant from any liability for claims asserted against cross-plaintiff, and for losses and damages suffered by cross-plaintiff as a result of any such claims for death or personal injury . . ." (See, Exhibit B to Border's Third-Party Petition, Paragraph 1.02, page 2 [Exhibit B herein]).

1.07.   Additionally, the Cross-claim alleges that Border agreed to procure special marine liability and/or comprehensive general liability indemnity insurance through St. Paul for the benefit and protection of its customers, including Rivera.

1.08.   As presently structured, Rivera's Cross-claim against Border Shipyards alleges that an oral agreement existed between Border and Rivera which consisted of the following:

(1)  Border would obtain insurance to protect Rivera and the F/V Negrita from any liability arising as a result of the repairs being performed upon the said vessel; and

(2) Border agreed to hold Rivera, as vessel owner, harmless from all liability relating to the repair operations being performed on the F/V Negrita, irrespective of whether the negligence was generated by Border or Rivera.

These two <u>independent</u> agreements will be discussed at greater length below.

1.09.   As a result of the filing of the first 1998 lawsuit by Lopez against Border and the refusal by St. Paul to provide an unqualified defense, Border filed a declaratory judgment action in state court.  Such lawsuit was subsequently removed to this Court in the instant proceeding.   During the pendency of the 1998 lawsuit, no action was taken in the development of the case because of the apparent inactivity in the underlying state court action.  The parties to this action did not know on what issues to seek relief until such time as the state court action had solidified in the allegations of liability brought by the Lopez plaintiffs.  As previously stated, the 1998 lawsuit was dismissed and the subsequent Lopez petition was filed in February 2000.  This Court recently granted, on March 20, 2001, St. Paul's Motion to File its Second Amended Answer and Counterclaim for Declaratory Judgment, which answer granted St. Paul leave to file a third party complaint against Rivera, d/b/a La Negrita.

1.10.   Border and Rivera have filed a joint Motion for Remand which is still pending and to which St. Paul has not responded.

1.11.   Border has never defaulted in the payment of premiums under said policy, nor is it an issue according to St. Paul.

1.12.   Border has brought its insurance agent into the state court action, in part, for misrepresentation concerning the policy in question, as shown by a copy of the Third Party Action attached hereto as Exhibit B and incorporated herein by reference.

1.13.   The concern which plaintiffs have about a motion for summary judgment being filed and ruled upon at this early date and without the benefit of discovery, is the fact that the Lopez plaintiffs may subsequently file additional pleadings which may make any rulings issued by this Court moot.   To that extent, plaintiffs respectfully suggest that the case is this instance is not ripe for disposition until such time as the underlying Lopez lawsuit has proceeded to conclusion.

## II.

## Statement of the Issues to be Ruled Upon by the Court

2.01.   St. Paul seeks a ruling that it neither has a duty to defend nor indemnify Border in the underlying lawsuit and seeks the dismissal of Border's claims against it, as well as any and all potential claims against it.

2.02.   Border contends that, as aforesaid, this motion for summary judgment is premature and would, at best, be interlocutory inasmuch as it only rules upon the current set of pleadings.   Additionally, as will be shown below, Border contends that St. Paul has a duty to defend and indemnify.

III.

## Summary Judgment Standards

3.01.   Summary judgment is proper when the pleadings, depositions, answers to Interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed. 2d 265 (1986). A dispute about a material fact is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).

3.02.   Conclusory assertions, unsupported by specific facts presented in affidavits, are insufficient to either support or defeat a motion for summary judgment. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed. 2d 695 (1990).

3.03.   All evidence and the inferences to be drawn from the evidence produced in the motion for summary judgment must be viewed in light most favorable to the party opposing the motion. United States v. Diebold, 369, U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed. 2d 176 (1962); Marshall v. Victoria Transp. Co., 603 F.2d 1122, 1123 (5th Cir. 1979).

IV.

The St. Paul Policy

4.01.   The marine general liability policy issued by St. Paul (Exhibit A to Border's

Third-Party Petition (marked as Exhibit B hereto).  Pursuant to the policy, St. Paul agrees in

Section II (1) that:

"the company will pay on behalf of the insured all sums which the insured shall

become legally obligated to pay as damages because of:

coverage (a) bodily injury

coverage (b) property damage

to which this insurance applies caused by occurrence, and the company shall have the right

and the duty to defend any suit against the insured seeking damages even if the allegations

of the suit are groundless, false, or fraudulent . . ." .  The policy, however, contains certain

exclusions of coverage, one of which exclusions is as follows:

"(J)  the bodily injury to any employee of the insured arising out of or in the course

of his employment by the insured or to any obligation of the insured to indemnify another

because of damages arising out of such injury; but this exclusion does not apply to liability

assumed by the insured under an incidental contract." (See, Exhibit A to Border's Third-Party

Petition [marked as Exhibit B hereto], Section II [2][J].)

4.02.   The term "incidental contract" is initially defined in Section I (13)(G).  (See,

Exhibit A to Border's Third-Party Petition [marked as Exhibit B hereto], page 6.)  To define

incidental contract as "any written (1) lease of premises; (2) easement agreement, accepting connection with construction or demolition operations on or adjacent to a railroad; (3) undertaking to indemnify a municipality required by municipal ordinance, accepting connection with work for the municipality; (4) sidetrack agreement, or (5) elevator maintenance agreement.

4.03.   The policy, however, also contains contractual liability coverage for marine general liability in Section III(1)(A) of the policy which contains an <u>expanded</u> definition of incidental contract as follows:

"The definition of <u>incidental contract</u> is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business." (<u>See</u>, Exhibit A to Border's Third-Party Petition [marked as Exhibit B hereto], Section III, page 1).

V.

<u>The Duty to Defend</u>

5.01.   Under Texas law, the duty of an insurance company to defend an insured is significantly broader in scope than its duty to indemnify, and a breach of the former gives rise to a distinct and separate cause of action than does a breach of the latter.   <u>Gulf Chem. and Metallurgical Corp. v. Associated Metals and Minerals Corp.</u>, 1 F.3d 365, 369 (5th Cir. 1993).   In determining whether the facts of a given case obligate the carrier to provide a defense to its insured, the Texas courts follow the "eight corners" rule which requires the court to look strictly to the allegations in the pleadings and language of the policy.   <u>State</u>

Farm Lloyds v. Kessler, 932 S.W.2d 732, 736 (Tex. App. - Ft. Worth 1996, writ requested). If the underlying lawsuit alleges facts that are within the scope of coverage, the insurer ordinarily is held to owe the insured a duty to defend it. National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139, 140 (Tex. Sup. 1997).

5.02.    Neither the truth nor the falsity of the allegations, nor any other factors outside the pleadings, may be taken into consideration. Pro-Tech Coatings, Inc. v. Union Standard Ins. Co., 897 S.W.2d 885, 887 (Tex. App. - Dallas, 1995).

5.03.    "The duty to defend is not affected by facts ascertained before suit, developed in the process of litigation, or by the ultimate outcome of the suit." American Alliance Ins. Co. v. Frito-Lay, Inc., 788 S.W.2d 152, 153-154.  In fact, as long as the plaintiffs have potentially asserted a claim that lies within the coverage of the policy, the insurance carrier is under an obligation to defend the insured. Gulf States Ins. Co. v. Alamo Carriage Serv., 22 F.3d 88, 90 (5th Cir. 1994).

5.04.    The rules of construction governing the interpretation of contracts generally also apply to the interpretation of insurance policies. Gulf Chem. and Metallurgical Corp., supra at 369. Therefore, the common sense and plain language interpretation of the coverage afforded Border, its shareholders and Rivera is contained in a clear reading of the insuring provision of the policy issued by St. Paul. In that policy, St. Paul clearly, in its Exclusion J (Page 3 of Section II, Exhibit A to Border's Third-Party Petition [marked as Exhibit B hereto], excludes bodily injury to any employee of the insured arising out of or in the course

of his employment by the insured, or to any obligation of the insured to indemnify another because of damages arising out of such injury; **but this exclusion does not apply to liability assumed by the insured under an incidental contract**. It seems, therefore, that to the extent an employee was excluded by the first phrase in Exclusion J, such exclusion was limited to everything except "liability assumed by the insured under an incidental contract." The definition of incidental contract was amplified in Section III (1)(A) (See Exhibit A to Border's Third-Party Petition [marked as Exhibit B hereto], Section III, Page 1) of the policy. It was extended to "include any oral or written contract or agreement relating to the conduct of the named insured's business."

5.05.   In the present case, Border and Rivera have requested that St. Paul defend Border, its shareholders, directors and Rivera. Under the provisions of the policy, it would appear that the "eight corners" rule would  relegate this Court to an examination of  the pleadings brought in the underlying state court action. Inasmuch as the pleadings themselves allege negligence on the part of Border, its shareholders, directors, employees and Rivera, and since a common sense and plain meaning reading of the language contained in the policy exclusions does not exclude any liability assumed by Border as a result of an incidental contract with Rick Rivera, then it is necessary to resolve what type of "incidental contract" Border had with Rivera.

VI.

## The Incidental Agreements Made by Border

6.01.   Border Shipyards, Inc. is a small Texas corporation engaged in the repair of shrimp boats. (See, Affidavit of Morgan Gross attached hereto as Exhibit C and incorporated herein for all purposes.) The standard business practice in the shrimp boat repair business is still based in large part on a handshake. Usually, the only document generated is the bill which itemizes the cost of the services provided. Since Border's standard business practice with its customers is oral, the intent and understanding of the parties can only be determined by the substance of the oral agreements which would also include the mutual intent of the parties. The Affidavit of Morgan Gross, the general manager of Border Shipyards, Inc. clearly outlines the agreement and intent of the parties, not only of Rivera, but all customers similarly situated.

6.02.   Border's operating policy and procedures applicable at the time of the incident in question primarily consist of two major obligations which are relevant to the matter at hand. The first obligation of Border was to obtain insurance for and on behalf of the customer vessels which were brought into the facility. Rivera's F/V Negrita was such a vessel. Typically, the customer would bring the vessel to the shipyard for repair, and the shipyard would charge the vessel a prorated amount of the cost of the premium charged for the St. Paul policy. This was done pursuant to the understanding and agreement between Border and the customer that the insurance coverage afforded by the St. Paul policy would

extend to the customers insofar as any death or personal injury occurred to employees or invitees working on or near the vessel. In other words, to the extent that any employee, subcontractor or business invitee was injured, the customer vessel owner would be covered from all such risks by the St. Paul policy. Incorporated into this obligation was the understanding that the St. Paul policy would cover all personal injury and death occurring to anyone on the vessel - irrespective of whose negligence caused the death or injury. St. Paul admits that the Court should take into account the standard business practice of the parties. (See, St. Paul's Motion for Summary Judgment, page 6.) The standard business practice and the predictable understandings of the parties (Border and Rivera) are underscored in the opinion from Michael Swetnam, Border's expert witness, wherein he indicated that a reasonably prudent insurance purchaser could interpret the St. Paul policy to provide coverage as stated therein. A true and correct copy of the opinion of Mr. Swetnam is attached hereto as Exhibit D and incorporated herein for all purposes.

6.03. The second duty of Border, which was not addressed by St. Paul in its Motion for Summary Judgment, is the duty of Border Shipyard to guarantee and warrant the work which it was performing on behalf of the customer and to indemnify the customer for any losses suffered by the customer as a result of the negligence of Border, its employees, subcontractors or agents. In other words, if the vessel was not repaired correctly, then Border would guarantee and stand by its work and would repair the faulty workmanship at its own expense. Similarly, if an employee of the shipowner were injured by such faulty

workmanship, then Border would indemnify such injured employee for his damages resulting from the injuries by virtue of the insurance procured. Furthermore, if an employee of Border is injured, then the same warranty, guaranty and indemnity would apply to the customer to protect the customer from any negligence of Border, its employees, agents and representatives, which negligence would adversely affects the customer. It is natural to understand in such an unsophisticated atmosphere that existed at Border that the parties had the mutual understanding that the St. Paul policy would provide coverage to both Border and Rivera. With this understanding it is even easier to understand why Border agreed to hold Rivera harmless from all liability associated with the vessel, irrespective of whether the liability was generated by Border's negligence or Rivera's negligence.

6.04. It would seem, therefore, that under the incidental contracts, Border had two separate and distinct obligations - the duty to provide insurance coverage to the customer and the duty to indemnify and hold the customer harmless from any negligence caused by Border, its employees or agents or by the customer's own negligence.

6.05. When viewing the allegations contained in the current pleading in the underlying state court lawsuit, it would appear that no definitive exclusion applies to the contractual obligations of Border Shipyards because of the broad interpretation which must be afforded to the reading of the policy prepared by St. Paul for Border. When the definition of incidental contract was extended to include any oral or written contract or agreement relating to the conduct of Border's business, such amplification clearly covered any oral

contracts and agreements made by Border with its customers regardless of whatever arguments St. Paul makes today in an effort to renege on its promise to Border. Moreover, the insurance company's argument as to the type of contract which Border and St. Paul may have had only supports the premature stage of its Motion for Summary Judgment. At least according to St. Paul, there is a question of fact as to the existence of or the terms of the contract between Border and Rivera. In the present instance, the duty of St. Paul to defend the allegations of the Lopez lawsuit is clear.

6.06. St. Paul confuses its duty to defend with its duty to indemnify. Gulf Chemical, 1 F.3d at 369. Obviously, St. Paul would not be required to defend if the petition only alleges facts excluded by the policy which the insurer is not required to defend. Fidelity and Guarantee Insurance Underwriters, Inc. v. McManus, 633 S.W.2d 787, 788 (Tex. Supp. 1982). However, in the present case, there are no exclusions applicable to the underlying state court action brought by the Lopez plaintiffs. Furthermore, there is even less exclusion when the request for defense is made on the basis of the cross-claim filed by Rivera. The Rivera cross-claim (Exhibit E to St. Paul's Motion for Summary Judgment) clearly makes reference to the outstanding agreements existing by and between the parties and to the extent that the negligence of Border Shipyards, its employees, agents and its subcontractors causes ultimate harm to Rivera, and to the extent that Rivera's own negligence causes injury, then the obligations of Border would trigger under the hold harmless agreement which it had with Rivera. Border's duty to hold Rivera harmless because of the allegations made by Rivera in

its Cross-claim would still apply because of the allegations made by Rivera. To the extent that 905(b) may be applicable with regard to the Lopez plaintiffs, even though not pled, that statute allows for an employee to recover against the third party/vessel owner for which a defense should be provided with respect to its contractual duty to provide insurance.

6.07.   The policy of strict construction against the insured is especially strong when the Court is dealing with exceptions and words of limitations.  Blaylock v. American Guarantee Bank Liability Ins. Co., 632 S.W.2d 719, 721 (Tex. 1982).   Since the wording pertaining to the incidental contract coverage seems to be clear on its face, the Court may follow the settled rule of insurance law that terms in the contract that are unambiguous must be given their plain meaning.  Sekel v. Etna Life Ins. Co., 704 F.2d 1335, 1338 (5th Cir. 1983).

6.08.   In researching the response to St. Paul's motion, two cases were found which seem to be somewhat analogous to the case at hand. The more exhaustive case is Gibson and Associates, Inc. v. Home Insurance Co., 966 F.Supp. 468 (N.D. Texas, 1997), which provides an in depth analysis of incidental contracts, the duty to defend, policy exclusions and contractual liability coverage.  The Court reasoned that contractual liability coverage, such as exists in this case, is intended to extend coverage to liabilities incurred as a consequence of indemnity agreements.  In so holding, the Court held that the claim for indemnification by the City of Dallas (Rivera in this instance) was sufficient to "bring the

City's claim potentially within the scope of coverage of the policy." <u>Gibson</u> at 476.  The

Court held that the insurance company had the duty to defend.

6.09.   The other case, <u>Lafarge Corp. v. Hartford Cas. Ins. Co.</u>, 61 F.3d 389 (5th Cir.

1995) also discussed the applicability of coverage and the duty to defend in relation to a

claim made under an incidental contract provision.  Although the Court held that the claim

in that case did not merit a duty to defend, the Court nevertheless recognized that a duty of

defense existed when an incidental contract is properly pled, such as our case.

## VII.

### Direct Coverage is Provided to Border Shipyards

7.01.   St. Paul, in its Motion for Summary Judgment, only makes partial reference to

Exclusion J.  When read in its totality, Exclusion J excludes bodily injury to an employee of

the insured . . . "but this exclusion does not apply to liability assumed by the insured under

an incidental contract."  If the incidental contract/agreement existing by and between Border

and Rivera provided that Rivera will be held harmless from all liabilities arising as a result

of the negligence of Border and its employees or from Rivera's own active negligence, then,

clearly, coverage is afforded.  To determine whether such coverage under the St. Paul policy

is "direct" coverage or "indirect" engages an issue of semantics.  The agreement between

Border and its customer, Rivera, clearly was that the employee exclusion would not apply

if liability is assumed under an incidental contract.

## VIII.

### Direct Coverage is Provided to the Individual Shareholders

8.01.   The St. Paul policy extends coverage to the named insured (Border Shipyards, Inc.) and also extends coverage to all insured persons pursuant to Section I (12)(C), (Exhibit A to Border's Third-Party Petition [marked as Exhibit B hereto], Page 3), and to the executive officer, director or stockholder thereof while acting in the scope of their duties. St. Paul alleges that the decision by the shareholders/directors to not acquire worker's compensation insurance, or to not properly capitalize the corporation, constitutes decisions that were ultra vires or outside the course and scope of their capacities as shareholders/directors.   If, in fact, these decisions were made by Border's corporate shareholders/directors, then clearly they were made in the course and scope of their capacity as shareholders/directors of the company.  To the extent that insurance coverage extends to Border, such coverage would also extend to its shareholders and directors.

## IX.

### Coverage Under Incidental Contracts is Applicable

9.01.   In its brief St. Paul stated at Paragraph 41 that Border and Rivera could have entered into a valid indemnity agreement protecting Rivera against many third-party bodily injury claims and backed by St. Paul's policy.  St. Paul then argues that because the indemnity agreement was not in writing and because an oral agreement could not be clear and unequivocal (although they point to no case that supports the premise that oral contracts

can never be "clean and unequivocal"), then such indemnity agreement is unenforceable. This reasoning flies in the face of the policy itself which recognizes "oral contracts." If, in fact, it is impossible, as alleged by St. Paul, to have a valid oral indemnity agreement wherein the employer agrees to indemnify the vessel owner, then it would be impossible to have an oral indemnity agreement at all, and St. Paul sold the insureds nothing at all.  Contractual liability coverage ordinarily is intended to extend coverage to liabilities incurred as a consequence of indemnity agreements as here.

9.02.    In order to provide validity to the expansion of the term incidental contracts to include oral agreements, an oral agreement for indemnification, both for Border's own negligence, as well as the shipowner's negligence must be allowed.  St. Paul, in its motion at Paragraph 44, Page 19, clearly admits that the agreement of indemnity made by Border Shipyards to the shipowner for Border's own negligence is enforceable and would oblige St. Paul to provide coverage.  St. Paul, however, seeks to restrict that agreement of indemnity to only Border's negligence and not the shipowner's own active negligence.  Inasmuch as the agreement between Border and Rivera was that Border was insuring and guaranteeing to Rivera that no liability whatsoever would pass to Rivera, either by way of vicarious liability or by way of Rivera's own active negligence, then clearly, the absolute obligation of indemnity between the parties was established, and such indemnity must be assumed by St. Paul.

# X.

## Conflicting Interpretations

What this case amounts to is a difference of interpretation over an insurance policy, creating an obvious material fact issue precluding summary judgment.  St. Paul's motion demonstrates an obvious and unfounded decision to not accept the defense and indemnity of Rivera for the claims asserted by the Lopez plaintiffs in the state court action against him, and for Border Shipyards, Inc. against the claims made by the Lopez plaintiffs, as well as the cross-claim of Rivera in the state court.

WHEREFORE, premises considered, the parties hereto respectfully request this Court, subject to the Court's ruling on the pending Motion to Remand, to  deny St. Paul's Motion for Summary Judgment or, alternatively, defer ruling on St. Paul's Motion for Summary Judgment until further evidence is developed and until a finding of definite factual liability is obtained in the underlying state court action; and for such other and further relief to which Border and Rivera may be justly entitled.

Respectfully submitted,

SANCHEZ, WHITTINGTON, JANIS
    & ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284
Telephone: (956) 546-3731
Telecopier: (956) 546-3765 or 3766

By: _____
     Dennis Sanchez
     State Bar No. 17569600
     Federal Admission No. 1594
     ATTORNEY-IN-CHARGE
     FOR PLAINTIFFS
     BORDER SHIPYARDS, INC., ET AL.

LAW OFFICE OF JACK G. CARINHAS, JR.
302 Kings Highway, Suite 109
Brownsville, Texas 78521
Telephone: (956) 542-9161
Telefax: (956) 542-3651

By _____
     Jack G. Carinhas, Jr.
     State Bar No. 03795000
     Federal Admission No. 1179

     ATTORNEY-IN-CHARGE
     FOR THIRD PARTY DEFENDANT
     RICARDO RIVERA

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response has been served upon opposing counsel, Mr. Philip D. Nizialek, RATHWELL & NIZIALEK, P.C., Town Center One, 1450 Lake Robbins Drive, Suite 300, The Woodlands, TX 77380, by ☒ certified mail, return receipt requested, and/or by ☐ facsimile, and/or by ☐ hand delivery, on this _19th_ day of April, 2001.

Dennis Sanchez

# PLAINTIFF'S AND THIRD PARTY DEFENDANT'S EXHIBIT A

CVISPDF – www.fasiso.com

COPY

**CAUSE NO. 2000-02-758-D**

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY, | § | IN THE DISTRICT COURT |
| AND AS REPRESENTATIVE OF THE | § | |
| ESTATE OF ERNESTO LOPEZ, DECEASED, | § | |
| AND AS NEXT FRIEND OF PERLA IVON | § | |
| LOPEZ and ERNESTO LOPEZ, MINORS, | § | |
|     Plaintiffs | § | |
| | § | |
| VS. | § | 103rd JUDICIAL DISTRICT |
| | § | |
| BORDER SHIPYARDS, INC., JORGE | § | |
| GONZALEZ, RUBEN BARRERA, CARL | § | |
| GAYMAN, AND RICK RIVERA, | § | |
| INDIVIDUALLY, AND D/B/A LA NEGRITA | § | |
|     Defendants. | § | CAMERON COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION

**COME NOW, PETRA LOPEZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ERNESTO LOPEZ, DECEASED, AND AS NEXT FRIEND OF PERLA IVON LOPEZ AND ERNESTO LOPEZ, MINORS,** Plaintiffs, complaining of Defendants, file this their Plaintiffs' Second Amended Original Petition, and for cause of action would respectfully show the Court as follows:

### I.

Plaintiffs intend to conduct Discovery under Level 2, Texas Rules of Civil Procedure.

### II.

### PARTIES

Plaintiffs are all of the beneficiaries entitled to bring this action pursuant to §71.004 of the **Texas Civil Practices and Remedies Code.** Their names and relationship to **ERNESTO LOPEZ,** Decedent, (hereinafter referred to as "Decedent") are:

| NAME | RELATIONSHIP TO DECEDENT |
|------|--------------------------|
| Petra Lopez | Spouse |
| Perla Ivon Lopez | Minor Daughter |
| Ernesto Lopez | Minor Son |

Defendant, **BORDER SHIPYARDS, INC.**, is a Texas corporation duly organized and existing and doing business in the State of Texas, said corporation has made an appearance.

Defendant, **JORGE GONZALEZ**, is a resident of Cameron County, the State of Texas, during all relevant times hereto, said Defendant has made an appearance.

Defendant, **RUBEN BARRERA**, is a resident of Cameron County, the State of Texas, during all relevant times hereto, said Defendant has made an appearance.

Defendant, **CARL GAYMAN**, is a resident of Cameron County, the State of Texas, during all relevant times hereto, said Defendant has made an appearance.

Defendant, **RICK RIVERA, INDIVIDUALLY, D/B/A LA NEGRITA**, is a resident of Cameron County, the State of Texas, during all relevant times hereto, said Defendant has made an appearance.

## III.

## VENUE

Venue of this lawsuit is proper Cameron County, Texas for the reasons that this accident accrued in Cameron County and Defendant is doing business in Cameron County, Texas at all relevant times hereto.

## IV.

## FACTS

On or about May 11, 1998, **ERNESTO LOPEZ**, Decedent, while in the course and scope of his employment as a welder with Defendant **BORDER SHIPYARDS, INC.**, was asked by said Defendant, to weld the propeller shaft on a ship with a shoddy and defective arc welder, and without the assistance of a helper.   Said arc welder was a Lincoln Arc Welder, Model No. AG 250, Code 6930, Serial No. ACA23166.  The condition of the equipment provided by said Defendant to Mr. Lopez was such that the metal element on the handle was exposed due to the plastic sheath having been broken off.  Additionally, although the appropriate procedure to weld a propeller shaft is to cut an opening in the ship's hull to access the propeller from below, said Defendant forced Mr. Lopez to work on the propeller shaft from an unsafe location, which forced him to  have to hold onto the propeller shaft as he welded it.   While the Mr. Lopez was working, he was electrocuted by the defective unsafe equipment and died.   Said Defendant's failure to provide Decedent with safe equipment and/or safety equipment proximately caused Decedent's tragic and untimely death.

## V.

## NON-SUBSCRIBER

Defendant, **BORDER SHIPYARDS** was not a subscriber to workman's compensation insurance at the time **ERNESTO LOPEZ, DECEASED,** sustained his injuries during the course and scope of his employment with **BORDER SHIPYARDS** and therefore, said Defendants are denied any and all defenses of contributory and/or comparative responsibility. *Kroger Co. vs. King,* 23 S.W.3d 347 (Tex. 2000).

about 1986 or 1987, an employee of **BORDER SHIPYARDS** sustained an "on-the-job injury" and the shareholders, individually, and on behalf of the business settled the claim directly with the injured employee. Therefore, Plaintiffs seek the court to disregard the corporate fiction based upon some of the foregoing factors, as follows:

1. That **BORDER SHIPYARDS** is organized and operated as a mere tool or business conduit of the owners' businesses entities;

2. That the corporate fiction of **BORDER SHIPYARDS** is designed as a means of evading existing legal obligations.

3. That the corporate fiction of **BORDER SHIPYARDS** is designed circumvent an existing legal obligation and Texas workman's compensation statute among other statutes;

4. That **BORDER SHIPYARDS** is a corporation formed and operated with inadequate capitalization;

5. That the corporate fiction of **BORDER SHIPYARDS** is a means of perpetuating fraud;

6. The corporate fiction of **BORDER SHIPYARDS** is designed to protect the owners from and is relied upon by the protection of a crime or to justify a wrong.

## VII.

### FIRST CAUSE OF ACTION
### NEGLIGENCE

Plaintiffs allege that Defendants, acting through their servants, agents and/or employees were negligent, jointly and severally, in the following particulars:

1. Failing to implement and enforce safety policies regarding working under dangerous conditions, such as the policy to weld on propeller shafts only after the hull has been opened to have proper access to the shaft;

2. Failing to train its agents, servants, and/or employees on proper safety procedures for working under dangerous conditions;

3.    Failing to provide its agents, servants and/or employees with adequate equipment, including arc welders;

4.    Failing to provide safety equipment such as insulated welding gloves to its agents, servants and/or employees;

5.    Failing to supervise its agents, servants and/or employees to ensure that their safety was properly guarded;

6.    Failing to warn **ERNESTO LOPEZ**, Decedent, of the dangerous condition and/or hazards known to Defendant;

7.    Failing to provide tools and equipment that were safe and free from defects or in defective condition such as to create a danger of electrocution;

8.    Failing to maintain a safe place to work; and

9.    Failing to provide adequate assistance to the Decedent.

Plaintiffs allege that each and every of the foregoing acts and/or omissions in combination or singularly on the part of the Defendants constituted negligence which was and is a direct and proximate result of the injuries and damages sustained by the Plaintiffs.

## VIII.

### SECOND CAUSE OF ACTION
### MARITIME VIOLATIONS

Plaintiffs asserts a claim and causes of action against Defendant Negrita under various Maritime statutes, and that Defendant Negrita is liable for the fatal injuries sustained by Plaintiffs' decedent.

## IX.

### DECEDENT'S CONSCIOUS PAIN AND SUFFERING

As a direct and proximate result of the negligence of Defendants, Decedent suffered great electrical shock to the vital organs of his body. Decedent's entire body was burned internally by

electricity, and Decedent suffered great shock to his entire nervous system. The Decedent suffered great pain and suffering at the time of his electrocution.

## X.

## **DEATH OF DECEDENT**

Decedent died on May 11, 1998, as a proximate result of the electrical shock and injuries inflicted upon him by the negligence and carelessness of the Defendants, as described above.

## XI.

## **DAMAGES**

Decedent was forty-three (43) years of age at the time of his death. He was in good health, with a reasonable life expectancy of at least 32 more years. Decedent was married to Plaintiff **PETRA LOPEZ**. Of the marriage, two (2) children were born, being those named above and joined as Plaintiffs. During his lifetime, Decedent was industrious and energetic, a good father, husband and provider. He performed numerous and usual tasks in and about the family residence, and gave advice, counsel, comfort, care and protection to his wife and family. In all reasonable probability, he would have continued to do so, providing for and supporting his wife for the remainder of her natural life and caring for and supporting his children at least until they attained adulthood, and probably thereafter, as he planned to provide each with all the costs incident to attending college in accordance with their desires and goals in life. At his death, Decedent possessed assets and accumulated savings from his past earnings, which, in all reasonable probability, he would have continued to accumulate for the remainder of his natural life.

As a result of the untimely death of Decedent, **PETRA LOPEZ** suffered pecuniary loss from the death of her husband, **ERNESTO LOPEZ**, including losses of care, maintenance, support,

services, advice, counsel, and contributions of a pecuniary value that she would, in reasonable

probability, have received from her husband during his lifetime had he lived. In addition, she has

suffered loss of consortium and damage to the husband-wife relationship, including loss of affection,

solace, comfort, companionship, society, assistance, sexual relations, emotional support, love, and

felicity necessary to a successful marriage. She has suffered mental anguish, grief, and sorrow as

a result of the death of her husband, **ERNESTO LOPEZ**, and is likely to continue to suffer for a

long time in the future. For these losses, **PETRA LOPEZ** seeks damages within the minimum

jurisdictional limits of the Court.

**PERLA IVON LOPEZ and ERNESTO LOPEZ** have suffered pecuniary loss from the

death of their father, **ERNESTO LOPEZ,** including losses of care, maintenance, support, services,

advice, counsel and contributions of a pecuniary value that they would, in all reasonable probability,

have received from their father during his lifetime had he lived. They have suffered additional losses

by virtue of the destruction of the parent-child relationship, including the right to love, affection,

solace, comfort, companionship, society, emotional support, and happiness. They have suffered

severe mental depression and anguish, grief and sorrow as a result of the death of their father,

**ERNESTO LOPEZ,** and are likely to continue to suffer for a long time in the future. For these

losses, **PERLA IVON LOPEZ and ERNESTO LOPEZ** seek damages in excess of the minimum

jurisdictional limits of the Court.

Plaintiffs have suffered a loss of inheritance that, in all reasonable probability, Decedent

would have left to them by will or inheritance. For these losses, **PERLA IVON LOPEZ** and

**ERNESTO LOPEZ** seek damages in a sum within the jurisdictional limits of the Court.

## XII.

## GROSS NEGLIGENCE

Plaintiffs assert that the operation of **BORDER SHIPYARDS** and the failure of the owners as well as the company to provide a safe workplace was done knowingly, willingly, and was foreseeable that an injury and death would result of their ongoing negligence and gross negligence. Plaintiffs request a finding an award of exemplary damages against the owners and the corporation to set an example to these parties and to the general public.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request that Defendants be cited to appear and answer, and that on final trial Plaintiffs have judgment against these Defendants, jointly and severally, for:

1.  Damages in the amount of SIX MILLION DOLLARS ($6,000,000.00) in recompense for the wrongful death of **ERNESTO LOPEZ**, husband, father, son and for the loss of affection and companionship of the Decedent, as described above, and the loss of the pecuniary support from the Decedent, as described above, together with prejudgment interest thereon from May 11, 1998, as provided by law, and post-judgment damages as provided by law from the date of judgment until paid;

2.  Damages in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) or within the jurisdictional limits of this Court, in recompense for the loss of pecuniary support from the Decedent, as described above, for as many years as the Decedent would likely have lived in the future, together with pre-judgment interest thereon from May 11, 1998, as provided by law, and post-judgment damages as provided by law from the date of judgment until paid;

3.  Damages in the amount of FOUR MILLION DOLLARS ($4,000,000.00) or within the jurisdictional limits of this Court, to punish the acts and/or omissions of Defendants for the willful, wanton, with malice, and gross negligent conduct that resulted in the death of Decedent, and to set these Defendants as an example to society;

4.  Costs of suit; and

5.  Any and all such other relief to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**GUERRA & MOORE, L.L.P.**
4201 N. McColl Road
McAllen, Texas 78504
Telephone No. (956) 618-3000
Telecopier No. (956) 686-4200

By: _____
J. Michael Moore
State Bar No. 14349550
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing original document was sent to the Clerk of the Court via First Class U.S. Postage and a true and correct copy of the above and foregoing instrument was forwarded to opposing counsel, in indicated below, in accordance with the Texas Rules of Civil Procedure, on this ___ day of March, 2001.

| | |
|---|---|
| Javier Gonzalez<br>**ROYSTON, RAYZOR, VICKERY & WILLIAMS**<br>P. O. Box 3509<br>Brownsville, Texas 78521 | **U.S. Mail** |
| Norton A. Colvin Jr.<br>**RODRIGUEZ, COLVIN & CHANEY L. L. P.**<br>1201 East Van Buren<br>Brownsville, Texas 78522 | **U.S. Mail** |
| Jack Carinhas, Jr.<br>**ATTORNEY AT LAW**<br>302 Kings Highway, Ste. 109<br>Brownsville, Texas 78521 | **U.S. Mail** |

_____
J. Michael Moore

# PLAINTIFF'S AND THIRD PARTY DEFENDANT'S EXHIBIT B

ChloPDF – www.fastio.com

CAUSE NO. 2000-02-758-D

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY AND AS | § | IN THE DISTRICT COURT OF |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| ERNESTO LOPEZ, DECEASED, AND AS | § | |
| NEXT FRIEND OF PERLA IVON LOPEZ | § | |
| AND ERNESTO LOPEZ, MINORS, | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | |
| | § | |
| BORDER SHIPYARDS INC., | § | |
| JORGE GONZALEZ, WILLIAM KENON, | § | |
| RUBEN BARRERA, AND CARL GAYMAN, | § | CAMERON COUNTY, TEXAS |
| RICK RIVERA, INDIVIDUALLY AND | § | |
| DBA LA NEGRITA | § | |
| *Defendants/Third-Party Plaintiffs* | § | |
| | § | |
| VS. | § | |
| | § | |
| THE LINCOLN ELECTRIC COMPANY, | § | |
| JACKSON PRODUCTS, INC., | § | |
| ENGLISH INSURANCE AGENCY, INC., | § | |
| ENGLISH MARINE AGENCY, INC. | § | |
| AND FG-CSL, INC. F/K/A CENTURY | § | |
| SURPLUS LINES AGENCY, INC. | § | |
| *Third-Party Defendants* | § | 103RD JUDICIAL DISTRICT |



FILED
AURORA DE LA GARZA DIST. CLERK
FEB 23 2001
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

## ORIGINAL THIRD-PARTY PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, **BORDER SHIPYARDS, INC., JORGE GONZALEZ, RUBEN BARRERA AND CARL GAYMAN**, Defendants and now Third-Party Plaintiffs, and file this their Third-Party Petition, complaining of Third-Party Defendant, The Lincoln Electric Company and Jackson Products, Inc. and comes now only **BORDER SHIPYARDS, INC.,** Defendant and now Third-Party Plaintiff and files this its Third-Party Petition also against Third-Party Defendants, English Insurance Agency, Inc., English Marine Agency, Inc. and FG-CSL, Inc. f/k/a Century Surplus Lines Agency, Inc. and would show the Court the following:

44915:932278.2:022101

**FILE COPY**

# I.

## PARTIES

Third-Party Plaintiff, **BORDER SHIPYARDS, INC.**, is a Texas Corporation with its principal office in Brownsville, Cameron County, Texas.

For the limited purpose of this third-party petition against Third-Party Defendants, The Lincoln Electric Company and Jackson Products, Inc., **JORGE GONZALEZ, RUBEN BARRERA and CARL GAYMAN**, are all natural persons residing in Brownsville, Cameron County, Texas.

Third-Party Defendant, **THE LINCOLN ELECTRIC COMPANY,** is a Ohio corporation doing business in Texas. Lincoln Electric Company may be served by serving its registered agent in Texas, CT Corporation, 350 North St. Paul, Dallas, Texas 75201. Citation is requested to be prepared and forwarded to its registered agent via certified mail-return receipt requested.

Third-Party Defendant, **JACKSON PRODUCTS, INC.,** is a corporation and/or a legal entity doing business in Texas, but has not designated an authorized agent whom service of citation may be made. Jackson Products, Inc. has not designated nor maintained a resident agent for service of process. Consequently, pursuant to §17.045(a) of the Civil Practice & Remedies Code, Jackson Products, Inc. may be served by serving the Office of the Secretary of State, Secretary of State Robert Cuellar, at the Statutory Documents with an address of P.O. Box 12887 in Austin, Texas 78711-2887 with duplicate copies of process for Jackson Products, Inc., so that they may immediately mail a copy of the process (citation and Third-Party Petition) to Jackson Products, Inc.. Jackson Products, Inc.'s home or home office is 5801 Safety Drive, N.E. in Belmont, Michigan

44915:932278.2:022101                    -2-

49306. It is requested that citation be prepared and duplicate copies of it and the Third-Party Petition be sent to the Secretary of the State of Texas.

Third-Party Defendant, **ENGLISH INSURANCE AGENCY, INC.**, is a Texas corporation and can be served by serving its registered agent, Greg A. Klement at 1814 West Jefferson in Harlingen, Texas 78550 and it is requested that citation be prepared for service to this registered agent via certified mail, return receipt requested.

Third-Party Defendant, **ENGLISH MARINE AGENCY, INC.**, is a Texas corporation and can be served by serving its registered agent, Ellen Lauree English at 1120 South Commerce in Harlingen, Texas 78550 and it is requested that citation be prepared for service to this registered agent via certified mail, return receipt requested.

Third-Party Defendant, **FG-CSL, INC. F/K/A CENTURY SURPLUS LINES AGENCY, INC.**, is a Texas corporation that may be served by serving its registered agent Christopher McClellan at 515 Congress, Suite 1500 in Austin, Texas 78701. Citation is requested to be prepared and forwarded via certified mail, return receipt requested to its registered agent.

## II.

## ALL PARTIES IN AGREEMENT FOR LEAVE

Third-Party Plaintiffs would show this Court that all parties currently in the litigation are in agreement and unopposed to this Court granting them leave to file this third-party petition, pursuant to Texas Rules of Civil Procedure 38(a) and contemporaneously, Third-Party Plaintiffs have filed their Unopposed Motion for Leave to file this Third-Party Petition.

## III.

## VENUE AS TO INSURANCE THIRD-PARTY DEFENDANTS

Comes now, **BORDER SHIPYARDS, INC.**, Third-Party Plaintiff complaining of Third-Party Defendants, **ENGLISH INSURANCE AGENCY INC., ENGLISH MARINE AGENCY, INC. and FG-CSL, INC. F/K/A CENTURY SURPLUS LINES AGENCY, INC.,** and would show this Court that the insurance policy at issue, which was caused to be issued by these third-party defendants, was fully performable in Cameron County, Texas; and these Third-Party Defendants, the insured entity and individuals and the intended beneficiary all have their principal offices, do business and/or reside in Cameron County, Texas. The insurance policy caused to be issued was suppose to or did provide insurance protection to an entity, individuals and an intended beneficiary for any losses resulting in Cameron County, Texas; premiums for the insurance policy in question were paid in Cameron County, Texas; the loss which was supposed to be covered by the policy in question for contractual liability, occurred in Cameron County, Texas. Consequently, for all the foregoing reasons, venue is proper in Cameron County, Texas.

## IV.

## FACTUAL CLAIMS

In a First Amended Original Petition filed against Border Shipyards, Inc. on January 30, 2001, the following claims were asserted against Border Shipyards, Inc.:

> Plaintiffs, Petra Lopez, Individually, And As Representative of the Estate of Ernesto Lopez, Deceased, and as Next Friend of Perla Ivon Lopez and Ernesto Lopez, Minors and Maria Del Carmen Lopez allege that on or about May 11, 1998, Ernesto Lopez, Decedent, while in the course and scope of his employment as a welder with Defendant, Border Shipyards, Inc., was asked by said Defendant to weld the propeller shaft on a ship with a shoddy and defective arc welder. Said arc welder was a Lincoln Arc Welder; Model No. AG-250, Code No. 6930 with Serial No.

ACA23166. Plaintiffs further allege that the condition of the equipment provided by the Defendant to the decedent was such that the metal element on the handle was exposed due to the plastic sheath having been broken off. Plaintiffs further allege that while the decedent was working, he was electrocuted by the above-referenced defective equipment and died. The Jackson electrode holder was an AW-C Model. Accordingly, Plaintiffs allege damages via a wrongful death and survival action for the loss of affection and companionship of the decedent, for loss of pecuniary support and for loss of inheritance. Plaintiffs further seek recovery of exemplary damages, all as more fully set forth in Plaintiffs' First Amended Original Petition in this case.

## V.

## INDEMNITY

The Lincoln Electric Company and Jackson Products, Inc., are liable to Border Shipyards, Inc. for indemnity for any and all sums it may be compelled to pay to Plaintiffs as a result of the occurrence made the basis of Plaintiffs' suit. In this connection, Third-Party Plaintiffs would show that The Lincoln Electric Company manufactured the above-referenced arc welder. Third-Party Plaintiffs would further show that the electrode holder was manufactured by Jackson Products, Inc. Plaintiffs in their First Amended Original Petition allege the existence of certain defects in the subject arc welder and electrode holder manufactured by these Third-Party Defendants.

Further, Third-Party Plaintiffs deny that they are guilty of any negligence or gross negligence contributing to or independently causing the harm complained of by the Plaintiffs. Consequently, Third-Party Plaintiffs are entitled to judgment over against Third-Party Defendants for indemnity for any and all sums for which they may be adjudged liable to the Plaintiffs.

## VI.

## DEFENSE COSTS

Third-Party Plaintiffs also seek recovery of their defense costs, including but not limited to attorney's fees.

44915:932278.2:022101                                    -5-

# VII.

## MANUFACTURERS' CONTRIBUTION

Alternatively, Third-Party Plaintiffs are entitled to contribution from Third-Party Defendants, The Lincoln Electric Company and Jackson Products, Inc. toward any liability that may be found to exist from Third-Party Plaintiffs to Plaintiffs as a result of the occurrence made the basis of Plaintiffs' suit. In this connection, Third-Party Plaintiffs will show that Third-Party Defendants designed, manufactured and placed into the stream of commerce the alleged defective products as claimed by the Plaintiffs. As such and assuming the same, it is further alleged that the Third-Party Defendants' designing, manufacturing and placing into the stream of commerce of the subject arc welder and electrode holder, alone or in combination, were the direct cause of the death made the basis of this suit and of any injuries and damages allegedly sustained by the Plaintiffs and as further alleged by them. Accordingly, pursuant to Chapter 33 of the Civil Practice & Remedies Code, Third-Party Plaintiffs are entitled to contribution for the percentage of responsibility assigned to the Third-Party Defendants by the trier of fact. Third-Party Plaintiffs did not alter, add to or change the subject equipment from its original state as it came from Third-Party Defendants' manufacture and possession.

# VIII.

## DUTY OWED

Third-Party Plaintiffs would further show that Third-Party Defendants owed a duty to the Plaintiffs for claims of negligence and gross negligence for the alleged occurrence made the basis of this lawsuit.

## IX.

## RES IPSA LOQUITUR

Third-Party Plaintiffs cannot more specifically allege, nor have the Plaintiffs alleged acts of specific negligence, on the part of Third-Party Defendants, because facts in that regard are peculiarly within the knowledge of Third-Party Defendants. Pleading further and in the alternative, in the event Plaintiffs or Third-Party Plaintiffs are unable to prove specific acts of alleged negligence against Third-Party Defendants, Third-Party Plaintiffs rely on the doctrine of *res ipsa loquitur*. In this connection, Third-Party Plaintiffs will show that the occurrence giving rise to this litigation are such that the occurrences would not have happened in the absence of alleged negligence, and that the arc welding unit and electrode holder in question were within the exclusive control of Third-Party Defendants at the time any alleged negligence probably occurred or for which they would be strictly liable. Third-Party Plaintiffs have no means of ascertaining the method or manner in which the products were designed, manufactured, sold and represented, and they came into Third-Party Plaintiffs' possession in the same condition they were in when they left the control of Third-Party Defendants. Thus, Third-Party Defendants would be negligent and/or strictly liable according to the Plaintiffs' allegations as described above and in Plaintiffs' First Amended Original Petition, which accordingly, said alleged negligence/strict liability would be the proximate cause of the alleged damages sustained by the Plaintiffs.

## X.

## INSURANCE FACTS

Third-Party Plaintiff would show this Court that Third-Party Defendants, **ENGLISH INSURANCE AGENCY, INC., ENGLISH MARINE AGENCY, INC.** and **FG-CSL, INC.**

**F/K/A CENTURY SURPLUS LINES AGENCY, INC.** (hereinafter "agents") were insurance agents/brokers of Third-Party Plaintiff and procured insurance coverage for third-party plaintiff in the form of a marine general liability policy on or about April 28, 1998, under policy No. 342ZT5468 ("the Policy"), which is attached hereto as Exhibit "A" and incorporated herein by reference as if set forth fully at length herein. The relevant policy period in question ran from April 28, 1998 until April 28, 1999. The policy was solicited, procured and caused to be issued by agents. When such entities solicited, procured and caused to be issued the policy, they were doing so as delivering and/or intermediate agents and were doing so in the course and scope of their employment and to further agents' business reciprocally.

## XI.

### RESPONDEAT SUPERIOR

At all times material to this cause of action, agents were the employees, agents and/or representatives of each other and were acting in the furtherance of each other's business. English Insurance Agency, Inc. and English Marine Agency, Inc. were soliciting and the delivering agents of the policy and FG-CSL, Inc. f/k/a Century Surplus Lines Agency, Inc. was the intermediate agent. Consequently, third-party defendant invokes the doctrine of respondeat superior; vicarious liability and master/servant.

## XII.

### RESULTING LOSS AND CLAIMS UNDER THE POLICY

On or about May 11, 1998, Petra Lopez, Individually and as Representative of the Estate of Ernesto Lopez, Deceased and As Next Friend of Perla Ivon Lopez and Ernesto Lopez, Minors ("beneficiaries") claim that decedent, Ernesto Lopez was welding a propeller shaft inside the icehold

44915:932278.2:022101                    -8-

of the F/V Negrita, which was dry-docked at Border Shipyards, Inc.'s shipyard.  At the time,

beneficiaries further claim that Lopez was forced to work in an unsafe location inside the vessel and

with a defective arc welding unit and electrode holder and as a result, he was electrocuted and died

thereafter ("the claim").   Named as a defendant was third-party plaintiff in a lawsuit styled

*Petra Lopez, Individually, et al vs. Border Shipyards, et al* in Cause No. 2000-02-758-D, now

pending in the 103rd Judicial District County of Cameron County, Texas.  Also named as a defendant

was Rick Rivera, Individually and d/b/a La Negrita (hereinafter "Rivera").  Rivera answered and

filed an original cross-claim against third-party plaintiff, making claim for indemnity and as an

intended beneficiary under the policy seeking defense and indemnity by virtue of contractual liability

coverage afforded for *incidental contracts* under the policy.  Rivera's First Amended Cross-Claim

against Border Shipyards, Inc. requesting affirmative relief and the beneficiaries' First Amended

Petition for claims of affirmative relief against Rivera are currently pending in this action and are

referred to and incorporated herein by reference.  A copy of the most recent amended cross-claim

of Rivera is attached as Exhibit "B" and incorporated herein by reference as if set forth fully at

length herein.

## XIII.

### DEMAND TO DEFEND AND INDEMNIFY & COVERAGE BASES

Third-Party Defendant has demanded on behalf of itself and Rivera defense and indemnity

of both of them in the above-reference personal injury suit and loss for the claim and cross-claim to

third-party plaintiff's insurer, St. Paul Mercury Insurance Company.  St Paul has refused such

demand and request for defense and indemnity.  The policy affords coverage for defense and

indemnity of Rivera against the beneficiaries' claims and Rivera's cross-claim against third-party

plaintiff. More specifically, the policy affords contractual liability coverage for *incidental contracts* for bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury by virtue of any liability assumed by the insured under any oral or written contract or agreement relating to the conduct of third-party plaintiff's business. Consequently, Rivera's cross-claim and beneficiaries' claim against Rivera, would fall under these parameters and insurance should be afforded. Notwithstanding, third-party plaintiff's insurer has refused coverage among other things, claiming any *incidental contract* was not in writing and therefore unenforceable.

## XIV.

## DECLARATORY RELIEF

Third-Party Plaintiff requests this Court to declare that its insurer, St. Paul Mercury Insurance Company has a duty to defend and indemnify Rivera as an intended beneficiary for the claims asserted by the beneficiaries and third-party plaintiff for the claims asserted by Rivera for indemnity arising out of the personal injury case referenced above. The claim occurred during the policy period of April 28, 1998 and April 28, 1999 ("the Policy period") and therefore, third-party plaintiff, seeks a declaration from this Court that coverage is afforded by virtue of an *incidental contract* as that term is defined under the policy.

## XV.

## DECEPTIVE TRADE PRACTICES ACT

Third-Party Plaintiff would further show this Court that it is a *consumer* as that term is defined under the Texas Deceptive Trade Practices Act and that at the time, it was the purchaser of goods and/or services from agents. The following deceptive representations were impliedly made:

1.   Services and goods had characteristics, uses or benefits that they did not have;

2.   Services and goods were of particular standard, quality or grade when they were of another;

3.   Representing that an agreement conferred or involved rights, remedies, or obligations, which it did not have or involved;

4.   Agents failed to disclose information concerning services, or goods which was known at the time of the transaction and such failure to disclose such information was intended to induce the consumer, third-party plaintiff, into a transaction into which the consumer would not have entered into had the information been properly disclosed; and

5.   Withholding material information regarding coverage for oral indemnity agreements.

## XVI.

## MISREPRESENTATION

Agents impliedly misrepresented and/or allowed it to occur to third-party plaintiff.  Material information concerning non-coverage of oral indemnity agreements was withheld.  The insurance coverage supposed to have been afforded to third-party plaintiff and for which it detrimentally relied, namely, was that any loss onboard any vessel dry-docked at the yard, would be covered under the policy.  Accordingly, third-party plaintiff has been damaged for which it seeks recovery for on behalf of itself and Rivera as an intended beneficiary under the policy.  Third-Party Plaintiff asserts a cause of action for misrepresentation and would show this Court that said implied misrepresentations were made intentionally and/or negligently to induce third-party plaintiff to purchase insurance.

## XVII.

## NEGLIGENCE

Agents were negligent in the following respects, without limitation:

1.   Failing to properly procure insurance for third-party plaintiff;

2.    failing to act as a reasonable and prudent agent would have under the circumstances;

3.    failing to ensure third-party plaintiff would have proper insurance coverage afforded to it for any loss occurring onboard any vessel dry-docked at its yard;

4.    allowing the apparency of coverage to exist under the policy that all oral/written indemnity agreements were in fact covered and would apply to any losses onboard vessels dry-docked at third-party plaintiff's yard;

5.    failing to disclose that *incidental contracts* did not include oral indemnity agreements;

6.    failing to properly explain the terms and conditions of an insurance contract;

7.    failing to properly procure insurance;

8.    allowing the apparency of insurance coverage to exist that insurance was afforded for any loss onboard any vessel dry-docked at third-party plaintiff's yard;

9.    falling below the standard of care of an insurance agent or broker; and

10.   other acts of negligence.

Because of the agents' negligent acts and/or omissions, third-party plaintiff has been injured, for which it seeks recovery for itself and Rivera as an intended third-party beneficiary to the policy.

## XVIII.

### BREACH OF CONTRACT

All of the acts and omissions described above, singularly or in combination with another, constitute a material breach of the contract by agents.

## XIX.

### FRAUD

Third-Party Plaintiff would further show that the actions or inactions described above by the agents, constitute fraud for which third-party plaintiff asserts a cause of action for as well.

## XX.

## ESTOPPEL

In the alternative, third-party plaintiff would further show it detrimentally relied upon the implied representations made by agents that any loss onboard a vessel dry-docked at third-party plaintiff's yard would be covered under the policy and that it was properly insured and agents knew or should have known that third-party plaintiff would rely on them detrimentally and change their position by allowing vessels to be dry-docked at the yard; a portion of the insurance premium being charged to the boat owner; third-party plaintiff's employees being able to go onboard vessels to do necessary repairs; and making premium payments toward the policy. Consequently, third-party plaintiff asserts a cause of action in the alternative, for promissory and equitable estoppel.

## XXI.

## BREACH OF FIDUCIARY DUTY

Third-Party Plaintiff would further show agents had a position of trust and confidence over third-party plaintiff and breached this fiduciary duty owed by not properly procuring insurance to cover the loss and allowing the apparency of insurance to exist that oral indemnity agreements made with third-party intended beneficiaries such as a vessel owner, were in fact covered under the policy. Consequently, third-party plaintiff sues for said breach.

## XXII.

## GOOD FAITH AND FAIR DEALING

Third-Party Plaintiff would further show that a *special relationship* existed between agents/brokers and third-party plaintiff, so that a duty of good faith and fair dealing should be imposed and agents/brokers breached this duty for which third-party plaintiff sues.

44915:932278.2:022101                              -13-

## XXIII.

### EXEMPLARY DAMAGES

Third-Party Plaintiff further seeks recovery of exemplary damages against agents. The evidence shows an intent by these third-party defendants to cause substantial injury to third-party plaintiff; a conscious indifference to the rights and welfare of third-party plaintiff; and is actual malice, i.e., a wrongful act(s) which intentionally violated third-party plaintiff's rights, allowing the imposition of exemplary damages. Consequently, the acts and omissions constitute malicious conduct, aggravating factors and fraud, entitling third-party plaintiff to exemplary damages for which it seeks recovery.

### XXIV.

### ATTORNEY'S FEES

As a result of agents' acts, third-party plaintiff has been forced to retain the law firm of Royston, Rayzor, Vickery & Williams, L.L.P. and its attorneys would show their services and fees are reasonable and necessary and a recovery of such pursuant to the Texas Civil Practice and Remedies Code, the Texas Deceptive Trade Practices Act and under contract theories would be fair and just and that all conditions precedent for such recovery have been met.

### XXV.

### DAMAGES

Third-Party Plaintiff has been damaged in a sum in excess of the minimum jurisdictional limits of this Court and to a certain extent, are contingent upon a jury's award of damages to beneficiaries in the underlying wrongful death and survival actions for the claim, which at this point, are not fixed. Beneficiaries are seeking $10.5 million.

# XXVI.

## SCHEDULING ORDER

On January 31, 2001, the Court issued a scheduling order, which is attached hereto as Exhibit "C" and incorporated herein by reference as if set forth fully at length herein. Trial of this case is set for May 29, 2001 at 9:00 a.m.

# XXVII.

## DISCOVERY RULE

Third-Party Plaintiff herein pleads the discovery rule as that term is known under the existing case law and would show this Court that this doctrine as existing under current Texas case law may be applicable in this case with regard to any limitations affirmative defense, if any.

# XXVII.

## JURY REQUEST

Third-Party Plaintiff respectfully requests this cause be tried before a jury. On or about April 11, 2000, third-party plaintiff tendered to the District Clerk the appropriate jury fee and requests a jury of its peers.

**WHEREFORE, PREMISES CONSIDERED,** Third-Party Plaintiff, **BORDER SHIPYARDS, INC.** as to agents and along with third-party plaintiffs, **JORGE GONZALEZ, RUBEN BARRERA AND CARL GAYMAN,** requests that Third-Party Defendants be cited to appear and answer, and that on final trial of the merits, that third-party plaintiffs have the following:

1. A declaration that third-party plaintiffs' insurer has a duty to defend and indemnify it against claims made by Rivera for indemnity and for beneficiaries' claims directly against Rivera under the *incidental contract* provision as that term is defined under the policy for Marine General Liability;

44915:932278.2:022101                    -15-

2. Judgement against third-party defendants for actual and consequential damages in an amount in excess of the minimum jurisdictional limits of the Court;

3. Judgment against The Lincoln Electric Company and Jackson Products, Inc. for indemnity and contribution and defense costs as provided by law and in equity;

4. Further damages by reason of agent's knowing, fraudulent and/or grossly negligent misconduct in accordance with the provisions of 17.50(b) (1) of the Business & Commerce Code;

5. Exemplary and treble damages;

6. Pre-judgment interest as provided by law;

7. Attorney's fees;

8. Post-judgment interest as provided by law;

9. Costs of suit; and

10. Such other and further relief to which Third-Party Plaintiffs may be justly entitled.

Respectfully submitted,

James A. Hunter, Jr.
Texas Bar #00784311
Cameron Co. ID# 3612
Javier Gonzalez
Texas Bar #00787561
Cameron Co. ID# 3614
Attorneys for Defendant/Third-Party Plaintiff,
**BORDER SHIPYARDS, INC.**

Of COUNSEL:

ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
55 Cove Circle
P. O. Box 3509
Brownsville, Texas 78523-3509
Tel: (956) 542-4377
Fax: (956) 542-4370

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing **Original Third-Party Petition** has been forwarded via **U. S. MAIL** to all counsel of record and interested counsel on this _23rd_ day of **February, 2001,** as follows:

Hon. J. Michael Moore
GUERRA & MOORE, L.L.P.
Attorneys at Law
4201 N. McColl Road
McAllen, Texas 78504

Hon. Norton A. Colvin
Hon. R. Patrick Rodriguez
RODRIGUEZ, COLVIN & CHANEY, L.L.P.
1201 E. Van Buren Street
P. O. Box 2155
Brownsville, Texas 78522

Hon. Jack G. Carinhas
Attorney and Counselor at Law
302 Kings Highway, Suite 109
Brownsville, Texas 78521

Hon. Mike Mills
ATLAS & HALL, L.L.P.
P. O. Drawer 3725
McAllen, Texas 78502

Hon. William A. Abernethy
Hon. Clay Coalson
MEREDITH, DONNELL & ABERNETHY, P.C.
P. O. Box 2624
Corpus Christi, Texas 78403-2624

Royston, Rayzor, Vickery & Williams, L.L.P.

44915:932278.2:022101

-17-

4149

**342ZT5561**
Policy No.

**342ZT5468**
Former Policy No.

## INSURANCE IS PROVIDED BY THE COMPANY DESIGNATED BELOW

# The St Paul

### The St. Paul Mercury Insurance Company
A CAPITAL STOCK COMPANY HEREIN CALLED THE COMPANY

**DECLARATIONS:**

NAME AND ADDRESS OF ASSURED*

BORDER SHIPYARDS, INC.
400 'D' ROAD
BROWNSVILLE, TEXAS 78520

NAME AND ADDRESS OF AGENCY

CENTURY SURPLUS LINES AGENCY, INC.
2925 BRIARPARK, SUITE 550
HOUSTON, TEXAS 77042

Does hereby insure according to the form and clauses attached:

| Amount Insured | Rate | Premium |
|---|---|---|
| $ 1,000,000 | 3.30% | $ 12,000.00 MINIMUM & DEPOSIT |

Loss, if any, payable to

ASSURED OR ORDER

| From | To | Beginning and ending with (Time) |
|---|---|---|
| APRIL 28, 1998 | APRIL 28, 1999 | 12:01 A.M., C.D.T. |

Upon

SHIP REPAIRER'S LEGAL LIABILITIES/MARINE GENERAL LIABILITIES/WHARFINGERS LEGAL LIABILITY

COVERING MARINE GENERAL LIABILITIES/SHIP REPAIRER'S LIABILITIES/WHARFINGER'S LEGAL LIABILITY AS STATED HEREIN:

1. GENERAL CONDITIONS (SECTION I)
2. COVERAGE (SECTION II)
3. ADDITIONAL COVERAGES (SECTION III)
4. AMERICAN INSTITUTE SHIP REPAIRER'S LIABILITY CLAUSES (SECTION IV)
5. WHARFINGERS LEGAL LIABILITY CLAUSES (SECTION V)

ST. PAUL FIRE AND MARINE INSURANCE COMPANY ONLY:
PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY: - "This Policy is issued under and in pursuance of the laws of the State of Minnesota, relating to Guaranty Surplus and Special Reserve Funds." Chapter 437, General Laws of 1909. This provision does not apply in Texas:

IN WITNESS WHEREOF, the Company designated on the Declarations page has caused this Policy to be signed by its President and Secretary and countersigned on the Declarations page by a duly authorized representative of the Company.

*Paul D. Ziccarelli*
Secretary

*Dew Featherdale*
President

*R L Mellor*
President

APRIL 28, 1998
Countersigned Date

HOUSTON, TX
Countersigned At

Authorized Representative

STPAULFS.DOC

**ENGLISH MARINE AGENCY INC.**
1120 S. COMMERCE
HARLINGEN, TEXAS 78550



EXHIBIT
A

The **St Paul**

# SECTION I

# MARINE GENERAL LIABILITY

# GENERAL CONDITIONS

(1)     **NAMED INSURED:**              BORDER SHIPYARDS, INC.

(2)     **THE NAMED INSURED IS:**       CORPORATION

(3)     **ADDRESS OF THE INSURED:**     400 'D' ROAD
                                        BROWNSVILLE, TEXAS 78320

(4)     **LOSS, IF ANY PAYABLE TO:**    ASSURED OR ORDER

(5)     **POLICY PERIOD:**

Subject to its terms and conditions, this policy shall cover all occurrences on or after _April 28, 1998_ and prior to _April 28, 1999_ beginning and ending at 12:01 A.M. Central Daylight Time unless sooner terminated as hereinafter provided.

(6)     **PREMIUM:**     $ 12,000.00      MINIMUM & DEPOSIT PREMIUM

The Assured, by acceptance of this Policy, agrees to keep an accurate record of all Gross Charges for operations covered under the terms and conditions of this Policy, which record shall be open to examination by representatives of this Company at all times during business hours, during the term of this Policy or thereafter, and further agrees to report to this Company on or before **May 28, 1999**, the total amount thereof (collected and uncollected) for the preceding period or such period of time as is within the term of this Policy. If gross receipts exceed $280,000 the earned premium hereunder to be computed thereon at the rate of **$3.30 per each $100.00** and applied against the Deposit Premium until same is exhausted, following which all further earned premium shall be due and payable to this Company at time of filing the report on which the earned premium is due. This Company shall have the right of setoff against the claims payable under this Policy of any premiums due hereunder. It is agreed that, except in the event of cancellation of this Policy by this Company, the Minimum Premium hereunder shall be $12,000.00. The Deposit Premium, payable upon attachment of this Policy, shall be $12,000.00.

1

**The St Paul**

(7)     LIMIT OF LIABILITY:

It is understood and agreed the liability of this company shall not exceed $1,000,000 any one occurrence, including all claims, costs and expense regardless of the number of coverages involved and $ 2,000,000 any one policy period with respect to liability included within the products hazard or completed operations hazard, including all claims, costs and expense regardless of the number of coverages involved.  Any applicable deductible amount is to be included within the occurrence or aggregate limit.  Notwithstanding the above any limit or sublimit contained elsewhere herein, or added by endorsement shall apply but in no event shall any limit or sublimit contained elsewhere herein increase the occurrence or aggregate limit as stated above.

(8)     DEDUCTIBLE:

No claim shall be payable hereunder unless the aggregate liability for any one occurrence, including claims, costs and expense exceeds the sum of $10,000.00 and this sum shall be deducted from the amount payable hereunder for each occurrence, including claims, costs and expense.

(9)     AUTOMATIC COVERAGE-NEWLY ACQUIRED ORGANIZATIONS (90 DAYS):

The word "insured" shall include as Named Insured any organization which is acquired or formed by the Named Insured and over which the Named Insured maintains ownership or majority interest, other than a joint venture, provided this insurance does not apply to bodily injury, property damage, personal injury or advertising injury with respect to which such new organization under this policy is also an insured under  any other similar liability or indemnity policy or would be an insured under any such policy but for exhaustion of its limits or liability.   The insurance afforded hereby shall terminate  Ninety (90) days  from the date any such organization is acquired or formed by the named insured and shall not increase this company's limit of liability as set forth in paragraph 7, Limit of Liability.

(10)   CANCELLATION:

This policy may be canceled by the Named Insured by surrender thereof to this company through the Named Insured's authorized agent or broker or by mailing to this company, through the Named Insured's authorized agent or broker, written notice stating when thereafter the cancellation shall be effective.

This policy may be canceled by this company by mailing to the named insured at the address shown in this policy, written notice stating when not less than thirty (30) days thereafter such cancellation shall be effective except for ten (10) days in the event of non-payment of premium.  Such notice sent to the Named Insured in care of the agent or broker who negotiated this policy shall have the same effect as if sent directly to the named insured.

# The St Paul

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the company shall be equivalent to mailing.

If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either practicable after cancellation becomes effected or as soon as practicable after cancellation becomes effective, but payment or tender or unearned premium is not a condition of cancellation .

**(11)   POLICY TERRITORY:**

United States of America and as per "Limited Worldwide Liability Coverage" clause as described on Paragraph IX of Section III Marine General Liability Additional Coverage.

**(12)   PERSONS INSURED:**

Each of the following is an insured under this insurance to the extent set forth below:

(A)   If the Named Insured is designated in the General Conditions as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor and the spouse of the Named Insured with respect to the conduct of such a business;

(B)   If the Named Insured is designated in the General Conditions is a partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(C)   If the Named Insured is designated in the General Conditions as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(D)   Any person (other than an employee of the Named Insured) or organization while acting as real estate manager for the Named Insured; and

(E)   With respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law:

1.   An employee of the Named Insured while operating any such equipment in the course of his employment, and

3

**The St Paul**

2. Any other person while operating with the permission of the Named Insured any such equipment registered in the name of the Named Insured and any person or organization legally responsible for such operation, but only if there is no other valid or collectible insurance available, either on a primary or excess basis, to such person or organization;

Provided that no person or organization shall be an insured under this paragraph E with respect to:

3. Bodily injury to any fellow employee of such person injured in the course of his employment, or

4. Property damage to property owned by, rented to, in charge of or occupied by the Named Insured or the employer of any person described in subparagraph 2.

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a Named Insured;

(F) **ADDITIONAL PERSONS INSURED:**

As respects bodily injury, property damage and personal injury and advertising injury coverage under the provision *"Persons Insured"*, the following are added as insureds:

1. Spouse/Partnership - If the Named Insured is a partnership, the spouse of a partner but only with respect to the conduct of the business of the Named Insured;

2. Employee - Any employee (other than executive officers) of the Named Insured while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

   a) To bodily injury or personal injury to another employee of the Named Insured arising out of or in the course of his employment;

   b) To personal injury or advertising injury to the Named Insured or, if the Named Insured is a partnership or joint venture, any partner or member thereof, or the spouse of any of the foregoing;

4

CVAPDF - www.fesico.com

**The St Paul**

c)   To property damage to property owned, occupied or used by, rented to, in the care, custody or control of or over which physical control is being exercised for any purpose by another employee of the Named Insured, or by the Named Insured or, if the Named Insured is a partnership or joint venture, by any partner or member thereof or by the spouse of any of the foregoing;

## (13)   DEFINITIONS:

When used in this policy (including endorsements forming a part hereof):

(A)   *"Automobile"* means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

(B)   *"Bodily Injury"* means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

(C)   *"Collapse Hazard"* includes *"Structural Property Damage"* as defined herein and property damage to any other property at any time resulting therefrom. "Structural Property Damage" means the collapse of or structural injury to any building or structure due to (1) Grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work or (2) Moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) Arising out of operations performed for the named insured by independent contractors, or (2) Included within the completed operations hazard or the underground property damage hazard, or (3) For which liability is assumed by the insured under an incidental contract.

(D)   *"Completed Operations Hazard"* includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, part or equipment furnished in connection therewith.   Operations shall be deemed completed at the earliest of the following times:

1.   When all operations to be performed by or on behalf of the named insured under the contract have been completed.

2.   When all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

5

The St.Paul

3.   When the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed;

The completed operations hazard does not include bodily injury or property damage arising out of:

4.   Operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

5.   The existence of tools, uninstalled equipment or abandoned or unused materials, or

6.   Operations for which the classification stated in the policy or in the company's manual specifies *including completed operations*.

(E)   *"Elevator"* means any hoisting or lowering device to connect floors or landings whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery, but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls or a hold or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

(F)   *"Explosion Hazard"* includes property damage arising out of blasting or explosion.  The explosion hazard does not include property damage (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the named insured by independent contractors, or (3) included within the completed operations hazard or the underground property damage hazard, or (4) for which liability is assumed by the insured under an incidental contract;

(G)   *"Incidental Contract"* means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement;

6

# The St Paul

(H)   *"Insured"* means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

(I)   *"Mobile Equipment"* means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills, concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

(J)   *"Named Insured"* means the person or organization named in the General Conditions of this policy;

(K)   *"Named Insured's Products"* means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "Named Insured's Products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

(L)   *"Occurrence"* means an accident, including continuous or repeated exposure in conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

The definition of occurrence includes any intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protection persons or property;

(M)   *"Policy Territory"* means (1) the United States of America, its territories or possessions, or Canada, or (2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation;

(N)   *"Products Hazard"* includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

7

CVisPDF - www.fenix.com

# The St Paul

(O)    *"Property Damage"* means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

(P)    *"Underground Property Damage Hazard"* includes underground property damage as defined herein and property damage to any other property at any time resulting therefrom, "Underground Property Damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving.  The underground property damage hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard, or (3) for which liability is assumed by the insured under an incidental contract.

**(14)   CONDITIONS:**

(A)    *Financial Responsibility Laws*

When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law.  The insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

(B)    *Insured's Duties in the Event of Occurrence, Claim or Suit*

1)  In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereto, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company as soon as practicable;

If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative;

2)  The insured shall cooperate with the company and, upon the company's request assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy;

8

The **St Paul**

and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

(C)   *Action Against Company*

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

(D)   *Other Insurance*

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

1. Contribution By Equal Shares: If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

9

The St Paul

2. Contribution By Limits: If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

(E) *Subrogation*

In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

(F) *Changes*

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

(G) *Assignment*

Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon, if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, by only until the appointment and qualification of the legal representative.

(H) *Declarations*

By acceptance of this policy, the named insured agrees that the statements in the application on file with this company are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

10



# SECTION II

# COVERAGE

(1)     The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

|  |  |
|---|---|
| **COVERAGE A** | **Bodily Injury** |
| **COVERAGE B** | **Property Damage** |

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claims or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments, settlements, or related expenses.

## <u>EXCLUSIONS</u>

(2)     The insurance afforded hereunder is subject to the following exclusions:

(A)     To liability assumed by the insured under any contract or agreement except an incidental contract, but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(B)     To bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

     1.     Any automobile or aircraft operated by any person in the course of his employment by any insured,

     2.     Any automobile or aircraft owned or operated by or rented or loaned to any insured, or

but this exclusion does not apply to the parking of any automobile on premises owned by, rented to or controlled by the named insured or by the ways immediately adjoining, if such automobile is not owned by or rented or loaned to any insured;

(C)     To bodily injury or property damage arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

1

CMsPDF - www.fsvita.com

**The St Paul**

(D)   To bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to any insured;

(E)   To bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

    1.   Any watercraft owned or operated by or rented or loaned to any insured, or

    2.   Any other watercraft operated by any person in the course of his employment by any insured;

but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured. Notwithstanding anything contained above, this exclusion does not apply to operations covered under <u>Section 4, Ship Repairer's Legal Liability Clauses and Section 5, Wharfinger's Liability Clauses</u> of this policy;

(F)   This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, radioactive substances, acids, alkalis, toxic irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water;

(G)   To bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to liability assumed by the insured under an incidental contract;

(H)   To bodily injury or property damage for which the insured or his indemnitee may be held liable:

    1.   As a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

    2.   If not so engaged, as an owner or lessor of premises used for such purposes; if such liability is imposed:

        a)   By, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

        b)   By reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

But part b of this exclusion (H) does not apply with respect to liability of the insured or his indemnitee as owner or lessor described in 2 above;

2

CVisPDF - www.fasisia.com

# The St Paul

(I)  to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(J)  to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured under an incidental contract;

(K)  to property damage to:

1.  property owned or occupied by or rented to the insured,

2.  property used by the insured, or

3.  property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

Notwithstanding anything contained above, this exclusion does not apply to operations covered under Section IV of this policy;

(L)  to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(M)  to loss of use of tangible property which has not been physically injured or destroyed resulting from:

1.  a delay in or lack of performance by or on behalf of the named insured or any contract or agreement, or

2.  the failure of the named insured's products of work performed by or on behalf of the named insured to meet the level of performance after such products or work have been put to use by any person or organization other than an insured.

but this exclusion does not apply to loss or use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(N)  to property damage to the named insured's products arising out of such products or any part of such products;

3

The St Paul

(O)     to property damage to work performed by or on behalf of the named insured arising out of the work of any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(P)     to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property to which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(Q)     to property damage included within:

1.      ~~the explosion hazard~~ AMP
2.      ~~the collapse hazard~~ AMP
3.      the underground property damage hazard;

(R)     for bodily injury or property damage, including loss of use thereof, arising out of the manufacturing, processing, handling, distribution, sale application or use of asbestos, or asbestos related products(s).

4

**The St Paul**

## SECTION III

## MARINE GENERAL LIABILITY

## ADDITIONAL COVERAGE

**I.**     **CONTRACTUAL LIABILITY COVERAGE**

**A.**     The definition of <u>incidental contract</u> is extended to include any oral or written contract or agreement relating to the conduct of the Named Insured's business.

**B.**     The insurance afforded with respect to liability assumed under an incidental contract is subject to the following <u>additional exclusions</u>:

    **1.**     To bodily injury or property damage for which the insured has assumed liability under any incidental contract, if such injury or damage occurred prior to the execution of the incidental contract.

    **2.**     If the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of the rendering of or the failure to render professional services by such insured, including:

        **a.**     The preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

        **b.**     Supervisory, inspection or engineering services.

    **3.**     If the indemnitee of the insured is an architect, engineer or surveyor, to the liability of the indemnitee, his agents or employees, arising out of:

        **a.**     The preparation of approval of maps, drawings, opinions reports, surveys, specifications, or

        **b.**     The giving of or the failure to give directions or instructions by the indemnitee, his agents or employees, provided such giving or failure to give is the primary cause of the bodily injury or property damage.

    **4.**     To any obligation for which the insured may be held liable in an action on a contract by a third party beneficiary for bodily injury or property damage arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project.

1

The St.Paul

5. To bodily injury or property damage arising out of construction or demolition operations, within 50 feet of any railroad property, and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; but this exclusion does not apply to sidetrack agreements.

C. Section Two Bodily Injury and Property Damage Exclusions *2B, C, D and E, (applicable under Section Two), are not applicable under this Section Three (III), Contractual Liability Coverage.

D. The following additional condition applies:

*Arbitration*
The company shall be entitled to exercise all of the insured's rights in the choice of arbitrators and in the conduct of any arbitration proceeding.

## II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

A. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay damages because of personal injury or advertising injury to which the insurance applies sustained by any person or organization and arising out of the conduct of the named insured's business within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

B. This insurance does not apply:

1. To liability assumed by the insured under any contract or agreement;

2. To personal injury or advertising injury arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge of consent of the insured;

3. To personal injury or advertising injury arising out of a publication or utterance of a libel or slander, or a publication or utterance in violation or an individual's right of privacy. If the first injurious publication or utterance of the same or similar material by or on behalf of the named insured was made prior to the effective date of this insurance;

4. To personal injury or advertising injury arising out of libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the insured with knowledge of the falsity thereof;

2

**The St Paul**

5.    To personal injury or advertising injury arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in the declarations of the policy as a named insured;

6.    To advertising injury arising out of:

    a.    Failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract, or

    b.    Infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised, or

    c.    Incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised

7.    With respect to advertising injury:

    a.    To any insured in the business of advertising, broadcasting, publishing or telecasting, or

    b.    To any injury arising out of any act committed by the insured with actual malice.

**C.    Limit of Liability**

Regardless of the number of (1) insureds hereunder, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of personal injury or advertising injury, the total limit of the company's liability under this coverage for all damages shall not exceed the limit of liability, as outlined in Section I, General Conditions Clause 7.

**D.    Additional Definitions**

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the course of the name insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright title or slogan.

"Personal Injury" means injury arising out of one or more of the following offenses committed during the policy period:

1.    False arrest, detention, imprisonment, or malicious prosecution;

2.    Wrongful entry or eviction or other invasion of the right of private occupancy;

3

CVisPDF - www.favira.com



3.   A publication or utterance:

    a.   Of a libel or slander or other defamatory or disparaging material, or

    b.   In violation of an individual's right of privacy; except publications or utterances in the course of or related in advertising broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

## III.   PREMISES MEDICAL PAYMENTS COVERAGE

The company will pay to or for each person who sustains bodily injury caused by accident all reasonable medical expense incurred within one year from the date of the accident on account of such bodily injury, provided such bodily injury arises out of (a) a condition in the insured premises, or (b) operations with respect to which the named insured is afforded coverage for bodily injury liability under the policy.

The insurance <u>does not</u> apply:

A.   To bodily injury

    1.   Arising out of the ownership, maintenance, operation, use, loading or unloading of

        a.   Any automobile or aircraft owned or operated by or rented or loaned to any insured, or

        b.   Any other automobile or aircraft operated by any person in the course of his employment by any insured;

    but this exclusion does not apply to the parking of an automobile on the insured premises, if such automobile is not owned by or rented or loaned to any insured;

    2.   Arising out of

        a.   The ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity, or

        b.   The operation or use of any snowmobile or trailer designed for use therewith;

           (i)   Owned or operated by or rented or loaned to any insured.

4

**The St Paul**

(ii)     Operated by any person in the course of his employment by any insured;

3.     Arising out of the ownership, maintenance, operation, use, loading or unloading of

    a.     Any watercraft owned or operated by or rented or loaned to any insured, or

    b.     Any other watercraft operated by any person in the course of his employment by any insured but this exclusion does not apply to watercraft while ashore on the insured premises;

4.     Arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the named insured;

B.     To bodily injury

1.     Included within the completed operations hazard or the products hazard.

2.     Arising out of operations performed for the named insured by independent contractors other than:

    a.     Maintenance and repair of the insured premises, or

    b.     Structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

3.     Resulting from the selling, serving or giving of any alcoholic beverage

    a.     In violation of any statute, ordinance or regulation;

    b.     To a minor;

    c.     To a person under the influence of alcohol, or;

    d.     Which causes or contributes to the intoxication of any person.

if the named insured is a person or organization engaged in the business of manufacturing, distribution, selling or serving alcoholic beverages, or if not so engaged is an owner or lessor of premises used to such purposes but only part (a) of this exclusion (b) (3) applies when the named insured is such an owner or lessor.

4.     Due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing.

5

# The St.Paul

C.  To bodily injury

1.  To the named insured, any partner thereof, any tenant or other person regularly residing on the insured premises or any employee of any of the foregoing if the bodily injury arises out of and in the course of his employment therewith;

2.  To any other tenant if the bodily injury occurs on that part of the insured premises rented from the named insured or to any employee of such a tenant if the bodily injury occurs on the tenant's part of the insured premises and arises out of and in the course of his employment for the tenant;

3.  To any person while engaged in maintenance and repair of the insured premises or alteration, demolition or new construction at such premises;

4.  To any person if any benefits for such bodily injury are payable or required to be provided under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

5.  To any person practicing instructing or participating in any physical training sport, athletic activity or contest whether on a formal or informal basis;

6.  If the named insured is a club, to any member of the named insured;

7.  If the named insured is a hotel, motel, or tourist court, to any guest of the named insured.

D.  To any medical expense for services by the named insured, any employee thereof or any person or organization under contract to the named insured to provide such services.

## Limit Of Liability

The limit of liability for Premises Medical Payments Coverage is $1,000.00 each person.  The limit of liability applicable to "each person" is the limit of the company's liability for all medical expense for bodily injury to any one person as the result of any one accident; but subject to the above provision respecting "each person", the total liability of the company under Premises Medical Payments Coverage for all medical expense for bodily injury to two or more persons as the result of any one accident shall not exceed the limit of bodily injury liability stated in the policy as applicable to "each occurrence".

When more than one medical payments coverage afforded by the policy applies to the loss, the company shall not be liable for more than the amount of the highest applicable limit of liability.

6

**The St Paul**

*Additional Definitions*

When used herein:

"Insured Premises" means all premises owned by or rented to the named insured with respect to which the named insured is afforded coverage for bodily injury liability under this policy, and includes the ways immediately adjoining on land;

"Medical Expense" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral service.

*Additional Condition*

Medical Reports:  Proof and Payment of Claim

As soon as practicable the insured person or someone on his behalf shall give to the company written proof of claim, under oath if required, and shall, after each request from the company, execute authorization to enable the company to obtain medical reports and copies of records.  The injured person shall submit to physical examination by physicians selected by the company when and as often as the company may reasonably require.  The company may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder to such injury.  Payment hereunder shall not constitute an admission of liability of any person or except hereunder, of the company.

Notwithstanding anything contained herein to the policy deductible as outlined in Section I Clause No. 8 of the General Conditions does not apply as respect to this section only.

## IV.    HOST LIQUOR LAW LIABILITY COVERAGE

Section II, exclusion (H) does not apply with respect to liability of the insured on his indemnitee arising out of the giving or serving of alcoholic beverages at functions incidental to the named insured's business, provided the named insured is not engaged in the business of manufacturing, distributing, selling, or serving of alcoholic beverages.

## V.    FIRE LEGAL LIABILITY COVERAGE - REAL PROPERTY

With respect to property damage to structures or portions thereof rented or leased to the named insured, including fixtures permanently attached thereto, if such property damage arises out of fire;

a.    All of the exclusions of the policy, other than the Nuclear Energy Liability Exclusion (Broad Form), are deleted and replaced by the following:

This insurance does not apply to liability assumed by the insured under any contract or agreement.

7

CMXPDF - www.fenix.com

**The St Paul**

b.   The limit of property damage liability as respects this Fire Legal Liability Coverage-Real Property is $50,000. each occurrence.

c.   The Fire Legal Liability Coverage-Real Property shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof), available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage, and the Other Insurance Condition of the policy is amended accordingly.

## VI.   BROAD FORM PROPERTY DAMAGE LIABILITY COVERAGE (INCLUDING COMPLETED OPERATIONS)

(A)   Section II, exclusions K and O are replaced by the following:

1.   To property owned or occupied by or rented to the insured, or, except with respect to the use of elevators, to property held by the insured for sale or entrusted to the insured for storage or safekeeping.

2.   Except with respect to liability under a written sidetrack agreement or the use of elevators:

a.   To property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured,

b.   To tools or equipment while being used by the insured in performing his operations,

c.   To property in the custody of the insured which is to be installed, erected or used in construction by the insured,

d.   To that particular part of any property, not on premises owned by or rented to the insured,

(i)   Upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out such operations, or

(ii)   Out of which any property damage arises, or

(iii)   The restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;

3.   With respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.

8

CtoPDF - www.fenho.com

# The St Paul

B.  The Broad Form Property Damage Liability Coverage shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage and other Insurance Condition of the policy is amended accordingly.

## VII.  INCIDENTAL MEDICAL MALPRACTICE LIABILITY COVERAGE

The definition of bodily injury is amended to include Incidental Medical Malpractice Injury.

Incidental Medical Malpractice Injury means injury arising out of the rendering of or failure to render during the policy period, the following services:

a.  Medical, surgical, dental x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith, or

b.  The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

This coverage does not apply to:

1.  Expenses incurred by the insured for first-aid to others at the time of an accident and the "Supplementary Payments" provision and the "Insured's Duties in the Event of Occurrence, Claim or Suit" Condition are amended accordingly:

2.  Any insured engaged in the business or occupation of providing any of the services described under VII (A) and (B) above;

3.  Injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under VII (A) and (B) above.

## VIII.  NON-OWNED WATERCRAFT LIABILITY COVERAGE

Section II Exclusion (E) does not apply to any watercraft herein provided such watercraft is neither owned by the name insured nor being used to carry persons or property for a charge.

Where the insured is, irrespective of this coverage, covered or protected against any loss or claim which would otherwise have been paid by the company under this endorsement, there shall be no contribution or participation by this company on the basis of excess, contributing, deficiency, concurrent, or double insurance or otherwise.

9

**The St Paul**

## IX.  LIMITED WORLDWIDE LIABILITY COVERAGE

The definition of policy territory is amended to include the following:

Anywhere in the world with respect to bodily injury, property damage, personal injury or advertising injury arising out of the activities of any insured permanently domiciled in the United States of America though temporarily outside the United States of America, its territories and possessions or Canada, provided the original suit for damages because of any such injury or damage is brought within the United Sates of America, its territories or possessions or Canada.

Such insurance as is afforded above shall not apply:

      a.    To bodily injury or property damage included within the completed operations hazard or the products hazard;

      b.    To Premises Medical Payments Coverage.


## X.  IN REM ENDORSEMENT

It is agreed that any loss, otherwise covered by this policy, shall be considered covered thereby even though asserted by an action "In Rem" instead of action "In Personam" all limitations, exclusions and other provisions of the policy shall be applicable to this endorsement.


## XI.  TRAVELING WORKMEN ENDORSEMENT

This insurance is extended to cover work performed by persons employed by or on behalf of the Assured whenever they are aboard the vessel and/or drilling rig at sea or in any port for the purpose of effecting repairs and/or other work entrusted to the Assured notwithstanding that such persons may be signed on as members of the vessel's crew.


## XII.  BLANKET WAIVER/ADDITIONAL ASSUREDS ENDORSEMENT

It is agreed that the Underwriters waive their rights of subrogation against any person or company to whom the Named Assured is obligated by written contract to provide such waiver with respect to third party vessels while being repaired/constructed by the Named Assured.

It is further agreed that to the extent that the Named Assured is obligated by written contract to name any one person(s) or company as Additional Assured hereunder, the Underwriters agree that such person(s) or company shall be considered as additional Assureds but only with respect to and while said third party additional assured's party vessels are being repaired or constructed.


## XIII.  GULF OF MEXICO EXTENSION

It is agreed that the coverage afforded by this policy is extended to cover operations of the named insured in the Gulf of Mexico.

CVAPDF - www.faxlic.com

**The St.Paul**

## XIV.   INDEPENDENT AND/OR SUB-CONTRACTORS ENDORSEMENT

It is agreed to include the liability of Independent and/or sub-contractors whilst doing work for the assured, subject to such work being normal and/or incidental to that of the assured.

Excluding liability to the employees and/or equipment of such independent and/or sub-contractors, but this exclusion shall not exclude liability for claims made against the Assured's principal by such Independent and/or subcontractors employees for which the assured is responsible under a normal contractual agreement made between the assured and his principal.

It is a condition of this insurance that the assured gives no waiver of rights of subrogation against such independent and/or sub-contractors; all receipts relating to such operations are declared and the premium as stated in the policy paid thereon; subject otherwise to all terms and conditions of the assured policy.

## XV.   RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

(A)   ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

(B)   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

(C)   any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

## XVI.   GAS-FREEING AND SIMILAR ACTIVITIES EXCLUSION CLAUSE

This policy will not indemnify the Assured for any loss, damage, liability or expense including legal fees as a result of gas-freeing operations, including stripping, blowing and other similar activities related to gas-freeing.

# The St Paul

## XVII.  LEASED WORKER EXCLUSION

Notwithstanding anything contained elsewhere herein to the contrary, including but not limited to Section I of the Marine General Liability Form, this coverage specifically excludes, does not provide coverage for and will not pay in any circumstance, in whole or in part, in contribution, in excess of or otherwise, any sum(s) for which the Insured is or may become liable including but not limited to, the duty and/or the costs of defense with respects to tort and/or contractual liability for bodily injury and/or personal injury to LEASED WORKERS.

Further, this exclusion modifies the duty to defend obligation hereunder. To the extent that underwriters hereon can prove that this exclusion applies, there will be no duty to defend the Named Insured(s) and/or Additional Named Insured(s) regardless of what allegations and/or pleadings are made by the LEASED WORKER.

The term "LEASED WORKER(S)" as used in this endorsement is defined as any WORKER(s) which is engaged through an EMPLOYEE LEASING ARRANGEMENT with the named insured.

A WORKER means any person in the course or scope of employment.

EMPLOYEE LEASING ARRANGEMENT means an arrangement under lease, contract or other agreement made orally or in writing whereby an EMPLOYEE PROVIDER FIRM provided and/or intended and/or intends to provide one or more LEASED WORKERS to named assured for any period of time regardless of duration.

EMPLOYER PROVIDER FIRM means an entity or any affiliates whose principal business is providing WORKERS, as distinct from providing non-personnel services, to another entity to perform activities in furtherance of the business, trade or profession of the other entity at the business premises of or at locations designated by the other entity.

Notwithstanding the above, this endorsement does not exclude properly insured subcontractors. Properly Insured subcontractors are considered to include temporary employee service contractors which are both defined as worker(s) who are furnished to an entity to substitute for a permanent worker on leave or to meet seasonal or short term work load conditions. Properly insured is defined as being a subscriber to the workers compensation act for the state in which they are domiciled and those states in which they do business and/or any applicable federal workers compensation acts and liability insurance with limits at least equal to the limits of this policy. It is further agreed that said subcontractors shall require their underwriters to name the named insured herein as an additional insured and shall waive all rights of subrogation against the named insured herein and its principal. For the purposes of this endorsement the "principal" is defined as any party for whom the named insured is performing work.

**The St Paul**

## XVIII.   SEEPAGE AND POLLUTION BUY-BACK 72 HOUR CLAUSE (ON LAND ONLY)

Notwithstanding the seepage and pollution exclusion, paragraph II (f) of Section I contained in this policy, these shall not apply provided that the Insured establish that all of the following conditions have been met:

1.   The occurrence was accidental and was neither expected nor intended by the insured. An accident shall not be considered unintended or unexpected unless caused by some intervening event neither expected or intended by the Insured.

2.   The occurrence can be identified as commencing at a specific time and date. during the terms of this policy.

3.   The occurrence became known to the Insured within 72 hours after its commencement and was reported to Underwriters within 30 days thereafter.

4.   The occurrence did not result from the Insured's intentional or willful violation of any government statute, rule or regulation.

NOTHING CONTAINED IN THIS ENDORSEMENT SHALL OPERATE TO PROVIDE ANY COVERAGE HEREON WITH RESPECT TO:

1.   Removal of, loss of, or damage to sub-surface oil, gas, or any other substance.

2.   Fines, penalties, punitive damages, exemplary damages, treble damages, or any other damages resulting from the multiplication of compensatory damages.

3.   Any site or location used in whole or in part for the handling, processing, treatment, storage, disposal, or dumping of any waste materials or substance.

4.   The cost of evaluating and/or monitoring and/or controlling seeping and/or contaminating substances.

5.   The cost of removing and/or nullifying and/or cleaning up seeping and/or polluting and/or contaminating substances on property at any time owned and/or leased and/or rented by the Insured and/or under the control of the Insured.

6.   Loss of, damage to, or loss of use,   property directly or indirectly resulting from subsidence caused by subsurface operations of the Insured.

7.   Blowout and Cratering.

Case 1:99-cv-00019   Document 23   Filed in TXSD on 04/20/2001   Page 80 of 107

**St.Paul**

American Institute

# SHIP REPAIRERS LIABILITY CLAUSES

(November 3, 1977)

9

To be attached to and form a part of Policy No. _____ of the _____ 1

2

The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the latter being hereby waived, except provisions required by law to be inserted in the policy. 3 4

1. This Policy insures _____ 5

_____ 6

(hereinafter referred to as the Assured). 7

2. Policy Period: From _____ to _____ 12:01 A.M. Standard Time at the Assured's premises as stated in Clause 2. 8 9

3. In consideration of the payment of premium as hereinafter provided, and subject to the limits of liability, exclusions, conditions and other terms of this Policy, this Company agrees to pay on behalf of the Assured all sums which the Assured, as Ship Repairer, shall become legally obligated to pay: 10 11 12

  A. By reason of the liabilities imposed upon the Assured by law for physical loss of or damage to watercraft and their equipment, cargo, or other interests on board, occurring only while such watercraft are in the care, custody or control of the Insured for the purpose of repair or alteration at _____ 13 14 15 16

or while such watercraft are being moved via inland waters for a distance not in excess of _____ miles in connection with repairs or alteration; 17 18

  B. By reason of the liabilities imposed upon the Insured by law as damages because of property damage caused by a watercraft covered under "A" above while in the care, custody, or control of the Assured and being navigated or operated away from premises described in "A" above within permitted waters by an employee or employees of the Assured or in tow of a tug not owned by or demise chartered to the Assured. It is a condition of this Clause 3B that any employee of the Assured engaged in the navigation of a watercraft described herein shall possess such license as is required by the United States Coast Guard or any other applicable regulatory authority to perform the duties being carried out by said employee; 19 20 21 22 23 24

  C. For the cost of defending any suit against the Assured on any claim based on a liability or an alleged liability of the Assured covered by this insurance if the amount of the claim hereunder exceeds the amount deductible under this Policy, but this Company shall not be liable for the cost or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of this Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense. The cost and expense of prosecuting any claim in which the Assured shall have an interest by subrogation or otherwise, shall be divided between the Assured and this Company, proportionately to the amounts which they want to receive, respectively, if the suit should be successful. 25 26 27 28 29 30

4. The maximum liability of this Company on account of any one occurrence shall be: 31

  A. $ _____ with respect to each watercraft including its equipment, cargo, and other interests on board covered by Clause 3A; 32

  B. $ _____ any one occurrence with respect to liability covered by Clause 3B; 33

  C. The legal costs, fees and expenses covered by Clause 3C. 34

The maximum aggregate liability of this Company on account of any one occurrence with respect to the coverage afforded under Sections 4 A, B and C above shall be $ _____ 35 36

5. The Assured, by acceptance of this Policy, agrees to keep an accurate record of all Gross Charges for operations covered under the terms and conditions of this Policy, which record shall be open to examination by representatives of this Company at all times during business hours, during the term of this Policy or thereafter, and further agrees to report to this Company on or before the last day of each month the total amount thereof (collected and uncollected) for the preceding month or such period of time as is within the term of this Policy: the earned premium hereunder to be computed thereon at the rate of $ _____ per each $100.00 and applied against the Deposit Premium until same is exhausted, following which all further earned premium shall be due and payable to this Company at time of filing the report on which the earned premium is due: and any unearned premium, being the amount by which the Deposit Premium exceeds the earned premium, shall be refunded upon expiration or cancellation of this Policy. This Company shall have the right of setoff against the claims payable under this Policy of any premiums due hereunder. It is agreed that, except in the event of cancellation of this Policy by this Company, the Minimum Premium hereunder shall be $ _____ The Deposit Premium, payable upon attachment of this Policy, shall be $ _____ 37 38 39 40 41 42 43 44 45 46

6. NOTWITHSTANDING THE FOREGOING, it is hereby expressly understood and agreed that this Policy does not cover against nor shall any liability attach hereunder for: 47 48

  A. The first $ _____ of any claim or claims, including legal fees and expenses, arising out of the same occurrence and insured against hereunder; 49 50

  B. Death or personal injury; 51

  C. Any liability assumed under contract or otherwise in extension of the liability which would have been imposed upon the Assured by law in the absence of contract; 52 53

  D. Loss, damage or expense arising in connection with work on any vessel which has carried flammable or combustible liquid in bulk as fuel or cargo or any vessel which has carried flammable compressed gas in bulk, unless such work is done in accordance with the requirements of the rules and regulations of the National Fire Protection Association applicable to such work; 54 55 56

  E. Demurrage, loss of time, loss of freight, loss of charter and/or similar and/or substituted expenses; 57

  F. Loss, damage or expense which may be recoverable under any other insurance inuring to the benefit of the Assured except as to any excess over and above the amount recoverable thereunder; 58 59

2282 Ed. 9-83 Printed in U.S.A.

# The St Paul

### SECTION V

## *WHARFINGERS LIABILITY CLAUSES*

### *(BROAD FORM)*

| | |
|---|---|
| **ASSURED:** | BORDER SHIPYARDS, INC. |
| **ST. PAUL POLICY NO.:** | 342ZT5561 |
| **TERM:** | April 28, 1998 to April 28, 1999 |
| **LOCATION(S):** | 400 'D' Road<br>Brownsville, Texas 78320 |
| **POLICY LIMIT:** | $1,000,000 |
| **DEDUCTIBLE:** | $10,000 |
| **PREMIUM:** | $ 12,000 Minimum & Deposit |
| **PREMIUM RATES:** | Per page 1 of Section I |
| **REPORTING BASIS:** | Per page 1 of Section I |

# The St Paul

## TERMS AND CONDITIONS

*I.*   **COVERAGE**

This policy covers the legal liability of the Assured as Wharfingers (whether arising from negligence or otherwise) for:

1. Loss, damage and/or expense, including demurrage and loss of use, to vessels and/or barges, their apparel or equipment, their freight and cargoes and other interests on board (but excluding wear and tear), the property of others (including the cost or expense of removal of wreck of such property provided said wreck situation was brought about as a result of an accident or occurrence arising during the term of this insurance), whilst docked and/or moored and/or tied up at the Assured's docks and/or landing and/or fleeting sites at the locations named above or whilst approaching or departing therefrom.

2. Death or injury to any persons (except as excluded herein) and loss, damage and/or expense to other vessels and/or barges, their apparel or equipment, their freights and cargoes and other interests on board, and to cargoes, wharves, piers, docks, jetties, bridges, lighters, elevators, cars, carfloats or any other property or thing (not owned by or chartered to the Assured), resulting from or growing out of the Assured's operation as a Wharfinger.

*II.*   **LIMIT OF LIABILITY**

The liability of underwriters hereunder is limited to the amount shown above as the Policy Limit per any one accident, casualty or occurrence or series of accidents, casualties or occurrences arising directly or indirectly, from the same cause, incident or event.

*III.*   **ATTACHMENT**

This insurance attaches from the moment the said vessels and/or barges become at the risk of the Assured at the locations specified herein and covers continuously thereafter, during the term of this insurance, until removed from said locations of until no longer at the risk of the Assured, whichever shall first occur. However, in the event of temporary removal of a barge and/or vessel to within five (5) miles of the locations specified herein in an emergency or other unusual situation and provided that the Assured remains in the position of custodian or bailee of such barge and/or vessel, this policy will continue to cover the Assured's liabilities.

2

CSXPDF – www.fastio.com

# The St Paul

## IV.  DEDUCTIBLE

No claim shall be payable under this policy unless the aggregate liability of the Assured arising out of the same accident or occurrence and insured hereunder, plus any costs and expenses incurred in investigating and defending said accident or occurrence, exceeds the amount of the deductible shown above and this sum shall be deducted from the amount payable hereunder on account of liability arising from each such accident or occurrence.

## V.  PREMIUM

In consideration of the payment of the annual minimum and deposit premium shown above this policy provides Wharfinger's Liability insurance as defined herein.  The Assured, by the acceptance of this policy, agrees to keep a complete and accurate record of vessels and/or barges in respect of which insurance is provided by this policy and to report to the Company at the end of each *"Reporting Basis"* period shown above, the number of vessel/barge days (a vessel/barge day being defined as a period of 24 consecutive hours or part thereof during which a vessel and/or barge is at risk at the Assured's facility described above during that period).  Premium shall be assessed at the rates shown above and applied to the minimum and deposit until such deposit is exhausted.  Thereafter additional premium, if any, shall be payable as invoiced upon reporting.

## VI.  EXCLUSIONS

Notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that this insurance does not cover against nor shall any liability attach hereunder for loss, damage, injury or expenses arising from:

1.  Liability assumed under contract, express or implied, or otherwise in extension of the liability imposed upon the Assured by law.

2.  Death, personal injury, sickness, maintenance, cure or wages of any employee of the Assured or the Assured's sub-contractors or any person in the event that the occurrence takes place on shoreside premises owned or leased or used by the Assured.

3.  Vessel repair, construction, conversion or gas-freeing performed by the Assured.

3

# The St Paul

4. Loss, damage or expense resulting from loading or unloading of vessels and/or barges.

5. Loss or damage to cargo during loading, unloading or handling.

6. Loss, damage or expense which may be recoverable under any other insurance in the Assured's favor. *(see also* OTHER INSURANCE *herein)*.

7. Loss, damage or expense caused by or attributable to vessels owned by or chartered to the Assured.

8. Loss or damage to property owned by or leased or chartered to the Assured or utilized by the Assured in its business.

9. Loss or damage to vessels or craft stored ashore.

10. Liability arising directly or indirectly in consequence of the actual or potential discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, petroleum products or derivatives, liquids or gases, waste materials, sewerage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere or any water course or body of water except as provided for under POLLUTION COVERAGE herein.

11. Fines or penalties of any kind or nature whatsoever levied against the Assured.

12. Loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but the foregoing shall not exclude collision, explosion or contact with any fixed or floating object (other than a torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power, and for the purpose of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power; also warranted free, whether in time of peace or war, from all loss or damage caused by any weapon of war employing atomic fission or radioactive force. Further warranted free from the consequences of civil war, revolution, rebellion, insurrection or civil strife arising therefrom, or piracy.

# The St Paul

13. Any loss or damage caused by or resulting from strikes, lock-outs, labor disturbances, riots, civil commotions or the acts of any person or persons taking part in any such occurrence or disorder.

## VII. POLLUTION COVERAGE

**(A)    WITH RESPECT TO POLLUTION EMANATING FROM WATERCRAFT:**

This policy, subject otherwise to all its terms, limitations and conditions is extended to cover any loss, damage, cost, liability or expense the Assured, as Wharfingers, shall become liable to pay and shall pay in consequence of the actual or potential discharge, emission, spillage or leak upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever; provided, however, that notwithstanding anything to the contrary contained herein, the Company shall not be liable to indemnify the Assured:

1. For any loss, damage, cost, liability or expense paid or incurred in consequence of any such actual or potential discharge, emission, spillage or leakage unless proximately caused by fault on the part of the Assured.

2. For any loss, damage, liability or expense incurred by the Assured, under the provisions of any federal, state or local legislation regulating or controlling the discharge, emission, spillage or leakage of oil or any other substance into navigable waters or elsewhere and/or the removal of or liability for such discharge, emission, spillage or leakage. . The phrase "federal, state or local legislation" shall include laws or regulations of any foreign nation or political subdivision thereof, or of the District of Columbia, the Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the Virgin Islands and the Trust Territory of the Pacific Islands.

3. For any loss, damage, liability or expense which would have been payable according to the terms of a Policy written on the current form issued by the Water Quality Insurance Syndicate.

4. For any fine or penalty arising out of the actual or potential discharge, emission, spillage, or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

5

# The St Paul

**(B)    WITH RESPECT TO POLLUTION EMANATING FROM ANY OTHER SOURCE:**

This insurance shall be free from liability or expense arising directly or indirectly in consequence of the actual or potential dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalies, petroleum products or derivatives, liquids or gases, waste materials, sewerage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere or any watercourse or body of water; but this exclusion does no apply if such discharge, dispersal, release or escape is sudden and accidental.

*This insurance afforded by this section shall not increase the limit of the Company's liability under the policy with respect to any one accident or occurrence, which shall be the Policy Limit.*

## VIII.    REMOVAL OF WRECK

With respect to the Assured's liability for the cost of expense of removal of wreck it is agreed that such cost or expense shall be reduced by the proceeds of any salvage that may inure to the benefit of the Assured. It is also a condition of this coverage that every reasonable effort shall be made to have the U.S. Army Corps of Engineers assume the responsibility and expense for removal of such wreck before claim is made hereunder.

## IX.    OTHER LOCATIONS

In addition to the locations named above this insurance is extended to automatically hold the assured covered in respect to additional docks, landings or fleeting sites bought, leased or otherwise acquired or taken over the Assured for Wharfingers operations after inception of this insurance, provided prompt notice is given to the Company and subject to payment of additional premium as may be required. In the event that notice as above is not given to the Company, within 30 days of the acquisition of the additional location, this extension becomes null and void.

6

**The St Paul**

## X.   SUE AND LABOR

In case of loss or damage, for which the Assured may be liable as a Wharfinger, it shall be lawful and necessary for the Assured, his or their factors, servants and assigns, to sue, labor and travel for , in and about the defense, safeguard and recovery of the lost or damaged property, or any part thereof without prejudice to this insurance. The expenses properly incurred shall be borne by the Assured and this Company proportionately to the extent of their respective interests.   It is especially agreed that any expense or charge incurred by the Assured in minimizing, or attempting to minimize a claim shall not be deemed to be an admission of liability by the Assured and shall not invalidate any coverage provided by this policy, the Company to reimburse the Assured for any such expenses or charges, if incurred.

## XI.   NOTICE OF LOSS

In the event of any occurrence which may give rise to a claim under this policy, immediate notice shall be given to the Company and every process, pleading and paper of any kind relating to such occurrence shall be forwarded promptly to the Company.

Further, whenever required by the Company, the Assured shall aid in securing information, evidence, obtaining of witnesses and co-operate with the Company in all matters which the Company may deem necessary in the defense of any claim or suit or appeal from any judgment in respect to a claim under this policy.

## XII.   LEGAL COSTS

In the event of the liability of the Assured being contested, with the consent of this Company in writing, this insurance is also to pay its proportion of the costs which the Assured shall thereby incur and be compelled to pay.

## XIII.   ATTORNEYS

The Company shall have the option of designating the attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and Third Parties concerning any Claims, Loss or Interest covered by this Insurance, and the Company shall have the direction of such litigation or negotiations.

# The St Paul

### XIV.   _ADMISSION OF LIABILITY_

The insurance hereunder shall be voidable, in respect of any occurrence in the event the Assured shall make or shall have made any admission of liability either before or after such occurrence or in the event of the Assured shall interfere in any negotiations of the Company for settlement or in any legal proceedings in respect of any claim for which the Company is or may be liable under this insurance.

### XV.   _SUBROGATION_

Upon payment of any loss or damage the Company is to be subrogated to all the rights of the Assured to the extent of such payments.

### XVI.   _TIME OF ACTION_

No action shall lie against the Company for the payment of any claim under this insurance until the amount of damage for which the Assured is liable has been determined either by a   final judgment against the Assured or by agreement between the Assured and the claimant with the consent of the Company nor, in any event, unless such action is brought against the Company _within one year_ after final judgment is entered in said litigation, provided however, that where such limitation of time is prohibited by the laws of the State wherein this insurance is issued.  Then and in that event, no suit or action under this insurance shall be sustainable unless commenced within the shortest limitation permitted under the laws of such state.

### XVII.   _OTHER INSURANCE_

In the event there is other insurance covering the same loss, this insurance shall be considered as excess insurance and shall not apply or contribute to the payment of any loss until the amount collectible from all such specific insurance shall have been exhausted and then shall be liable, subject to the terms and conditions of this policy, only for the difference between the amount collectible from such other insurance and the total liability of the Assured. But notwithstanding anything contained herein to the contrary this insurance excludes all losses recoverable under the standard form or Comprehensive General Liability policy.

# The St Paul

**XVIII.**   <u>*CANCELLATION*</u>

This policy may be cancelled upon request of the Assured in which case any earned premium will be due and payable. This policy may be cancelled by the Company with ten (10) days written notice to the Assured, such cancellation to be deemed accomplished upon the lapse of ten (10) days from the date of mailing.

ATTACHED TO AND FORMING A PART OF POLICY NO. 342ZT5561

OF THE ST. PAUL MERCURY INSURANCE COMPANY

ISSUED TO: BORDER SHIPYARDS, INC.

9

## CAUSE NO. 2000-02-758-D

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY | § | IN THE DISTRICT COURT OF |
| AND AS REPRESENTATIVE THE | § | |
| ESTATE OF ERNESTO LOPEZ, | § | |
| DECEASED, AND AS NEXT | § | |
| FRIEND OF PERLA IVON LOPEZ | § | |
| AND ERNESTO LOPEZ, MINORS | § | |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, WILLIAM | § | |
| KENON, RUBEN BARRERA, AND | § | |
| CARL GAYMAN, RICK RIVERA, | § | |
| INDIVIDUALLY, AND DBA | § | |
| LA NEGRITA | § | 103RD JUDICIAL DISTRICT |

### RICARDO RIVERA'S FIRST AMENDED CROSS-CLAIM AGAINST BORDER SHIPYARDS, INC.

TO THE HONORABLE JUDGE OF SAID COURT:

Ricardo Rivera, Defendant herein, for his first amended cross-claim against Border Shipyards, Inc., Cross-Defendant, which has appeared and answered herein, would show unto this Honorable Court the following:

**1.**

1.01 At all material times Cross-Defendant **Border Shipyards, Inc.** operated a shipyard engaged in hauling out vessels and performing inspections, maintenance repairs, welding and other work upon them.

1.02 Prior to May 11, 1998 Cross-Plaintiff **Ricardo Rivera** entered into a contract with and engaged Cross-Defendant **Border Shipyards, Inc.** for the purpose of hauling out, leasing premises and/or rental of property for the space used by his F/V *Negrita* and for the performance of maintenance, repairs, welding work

EXHIBIT
B

and other services. Such contract provided and/or included the agreement, benefit and representation that any claim for injury or death of employees, workers, agents, invitees, and/or sub-contractors of Cross-Defendant performing work on board the F/V *Negrita* would be insured, defended and paid for by said Cross-Defendant and/or its insurance carrier, and that Cross-Plaintiff would be held harmless and indemnified by said Cross-Defendant from any liability for claims asserted against Cross-Plaintiff and for losses and damages suffered by Cross-Plaintiff, as a result of any such claims for death or personal injury, including attorney fees incurred by Cross-Plaintiff in defending against such claims.

1.03   As shown by the invoice of Cross-Defendant attached hereto marked Exhibit "A" and incorporated herein by reference, Cross-Plaintiff was charged $158.13 for the aforesaid insurance coverage, and Cross-Plaintiff is informed and believes that said insurance coverage was in full force and effect at the time the personal injury and death of **Ernesto Lopez** occurred on or about May 11, 1998; while he was welding inside the hull of the F/V *Negrita* in the course and scope of his employment as a welder with Cross-Defendant **Border Shipyards, Inc.**

1.04   Notwithstanding Cross-Plaintiff's payment of Cross-Defendant's above described invoice including its charge for marine insurance liability coverage, Cross-Defendant and it's insurance carrier, St. Paul Mercury Insurance Company, have refused to defend Cross-Plaintiff and otherwise have denied liability to Cross-Plaintiff for the claims brought by Plaintiff **Petra Lopez** in the lawsuit arising out of the personal injury and death of **Ernesto Lopez**, as well as Cross-Plaintiff's own claims for attorney fees and costs incurred in defending against the claims asserted by Plaintiff **Petra Lopez**.

## 2.
## Cause of Action for Defense and Indemnity

2.01   At all material times including May 11, 1998, Cross-Defendant **Border**

**Shipyards, Inc.** procured special marine liability and/or comprehensive general liability indemnity insurance through St. Paul Mercury Insurance Company for the benefit and protection of its customers including Cross-Plaintiff providing insurance coverage for claims of bodily injury and death arising out of accidents occurring on the premises of Cross-Defendant and/or in the conduct of Cross-Defendant's operations.

2.02    Accordingly by virtue of the aforesaid insurance coverage, Cross-Plaintiff is entitled to be defended, held harmless and indemnified by Cross-Defendant and its insurance carrier for any claim, judgment or liability against or incurred by Cross-Plaintiff arising out of this lawsuit and any judgment entered or other disposition thereof for the bodily injury and death of **Ernesto Lopez** on or about May 11, 1998, including attorney fees and costs incurred by Cross-Plaintiff in defending against such claims and in prosecuting this cross-claim against Cross-Defendant to obtain the relief and remedies which he was promised.

## 3.
## Breach of Contract

The refusal and omission of Cross-Defendant and its insurance carrier to defend, hold harmless and indemnify Cross-Plaintiff against the claims arising out of the personal injury and death of **Ernesto Lopez** on or about May 11, 1998 constitutes a breach of the contract and representations made by Cross-Defendant **Border Shipyards, Inc.** with Cross-Plaintiff and entitles Cross-Plaintiff to the damages set forth in Paragraph 4 below.

## 4.
## Damages

4.01    In the event that liability is established by judgment, settlement or other disposition against Cross-Plaintiff for the claims asserted by Plaintiff **Petra Lopez** for the personal injury and death of **Ernesto Lopez** in this lawsuit, Cross-Plaintiff is

entitled to recover judgment against **Border Shipyards, Inc.** for the amount of any such judgment or settlement in favor of Plaintiff including the benefits to which Cross-Plaintiff is entitled by virtue of the special marine liability or comprehensive general liability insurance coverage provided by St. Paul Mercury Insurance Company, for any loss, liability or expenses incurred by Cross-Plaintiff as a consequence.

4.02   Further, Cross-Plaintiff is entitled to recover from Cross-Defendant reasonable attorney fees and expenses in defending this lawsuit and in prosecuting this cross-claim.

4.03   Further, as a result of the occurrence of the accident to **Ernesto Lopez** Cross-Plaintiff has suffered property damage to his vessel F/V *Negrita* and loss of earnings.

4.04   The aforesaid damages suffered by Cross-Plaintiff exceed the minimum jurisdictional limits of the Court.

## 7.
## Prayer

WHEREFORE, premises considered, Defendant **Ricardo Rivera**, as Cross-Plaintiff, prays for judgment against Cross-Defendant **Border Shipyards, Inc.**, as follows:

1) For the amount of any judgment entered or recovery made against him in favor of Plaintiffs in the main cause;

2) Reasonable attorney fees in defending against the claims asserted against him by Plaintiff **Petra Lopez** in prosecuting this cross-claim;

3) For compensatory damages;

4) Prejudgment and postjudgment interest as provided by law;

5) Costs of suit; and

RICARDO RIVERA'S FIRST AMENDED CROSS-CLAIM
AGAINST BORDER SHIPYARDS, INC.                                    Page - 4

6)   Such other and further relief to which Defendant/Cross-Plaintiff may be justly entitled.

Respectfully submitted,

Jack G. Carinhas, Jr.
S.B. No. 03795000
302 Kings Highway, Suite 109
Brownsville, Texas 78521
Telephone:  956/542-9161
Telefax:     956/542-3651

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing pleading was served upon Mr. James H. Hunter of Royston, Rayzor, Vickery & Williams, L.L.P., P. O. Box 3509, Brownsville, Texas 78523-3509, Mr. Michael Moore of Guerra & Moore, L.L.P., 4201 N. McColl Road, McAllen, Texas 78504, and Mr. Norton A. Colvin, Jr. of Rodriguez, Colvin & Chaney, L.L.P., 1201 E. Van Buren Street, Brownsville, Texas 78522, by First Class Letter, postage prepaid and properly addressed on this _3rd_ day of January, 2001.

Jack G. Carinhas, Jr.

# BORDER SHIPYARDS, INC.

Star Route Box 5
Brownsville, Texas 78521
Phone: (512) 831-3400 - 831-4083

VESSEL: NEGRITA
OWNER: RICK RIVERA

INV. #
DATE: 5/21/1998
PHONE: 943-5101
FEET: 72

| ITEM | DESCRIPTION | |
|------|-------------|---|
| 1 | HAUL-OUT. | 240.00 |
| 2 | SCRAPE & WASH BOTTOM & SIDES. / SCAFOULING. | 72.00 |
| 3 | RENEW ZINCS. | 72.00 |
| 4 | RENEW PACKING. | 100.00 |
| 5 | SWEEP-BLAST BOTTOM. | .00 |
| 6 | PAINT BOTTOM. | 15.00 |
| 7 | SPOT-BLAST SIDES. | .00 |
| 8 | PAINT SIDES. NAME AND HOMEPORT. | .00 |
| 9 | REMOVE & REINSTALLED RUDDER. | 240.00 |
| 10 | REMOVE & REINSTALLED PROPELLER. | .00 |
| 11 | REMOVE & REINSTALLED PROPELLER. COUPLING & SHAFT. | 640.00 |
| 12 | RENEW CUTLASS BEARING. | 240.00 |
| 13 | WELDING ON BOTTOM. | .00 |
| 14 | CLEAN BILG. TO CUT OLD STUFFING BOX. REMOVE TWO STEEL | .00 |
|  | PLATES IN FREEZER ROOM.  FIT AND INSTALLED NEW STUFFING | .00 |
|  | BOX.  REINSTALLED OLD PLATES AND ADDED ADDITIONAL STEEL | .00 |
|  | PLATES TO OVER LAP OLD PLATES. | 1,680.00 |
|  | | .00 |
|  | | .00 |
|  | | .00 |
|  | | .00 |
|  | | .00 |
|  | TOTAL LABOR COST::::::::::::::: | 3,299.00 |

| QTY | MATERIAL LIST | | | | |
|-----|---------------|---|---|---|---|
| .25 | 214 PAINT | 6.00 | HAUL-OUT FEE'S------------ | 126.00 |
| 0 | ZINC-PRIMER | .00 | | |
| 0 | THINNER | .00 | OUTSIDE SERVICES---------- | .00 |
| 4 | NAVELON PACKING | 10.00 | | |
| 0 | TEFLUN PACKING | .00 | TOTAL LABOR--------------- | 3,299.00 |
| 0 | MASKING TAPE | .00 | | |
| 0 | PAINT ROLLERS | .00 | TOTAL MATERIAL LIST------- | 89.00 |
| 1 | PAINT BRUSHES | 3.00 | | |
| 0 | 1/4" PLATE | .00 | MARINE INSURANCE---------- | 158.13 |
| 0 | 1/2X4X6 ZINCS | .00 | | |
| 4 | BRONZE WELD ROD | 20.00 | SALES TAX----------------- | EXEMPT |
| 0 | 3/8" PLATE 2' | 50.00 | | |
|  | | 89.00 | TOTAL AMOUNT DUE::::::::::: | #3,672.13 |

3488 53

Exhibit

"A"

CAUSE NO. 2000-002-758-D

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY, | § | IN THE DISTRICT COURT |
| AND AS REPRESENTATIVE OF | § | |
| THE ESTATE OF ERNESTO LOPEZ, | § | |
| DECEASED, AND AS NEXT FRIEND | § | |
| OF PERLA IVON LOPEZ and | § | |
| ERNESTO LOPEZ, MINORS, and | § | |
| MARIA DEL CARMEN LOPEZ, | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | CAMERON COUNTY, TEXAS |
| | § | |
| BORDER SHIPYARDS, INC., | § | |
| JORGE GONZALEZ, WILLIAM | § | |
| KENON,RUBEN BARRERA | § | |
| AND CARL GAYMAN, RICK | § | |
| RIVERA,INDIVIDUALLY, AND D/B/A | § | |
| LA NEGRITA | § | |
| | § | |
| Defendants | § | 103RD JUDICIAL DISTRICT |

## AGREED SCHEDULING ORDER

Came to be considered the Agreed Scheduling Order. The Court has fully considered

said motion and the agreement of the parties and Orders as follows:

1.   Expert Designation:

a.   Plaintiff's deadline to designate expert witnesses is 03/29/01.

b.   Defendants' deadline to designate expert witnesses is 04/13/01.



2.     Discovery Completion: No discovery may be conducted after 05/23/01

3.     Announcements is set for 05/25/01 at 9:00 a.m.

4.     Trial is set for 05/29/01.

The Texas Rules of Civil Procedure shall govern all deadlines not addressed in this Order.

Entered this ___ day of _____, 2001.

_____
PRESIDING JUDGE

FILED _____ O'CLOCK ___ M
AURORA DE LA GARZA DIST CLERK

JAN 3 1 2001

DISTRICT COURT OF CAMERON COUNTY, TEXAS

FEB - 1 2001
Copies to:
J. Michael Moore
James H. Hunter, Jr.
Norton A. Colvin, Jr.
Jack G. Carinhas, Jr.

Page

AGREED TO IN FORM and SUBSTANCE:

By: _____

    GUERRA & MOORE, L.L.P.

    J. Michael Moore

    State Bar No.  14349550

    4201 North McColl Rd

    McAllen, Texas  78504

    (956) 618-3000 Tel

    (956) 686-4200 Fax

    ATTORNEY FOR PLAINTIFFS

By: _____

    ROYSTON, RAYZOR, VICKERY & WILLIAMS

    James H. Hunter, Jr.

    State Bar No.  00784311

    Javier Gonzalez

    State Bar No.  00787561

    55 Cove Circle

    P.O. Box 3509

    Brownsville, Texas  78523-3509

    (956) 542-4377 Tel

    (956) 542-4370

    ATTORNEYS FOR BORDER SHIPYARDS, INC.

By: _____

RODRIGUEZ, COLVIN & CHANEY, L.L.P.
Norton A. Colvin, Jr.
State Bar No. 04632100
R. Patrick Rodriguez
State Bar No. 24002861
1201 East Van Buren
Post Office Box 2155
Brownsville, Texas 78522
(956) 542-7441 Tel
(956) 541-2170 Fax
ATTORNEYS FOR DEFENDANTS,
JORGE GONZALEZ, RUBEN BARRERA,
AND CARL GAYMAN

---

By: _____
     Jack G. Carinhas, Jr.
     State Bar No. 03795000
     Attorney and Counselor at Law
     302 Kings Highway, Suite 109
     Brownsville, Texas 78521
     (956) 542-9361 Tel
     (956) 542-3651 Fax
     ATTORNEY FOR RICARDO RIVERA,
     INDIVIDUALLY AND DBA LA NEGRITA

# PLAINTIFF'S AND THIRD PARTY DEFENDANT'S EXHIBIT C

CUtePDF - www.fastio.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR WILLIAM | § | |
| E. KENON | § | |
| | § | CIVIL ACTION NO. B-99-019 |
| VS. | § | |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| VS. | § | |
| | § | |
| RICARDO RIVERA | § | |

## AFFIDAVIT OF MORGAN GROSS

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared MORGAN GROSS, personally known to me to be the person whose name is subscribed to this affidavit, and being by me duly sworn upon his oath stated and said:

1. " My name is Morgan Gross. I am a resident of Cameron County, Texas. I am president of Border Shipyards, Inc., a Texas corporation with its principal place of business being in Port Brownsville, Texas. I have personal knowledge of the facts stated herein and I have personal knowledge of the standard business practices utilized by Border Shipyards, Inc. in its daily dealings with its clients.

In other words, shrimpers, being simple people, and being used to making deals on handshakes were of the understanding that the insurance would cover all such losses. I know this because before I worked with Border Shipyards as its president and general manager, I had worked as a dock foreman of a shrimp fleet. We would take the vessels to Border Shipyard for repair and in our conversations with the Border Shipyard's then representatives, we knew that we were acquiring insurance through word which would protect us in all instances.

7. From such experience I also know that it was the practice and procedure of Border Shipyard to stand behind its work in all respects. If the vessel was not repaired properly, Border would stand behind its guaranty of satisfaction. If a vessel owner's crewman or employee were injured as a result of a defective repair job performed by Border, then Border would pay for the injury or damages caused by such defective repair and would hold the vessel owner harmless from all damages.

8. Furthermore, as president of Border Shipyards, Inc. and with the knowledge that both Border and the vessel owner would have insurance coverage under the terms of the policy, the agreement by Border to its vessel owner clients was to be totally responsible for any damages or injuries incurred by the vessel owner or its employees and representatives, even if such damages or injuries occurred as a result of the negligence of the vessel owner or its employee or representatives. I say this because with the knowledge and confidence that all parties were covered by insurance, it was of no concern to Border Shipyards, Inc. as to whose negligence caused the damages.

9. In the instance of Ricardo Rivera and the F/V Negrita and their dealings with Border Shipyards in May 1998, the same policies, procedures and agreements applied and were in effect. Mr. Rivera was charged his pro rata share of the St. Paul Insurance premium and Border Shipyards,

Inc. agreed to provide that insurance coverage, and agreed to hold him harmless from all injuries and damages irrespective of whose negligence caused the injuries and damages.

10. After Mr. Lopez died and before the F/V Negrita was lowered from the railway back into the water, I had a conversation with Ricardo Rivera regarding the accident. I told Mr. Rivera that he was totally "covered" from all liability because of the insurance policy coverage which Border had obtained for itself and Rivera. I knew that the St. Paul Insurance policy is supposed to cover the vessel owner from all liability whatsoever. In the event that Rivera was sued, I expected the insurance company to step in and protect him. Therefore, it was Border's agreement to cover Rivera from all liability. This was the same understanding that we had with all of the other client vessel owners."

FURTHER AFFIANT SAYETH NOT.



_____
Morgan Gross, Affiant

BORDER SHIPYARDS, INC.

By: _____
Morgan Gross, President

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public, by the said Morgan Gross, individually and as president of Border Shipyards, Inc., on this __18__ day of April, 2001.

CHRISTINA LOGAN
Notary Public, State of Texas
My Commission Expires
June 14, 2005

_____
Notary Public, State of Texas

L:\D17\17910\Affidavit of Morgan Gross.wpd

# PLAINTIFF'S AND THIRD PARTY DEFENDANT'S EXHIBIT D

CitiPDF - www.fastio.com

# S*I*S

Swetnam Insurance Services
148 N. Sam Houston, Suite 1A
P O. Box 1008
San Benito, TX  78586

January 29, 2001

Mr. Francisco J. Zabarte, Esquire
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, TX  78521-2284

RE:   Border Shipyards, Inc.
      St. Paul Mercury Insurance Company
      Policy Number:  342 ZT 5561

Dear Mr. Zabarte:

I have completed my initial review of the documents your office provided to me on behalf of Border Shipyards, Inc.

Insurance Policy Overview

The St. Paul Mercury Insurance Company's policy provides three (3) different types of insurance coverage to Border Shipyards, Inc.   Each different type of insurance coverage is listed below:

      1)     Marine General Liability;
      2)     Ship Repairer's Legal Liability; and
      3)     Wharfingers Legal Liability.

The policy contains five (5) sections which are outlined and listed below:

| | | |
|---|---|---|
| 1) | Section I | Marine General Liability - General Conditions |
| 2) | Section II | Coverage |
| 3) | Section III | Marine General Liability - Additional Coverage |
| 4) | Section IV | American Institute Ship Repairer's Legal Liability Clauses |
| 5) | Section V | Wharfingers Liability Clauses |

Under Section II; Coverage; Article (1) is the policy's insuring agreement that provides"....the Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

           Coverage A       Bodily Injury
           Coverage B       Property Damage
to which this insurance applies, caused by an occurrence, and the Company shall have the right

Phone: 956-399-4190
Fax: 956-399-4476
mswetnam@hotmail.com



and the duty to defend any suit against the insured seeking damages even if any of the allegations of the suit are groundless, false or fraudulent......"

Section II, Coverage; Article (2) "The insurance afforded hereunder is subject to the following exclusions:" clearly does not provide Border Shipyards, Inc. coverages for "...any obligation for ...... which the insured or any carrier as his insurer maybe held liable under any workman's compensation, ......law, or under any similar law." Since the insurance coverages afforded under St. Paul Mercury Insurance Company's policy do not apply to Border Shipyards, Inc. employees' work related bodily injuries because of this exclusion, the insurance company does not have a duty to defend Border Shipyards, Inc. and Border Shipyards, Inc. doesn't have a legal basis to seek recovery against St. Paul Mercury Insurance Company for this loss.

However, *if there is an incidental contract executed after April 28, 1998 and prior to May 11, 1998 between Border Shipyards, Inc. and Ricardo Rivera which includes a hold harmless and indemnification in favor of Ricardo Rivera, then Border Shipyards, Inc. has a strong position for their action against ST. Paul Mercury Insurance Company.* Under Section III, Additional Coverage; Article 1., Contractual Liability Coverage; Paragraph A redefines the policy's definition of an incidental contract to include ".... any oral or written contract or agreement relating to the conduct of the Named Insured's business." Paragraph B, Subparagraphs 1 thru 5 expands the exclusions applicable to the new incidental contract definition; Paragraph C removes exclusions 2B, C, D and E under Section II and Paragraph D allows the insurance company to select arbitrators at any arbitration proceeding.

After reviewing various letters provided by your firms, St. Paul Mercury Insurance Company appears to reserve its rights under the policy based upon the lack of a written contract to indemnify and hold harmless between the parties based upon state and federal statutes. The state and federal statutes may apply in this particular case; however, it is necessary to consider what a "reasonably prudent" insurance purchaser could interpret from the insurance policy. It is my opinion that St. Paul Mercury Insurance Company's policy provides coverage for an incidental contract - including an oral agreement to hold harmless and indemnify a third party. If St. Paul Mercury Insurance Company desired to fully disclose the fact their insurance contract did not provide incidental contractual liability coverages for oral agreements to indemnify and hold harmless third parties; then it could have included an exclusion to eliminate this apparent coverage provided by its policy. Furthermore, if Border's oral holdharmless and indemnity agreement given to Rivera was provided on the same basis as their policy's coverages, then Border and Rivera could have reasonably believed St. Paul Mercury Insurance Company would "pay on behalf of" the third party's claim. Please provide any additional information that you or any other party(ies) may have so that I may review my opinion (if necessary).

If you have any questions, please do not hesitate to contact me.

Sincerely,

Michael Swetnam