24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 0 2 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC., | § | |
| JORGE GONZALEZ, | § | |
| CARL "JOE" GAYMAN, | § | |
| RUBEN BARRERA and | § | |
| BUSTER HARRIS, and | § | |
| FOR WILLIAM E. KENON | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| ST. PAUL MERCURY | § | |
| INSURANCE COMPANY | § | |

## St. PAUL MERCURY INSURANCE COMPANY's MOTION for LEAVE to FILE (1) a REPLY to PLAINTIFFS' and THIRD-PARTY DEFENDANT'S RESPONSE IN OPPOSITION to ST. PAUL'S MOTION for SUMMARY JUDGMENT; and (2) MOTIONS to STRIKE and OBJECTIONS to (a) the AFFIDAVIT OF MORGAN GROSS; and (b) the REPORT of MICHAEL SWETNAM

TO THE HONORABLE DISTRICT COURT JUDGE:

St. Paul Mercury Insurance Company ("St. Paul") respectfully presents this Motion for Leave to File a Reply to Plaintiffs' and Third-Party Defendant's Response in Opposition to St. Paul's previously filed Motion for Summary Judgment against Border Shipyards, Inc., Jorge Gonzalez, Carl "Joe" Gayman, Ruben Barrera and Buster Harris and for William E. Kennan. St. Paul also requests Leave to File Motions to Strike and Objections to the Affidavit of Morgan Gross and the Report of Michael Swetnam. (The affidavit and report are attached as exhibits to Plaintiffs' and Third-Party Defendant's recently filed Response.)

The proposed Reply is attached as Exhibit "A." The Motion to Strike and Objections to the Affidavit of Morgan Gross (and Order) is attached as Exhibit "B." The Motion to Strike and Objections to the Report of Michael Swetnam (and Order) is attached as Exhibit "C.".

## FACTUAL BACKGROUND

1.      Defendant St. Paul filed its Motion for Summary Judgment (against Plaintiffs only) on April 2, 2001.

2.      On April 23, 2001, Plaintiffs -- joined, to St. Paul's surprise, by Third-Party Defendant Ricardo Rivera -- filed their Response to St. Paul's Motion for Summary Judgment.

3.      St. Paul acknowledges that its request for leave to file its reply comes after the normal twenty day deadline in which to file responses and rejoinders to Motions for Summary Judgment. However, Plaintiffs used every moment available to them to respond, enlisting the additional firepower of Mr. Rivera.  Their Joint Response raises novel issues, makes unsubstantiated factual assertions reported by an individual wholly unfamiliar with either the fatal accident at the heart of the underlying lawsuit or the vessel repair "contract" of central importance to the coverage dispute, and finally presents the report of a never-before designated or identified "expert."

4.      St. Paul believes it needs to address these new issues and assertions in order to allow the Court to fairly adjudge the issues properly before it, and believes the developments support an exception to the deadline.  St. Paul is filing this Reply and the Motions to Strike less than ten days after the Response was filed, and believes any inconvenience or hardship to Plaintiffs and their last-minute ally Mr. Rivera will be minimal.  At any rate, such inconvenience is vastly outweighed by St. Paul's need to reply to the matters asserted (and the Court's need to weigh that reply in the interest of justice).

## PRAYER

**WHEREFORE,** Defendant St. Paul respectfully asks the Court to grant it leave to file its Reply to Plaintiffs' and Third-Party Defendant's Response in Opposition to St. Paul's Motion for Summary Judgment, and further leave to Move to Strike and Object to the Affidavit of Morgan

Gross and the report of Michael Swetnam, and that the Reply and Motions be deemed filed upon the

Court's granting of this Motion for Leave.   St. Paul also prays for such other and further relief to

which it may be entitled.

Respectfully submitted,

BY:_____

Philip D. Nizialek
State Bar No. 15045250
S.D. Bar No. 14582
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas  77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

ATTORNEY-IN-CHARGE FOR
ST. PAUL MERCURY INSURANCE COMPANY

OF COUNSEL:
RATHWELL & NIZIALEK, P.C.
Richard Virnig
State Bar No. 20593220
S.D. No. 9464
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas  77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 6(A)(4), no conference with opposing counsel is required for this reply to a response to a Rule 56 Motion for Summary Judgment. St. Paul's counsel assumes counsel for Plaintiffs and for Mr. Rivera would oppose the Motion for Leave.

*Philip D. Nizialek*

Philip D. Nizialek

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the parties listed below via certified mail, return receipt requested, on this the _30th_ day of April, 2001.

Mr. Dennis M. Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 N. Expressway 83
Brownsville, Texas 78521-2284

Mr. Jack G. Carinhas, Jr.
302 Kings Highway, Suite 109
Brownsville, Texas 78521

Philip D. Nizialek

# EXHIBIT "A"

CibPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC., *et al.* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| ST. PAUL MERCURY | § | |
| INSURANCE COMPANY | § | |

**DEFENDANT SAINT PAUL MERCURY INSURANCE COMPANY'S REPLY
to PLAINTIFFS' and THIRD PARTY DEFENDANT'S RESPONSE IN OPPOSITION
to St. PAUL'S MOTION FOR SUMMARY JUDGMENT
against BORDER SHIPYARDS, INC., JORGE GONZALEZ, CARL "JOE" GAYMAN,
RUBEN BARRERA and BUSTER HARRIS, and for WILLIAM E. KENNAN**

TO THE HONORABLE JUDGE OF THIS COURT:

Defendant St. Paul Mercury Insurance Company ("St. Paul") has previously moved for

summary judgment against Plaintiffs Border Shipyards, Inc. ("Border Shipyards" or "Border"), Jorge

Gonzalez, Carl "Joe" Gayman, Ruben Barrera, Buster Harris, and William E. Kennon.  Plaintiffs

recently responded in opposition to that motion, and were joined in their Response by Third-Party

Defendant Ricardo Rivera d/b/a *La Negrita*.

Now, having first requested leave of the Court, St. Paul respectfully files its Reply to the

Joint Response.[1]  St. Paul would respectfully show the Court as follows:

**I. St. PAUL'S MOTION FOR SUMMARY JUDGMENT IS RIPE**

1.      The Joint Response suggests that future amended petitions in the underlying lawsuit

will render any adjudication by this court moot.  Joint Response ¶¶ 1.13, 2.02, 6.05.  Actually, there

---

[1] Along with this Reply, St. Paul is filing Motions to Strike the report of Border's "expert" Michael Swetnam and portions of the affidavit of Border's President, Marvin Gross.  St. Paul is also filing a Supplement to its Motion for Summary Judgment so as to refute Border Shipyards'/Mr. Rivera's suggestion that the most recent petition in the underlying lawsuit somehow affects the legal analysis in St. Paul's Motion for Summary Judgment.

1

is no danger of that.   Future petitions filed in the underlying lawsuit cannot change the following

immutable facts:

(1)  The Policy at issue is a CGL policy, not a workers' compensation policy.

(2)  The deceased, Mr. Ernesto Lopez, was an employee of Border Shipyards, and at the time
of his unfortunate death (May 11, 1998) was working in the course and scope of his employment.

(3)  The individual Plaintiffs herein (defendants in the underlying lawsuit) were shareholders
and/or directors of Border Shipyards on May 11, 1998.

(4)  Mr. Rivera was a customer of Border Shipyards on May 11, 1998; Border Shipyards was
making repairs to his boat for a fee.

(5)  If any "incidental contract" existed between Border Shipyards and Mr. Rivera on May
11, 1998, it was orally entered into.

2.       These facts -- and the law as applied to them -- are determinative of insurance

coverage and will never change, regardless of any contemplated or feasible amendments to the

underlying petition.  As has been noted in St. Paul's Motion for Summary Judgment, the "complaint

allegation rule" is not absolute.  The Court is free to -- indeed, must -- disregard statements in an

underlying petition which have nothing to do with the defendants' potential liability to the plaintiff,

but which have everything to do with whether insurance coverage exists, and must ascertain the true

facts with respect to the central insurance coverage questions.  *See Guaranty National Ins. Co. v. Vic

Manuf'g Co.*, 143 F.3d 192 (5th Cir. 1998)(in coverage dispute over policy including first generation

pollution exclusion, recitation in underlying petition that pollution was "sudden and accidental" did

not make it so); *Blue Ridge Ins. Co. v. Hanover Ins. Co.*, 748 F.Supp. 470 (N.D. Tex. 1990)(insurer

could introduce evidence that driver of a company vehicle was not authorized to drive the vehicle);

*see generally* St. Paul's Motion for Summary Judgment, ¶¶ 21 - 23.  With the immutable facts noted

above in place, this coverage dispute is ripe for adjudication.

2

3.     In an attempt to forestall the Court from deciding the very ripe issues at hand, the Joint Response suggests that "according to St. Paul, there is a question of fact as to the existence of or the terms of the contract between Border and Rivera." Joint Response, ¶ 6.05.  That is not so. Actually, Border and Mr. Rivera have failed to provide any probative evidence that *any* indemnity agreement ever existed between them.  *See* paragraphs 10 - 12 below. However, even if an oral indemnity agreement existed, St. Paul is wholly unconcerned with its content.  Border Shipyards simply could not have *orally* indemnified Mr. Rivera for the only type of liability Mr. Rivera could have to the Lopez plaintiffs.  *See* paragraphs 13 - 14 below.  Indeed, Border could not have indemnified Mr. Rivera *in writing* for the injury or death of Mr. Lopez, a defined longshoreman.  *See* paragraph 15 below.

4.     Finally, in a truly last-ditch effort to forestall adjudication, the Joint Response states "What this case amounts to is a difference of interpretation over an insurance policy, creating an obvious material fact issue precluding summary judgment." Joint Response, Art. X.  But of course mere "differences of interpretation" -- especially between the litigants! -- do not create fact issues. Over the years, the courts have resolved thousands of coverage disputes -- all of which, by necessity, involve "differences of interpretation" between the parties -- on motions for summary judgment. *See, e.g., Gulf Metals Industries, Inc. v. Chicago Ins. Co.*, 993 S.W.2d 800, 806-07 (Tex. App. -- Austin 1999, pet. denied)(fact that courts [not mere litigants] have come to different conclusions as to meaning of word "sudden" in sudden and accidental exception to standard first generation pollution exclusion is insufficient to create an ambiguity).

## II. THE RESPONSE MISSES A CENTRAL POINT:
## BORDER SHIPYARDS CANNOT BIND ST. PAUL
## EXCEPT IN COMPLIANCE WITH THE LAW AND THE INSURANCE POLICY

5.     The Joint Response "misses the vessel" on several points. Using a novel approach, Border Shipyards apparently would have this Court hold that an insurance policy -- and the law -- means whatever Border says it means. If Border Shipyards tells a customer, "You're insured!" that customer is insured; the terms of the Policy are immaterial. And if Border tells a customer, "You're indemnified for anything and everything!" that customer is indemnified for anything and everything -- state, federal and maritime laws designed to protect a would-be indemnitor from its own largesse notwithstanding. Of course Border's "through-the-looking-glass view" is not and cannot be correct.

6.     **Border Shipyards may be conceding it has no direct coverage.** To their credit, Joint Respondents may be conceding that the Policy does not offer coverage to Border Shipyards for any direct liability it may have for the unfortunate death of Mr. Lopez. Joint Response, ¶ 5.04. Certainly Plaintiffs' wholly unsubstantiated "expert" understands this. *See* Exhibit D to the Response, January 29, 2001 letter from Michael Swetnam, p. 2, first full paragraph, discussing the Policy's employee exclusion:

> . . . Since the insurance coverages afforded under St. Paul Mercury Insurance Company's policy do not apply to Border Shipyards, Inc. employees' work related injuries because of [an] exclusion, the insurance company does not have a duty to defend Border Shipyards, Inc. and Border Shipyards, Inc. doesn't have a legal basis to seek recovery against St. Paul Mercury Insurance Company for this loss.

As Mr. Swetnam notes -- how could he do otherwise? -- the Policy excludes any injuries subject to the workers' compensation laws, and no coverage is directly afforded to Border Shipyards.[2]

---

[2] St. Paul has filed a Motion to Strike Mr. Swetnam's "report" and a reference to his letter should not be considered a waiver of its Motion to Strike.

4

7.     Notwithstanding their previous (¶ 5.04) concession and their "expert's" conclusion that the Policy provides no coverage for Border Shipyards' liability, if any, to Mr. Lopez's survivors, Border and Mr. Rivera later appear to argue in paragraph 7.01 of their Joint Response -- at least in the heading -- that direct coverage for the corporation does indeed exist.  Perhaps St. Paul and Respondents merely have different ideas about what constitutes "direct" coverage.  If paragraph 7.01 merely stands for the proposition that *if* Border entered into an incidental contract with Mr. Rivera and *validly* assumed his liability, the employee exclusion does not apply to that assumption, St. Paul agrees with the point.  If instead Respondents are saying that if Border entered into a valid incidental contract with a third party -- where an exception to Exclusion J is contemplated by the Policy -- then Exclusion J does not apply to Border Shipyards *either*, that is a patently incorrect subversion of the language of the Policy.

8.     **Neither are the shareholders covered for their direct liability.**  Border/Mr. Rivera attempt no real response to the irrefutable St. Paul argument that *if* the Lopez plaintiffs are successful in piercing the corporate veil, the shareholders (and directors) will be subject to the employee exclusion as well.  As Border Shipyards and Mr. Rivera state their case, "To the extent that insurance coverage extends to Border, such coverage would also extend to its shareholders and directors."  Joint Response, ¶ 8.01.  St. Paul could not agree more.  There is no direct coverage for Border, and there is of course no direct coverage for the shareholders and directors.  The Policy's employee exclusion, Exclusion J, precludes any direct coverage for Mr. Lopez's employer, whether that employer was the corporation or, by virtue of the corporate veil being pierced, the shareholders.  The Policy is a CGL policy, not a workers' compensation policy.  Period.

5

9.     **There is no indirect coverage for Mr. Rivera's liability.**  While Respondents apparently concede that the employee exclusion negates any claim by Border Shipyards and its shareholders/directors for *direct* coverage, Border (joined, not unsurprisingly, by Ricardo Rivera) continues to believe coverage exists with respect to the potential *indirect* liability Border Shipyards may have for any recovery by the Lopez plaintiffs against Mr. Rivera.  In this regard, Border Shipyards seems to make the following arguments:

> We -- Border Shipyards, its shareholders, its directors and even its president -- are all simple, unsophisticated businessmen, doing business the old-fashioned way on a handshake basis. *See, e.g.,* Joint Response, ¶¶ 6.03 ("[the] unsophisticated atmosphere that existed at Border"); *see also* the affidavit of Border Shipyards' President, Morgan Gross, Exhibit C to the Joint Response, ¶ 6 ("shrimpers, being simple people, . . . used to making deals on handshakes").

(a)  However, notwithstanding our simple, unsophisticated, business-on-a-handshake ways, we do make a point of orally stating to our customers:

> As our customers, you are indemnified and held harmless for any bodily injury, death or property damage, suffered by any third party, including one of our employees, that may occur while work is being performed on and/or about your vessel, and this indemnification is in full force and effect even if such damage is the result of your own negligence, gross negligence, strict liability and/or other fault.

Joint Response, ¶ 6.02.  Whenever we make such an oral statement, which is all the time, that agreement is valid, notwithstanding laws designed to protect us from entering into just such onerous agreements.

(b)  Additionally, we always orally state to our customers:

6

> You will be happy to know that our St. Paul CGL policy
> provides important coverage benefits to you, too.

*Id.* And so it must be. The text of the policy is of no concern.

10.    **Border/Mr. Rivera have presented no competent evidence that any oral "incidental contract" ever existed.** As will be re-emphasized below, by law Border could not have orally indemnified Mr. Rivera against Rivera's own negligence. Even if the Court were to say an oral contract can validly indemnify the indemnitee for his own negligence or other fault, however, Border Shipyards and Mr. Rivera have presented absolutely no competent evidence that such an oral agreement ever existed. The Policy requires that any "incidental contract" must be entered into prior to the occurrence for which indemnity is sought.[3] The only attempt to "prove" the existence of an oral "incidental contract" between Border and Mr. Rivera, however, is the after-the-fact testimony of Morgan Gross, who was not even an employee of Border Shipyards prior to or on May 11, 1998, the date of Mr. Lopez's death. *See* deposition testimony of Morgan Gross in the underlying lawsuit, p. 59 line 22 to p. 60 line 5, attached hereto as Exhibit "A." Mr. Gross's testimony about Border's practices and customs, and his post-incident assurances to Mr. Rivera that he was covered, *see* Gross's Affidavit, ¶ 10, do not speak to whether Border Shipyards and Mr. Rivera entered into such an agreement *before* Mr. Lopez's death.

---

[3] Section III, Article I of the Policy ("Additional Coverage: Contractual Liability Coverage"), extends the definition of "incidental contracts" as noted in both St. Paul's Motion for Summary Judgment and the Joint Response. Paragraph (B)(1) of Section III, Article I further provides:

> B.  The insurance afforded with respect to liability assumed under an incidental contract is subject to the following additional exclusions:
>> 1.  To bodily injury or property damage for which the insured has assumed liability under any incidental contract, if such injury or damage occurred prior to the execution of the incidental contract.

(Note: The Policy has been attached to several pleadings and motions, and St. Paul will not burden the Court with an additional copy unless requested.)

7

11.     Rule 406 of the Federal Rules of Evidence allows the introduction of evidence of an individual's habits or an organization's routine practices.[4]  Such evidence may be competent where routine events not likely to be individually recalled are involved, such as the mailing of a form letter to a policyholder.  It is designed to allow testimony of a practice where the specific recall of a particular event would be impossible (or highly suspicious), "[g]iven the natural lack of recollection as to any one of thousands of routine transactions considered in light of the turnover of personnel . . . ."  *Graham*, Handbook of Federal Evidence, 5th Ed., § 406.3.  As stated in a leading case:

> In [the Rule 406] context, habit refers to the type of nonvolitional activity that occurs with invariable regularity.  It is the nonvolitional character of habit evidence that makes it probative. . . . Habits have a reflexive, almost instinctive quality.

*Weil v. Seltzer*, 873 F.2d 1453, 203 (D.C. Cir. 1989).

12.     For Border to suggest that it voluntarily entered into the most onerous agreement known to the business world, and -- following the death of a long-time employee -- can only testify to that effect by reference to habit and routine practice approaches the absurd.  Border's evidence -- "That's how we usually do things, as testified to by a man who wasn't even with us at the time of the death, let alone at the time of the formation of the alleged agreement" -- is wholly incompetent.  Where is the testimony of Mr. Rivera?  Where is the testimony of anyone who spoke to Mr. Rivera *prior* to the occurrence?  Border Shipyards and Mr. Rivera have had ample time -- two years, not to mention 20 days since the filing of St. Paul's Motion for Summary Judgment -- to come forward with *probative* testimony as to the existence and contents of an "oral incidental contract."  They have failed to do so, and St. Paul's Motion for Summary Judgment must be granted.

---

[4] "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

8

13. **Border could not have validly indemnified Rivera against Rivera's negligence.**

Even if the Court can overlook the absence of any proof that an "oral incidental contract" existed, Border's after-the-fact attempt to force its CGL carrier to shoulder its workers' compensation obligations cannot succeed. As to Border's almost incredible suggestion that it had orally agreed to indemnify Mr. Rivera for his own negligence, Mr. Rivera had bailed his vessel to Border Shipyards for repairs. Under that arrangement, any indemnity agreement running from Border Shipyards to Mr. Rivera could only have been for Mr. Rivera's own *active* negligence or other fault, and not for any responsibility Mr. Rivera might have notwithstanding his absence of fault. *Rollins Leasing Corp. v. Barkley*, 531 S.W.2d 603 (Tex. 1975). *See generally* St. Paul's Motion for Summary Judgment, ¶¶ 46 - 48. In such situations, the law wisely provides that such an onerous agreement must be in writing, pursuant to either the Texas "express negligence" doctrine or (most likely here) the maritime "clear and unequivocal" standard. *See* St. Paul's Motion for Summary Judgment ¶¶ 42 - 43 and 49.

14. Simply stated, by law the Ricardo Riveras of the world are not allowed to take advantage of the work-hungry Border Shipyards of the world by extracting remarkably onerous indemnity agreements as a condition of patronage, without at least reducing Border's obligations to clear, express and specific language.[5] *Amoco Production Co. v. Forest Oil. Co.*, 844 F.2d 251, 254 (5th Cir. 1988). That is good law. And, as previously suggested by St. Paul, *see* Motion for

---

[5] Throughout the Joint Response, Border and Mr. Rivera confuse "hold harmless" agreements with "indemnity agreements." As respects the former, Border can do anything it wants to surrender any claims *it* may have against Mr. Rivera; the "express negligence" (or, as here, "clear and unequivocal") doctrines do not come into play, and neither St. Paul nor any other insurer (at least of Border Shipyards) has standing to protest. What Border and Mr. Rivera cannot do without complying with the applicable standard, however, is enter into an onerous unilateral indemnity agreement with respect to claims by third parties. Border cannot take on Mr. Rivera's *own negligence* or other fault to third parties such as Mr. Lopez without the agreement being committed to writing, so that Border is aware of the tremendous shifting of responsibility that is being asked of it. Frankly, one cannot help but think that it is at least somewhat odd to see Border Shipyards crying so strenuously "We are responsible! We are responsible!" for Mr. Rivera's negligence.

Summary Judgment, ¶ 43 and fn. 10, such language must, at a bare minimum, be in writing.  The

alternative -- allowing CGL insureds to create coverage for their employee's injuries after the fact

by claiming they had orally entered into onerous unilateral indemnity agreements -- would be a flood

of litigation, as every workers' compensation non-subscriber in Texas attempts to unilaterally

convert its CGL policy into a workers' compensation policy, with disastrous effects for the working

men and women of Texas.

15.     **Subsection 905(b) would render a written indemnity agreement between Border
and Mr. Rivera completely void.**  The Joint Response does not even attempt to address the fact that

subsection 905(b) of the Longshore and Harbor Workers' Compensation Act  completely prohibits

the type of agreement Border and Rivera say they entered into.   Mr. Lopez was a defined

longshoreman and his survivors are seeking a recovery against a vessel owner.  While the survivors

may well have Texas law causes of action against Border Shipyards and the shareholders, the

LHWCA specifically provides that as against the vessel owner it is the exclusive remedy available

to them.  Accordingly, with respect to Mr. Lopez's sad death, subsection 905(b) of the Act prohibits

*any* indemnity by the employer in favor of the vessel owner. *See* 33 U.S.C. § 905(b); *see generally*

St. Paul's Motion for Summary Judgment ¶¶ 50 - 52.

16.     Whatever their intentions may have been, Border Shipyards and Mr. Rivera did not

validly enter into an indemnity agreement which could possibly extend to Mr. Rivera's liability (if

any) in the situation at hand.  Border Shipyards' strange suggestion that St. Paul has sold it nothing

if the law will not allow Border to orally enter into the most onerous indemnity agreement known

to the business world -- an agreement to be responsible for the indemnitee's own negligence (and

for a vessel owner's liability to a longshoreman at that) -- ignores the ordinary and common sense

application of the oral incidental contracts provision identified by St. Paul at paragraphs 42 and 43 of its Motion for Summary Judgment. Border Shipyards had no obligation to indemnify Mr. Rivera for the unfortunate death of Mr. Lopez, and St. Paul has no obligation to defend Mr. Rivera on behalf of Border Shipyards.

17.    **Border cannot verbally cast Rivera as an "additional insured."** Having failed in their attempt to end run state, federal and maritime law, Border Shipyards and Mr. Rivera then seek to end run the explicit terms of the Policy. Border appears to recognize that a St. Paul coverage obligation for Mr. Rivera's potential liability to the Lopez plaintiffs may arise in one of two ways: Border could validly indemnify Mr. Rivera for such liability pursuant to an incidental contract, or Border could cause Mr. Rivera to become an "insured" under the Policy.[6] Totally ignoring the explicit terms of the Policy, Border Shipyards appears to say that if it verbally tells its customers "Don't worry, you're covered by St. Paul!" then they are "insureds" under the Policy. *See, e.g.*, Joint Response, ¶ 6.02. Actually, this argument is at least marginally plausible. Border *could have* validly extended "additional insured" status to Mr. Rivera, and unless some other exclusion applied, St. Paul would have honored such an undertaking. However, Border could not have extended that status orally. The Policy clearly specifies that the creation of additional insured status for a party otherwise a stranger to St. Paul *must be in writing*, and that was not done.

18.    St. Paul observes that to the best of its recollection, neither Border Shipyards nor Mr. Rivera has ever used the phrase "additional insured" in any of their pleadings or motions. Indeed, Border and Mr. Rivera may be under the impression that a promise to secure "additional insured"

---

[6] Individuals and entities other than the Named Insured are sometimes entitled to coverage under an insurance policy. Shareholders, directors or executive officers of a corporate Named Insured, spouses of a partner, employees and certain "additional insureds" may all enjoy coverage under limited circumstances not present here.

11

status for a third party is an "incidental contract." *See* Joint Response, ¶¶ 6.02, 6.04, 6.06. If that is so, Border and Mr. Rivera are confusing two separate sources of insurance coverage. An "incidental contract" is one in which the Named Insured assumes the liability of another party; the agreement may be verbal unless indemnification for the indemnitee's own negligence or other fault is contemplated. Most CGL policies, and the St. Paul policy at issue, will back this undertaking by the Named Insured so far as liability is validly assumed. "Additional insured" status, on the other hand, extends much farther. It makes the third party an insured entity under the policy, entitled to the same rights as the Named Insured. Almost all CGL policies -- and certainly the Policy at issue -- require that such profound extensions of the insurance carrier's obligations be in writing.

19.     "Incidental contract" coverage and "additional insured" status are occasionally confused, in part because additional insured status is usually requested by indemnitees to "back up" previously executed indemnity agreements. By requiring the indemnitor's insurance company to recognize it as an additional insured, the indemnitee/additional insured is entitled to notice of changes in or cancellation of the policy. However, it is not unheard of for additional insured status to be "free-standing" (*i.e.* not backed by an indemnity agreement), and the case law is clear that the two potential sources of coverage are quite distinct. For example, section 905(b)'s prohibition against an employer indemnifying a vessel for injuries or death to a longshoreman *does not apply* to agreements to name a vessel as an additional insured on the employer's policy. *Voisin v. O.D.E.C.O. Drilling Co.*, 744 F.2d 1174, 1177 (5th Cir. 1984), *cert. denied sub nom. Rig Hammers, Inc. v. O.D.E.C.O. Drilling, Inc.*, 470 U.S. 1053 (1985); *Price v. Zim Israel Navigation Co., Ltd.*, 616 F.2d 422 (9th Cir. 1980).

12

20.     Like almost all CGL policies, the St. Paul Policy makes it very clear that "incidental contract" coverage and "additional insured" status are two different things.  Coverage pursuant to the insured's (valid) agreement to indemnify another party is granted as an exception to the typical exclusion for contract performance, Exclusion (A) in most CGL policies and in the St. Paul Policy. This common exclusion -- which confirms that liability insurance is meant to cover the insured's tort liability, not its breaches of contract; a liability policy is not a surety agreement -- reads as follows in the St. Paul Policy:

> (2)   The insurance afforded hereunder is subject to the following exclusions:
>
> > (A)   to *liability assumed by the insured* under any contract or agreement except an incidental contract . . .

Policy, Section II ("Coverage")(2)(A)(emphasis added).  As has been earlier noted by both St. Paul and Border/Mr. Rivera, the definition of what qualifies as an incidental contract is quite broad, and the usual employee exclusion does not apply to liability assumed under an incidental contract.  What Border and Mr. Rivera *have not noted,* however, is that the insuring agreement (via the exception to the exclusion) refers to "liability assumed by the insured," and not to "additional insured status conferred by the insured."  The latter coverage -- when created -- must be conferred under a specific provision (see below); it cannot be done through an "incidental contract," written or oral.

21.     While the exception to Exclusion (A) operates only with respect to liability assumed by the insured, Article XII of Section III ("Additional Coverage") grants the insured the right to extend "additional insured" status under certain circumstances, and provides the following:

> It is further agreed that to the extent the Named Assured is obligated by written contract to name any one person(s) or company as Additional Assured hereunder, the Underwriters agree that such person(s) or company shall be

13

considered as additional Assureds but only with respect to and while said third party additional assured's party vessels are being repaired or constructed.

This "omnibus additional insured" provision gives Border Shipyards great leeway to bind St. Paul. Any time Border enters into a written contract which requires it to designate an entity as an additional insured, it is a "done deal."

22.     However, despite this broad latitude given to Border Shipyards to create "additional insureds," as a requisite to binding St. Paul, the Policy requires that Border must be obligated to do so by a "written contract to name any one person(s) or company as Additional Assured hereunder[.]" An oral contract to name a person as additional insured is insufficient; the agreement must be in writing. And, as the affidavit of Marvin Gross illustrates, the only agreements Border Shipyards had with Mr. Rivera (and its other customers) were oral. *See* Exhibit C, affidavit of Marvin Gross, ¶ 5 ("The agreements are verbal") and ¶ 6 (". . . in our conversations with Border Shipyards' then representatives, we knew that we were acquiring insurance *through word* which would protect us in all instances").

23.     With Border Shipyards and/or Mr. Rivera attempting to establish the existence of additional insured status for Mr. Rivera under the Policy, the burden is on them (as opposed to St. Paul) to show that coverage in fact lies. *See Sentry Ins. Co. v. R.J. Weber Co.*, 2 F.3d 554, 556 (5th Cir. 1993)(under Texas law, burden is generally on insured to show that claim against it is potentially within coverage of policy). Very frankly, even if the burden were on St. Paul to establish the non-existence of additional insured status, the phrase "MARINE INSURANCE FEE" appended to an invoice simply does not qualify as a contract "to name any one person(s) or company as Additional Assured hereunder[.]" Actually, as testimony in the underlying case has brought out, the

14

fee is a software generated 4.5 % "junk fee" added to every invoice to recoup some or all of Border's insurance costs. *See* deposition of Jorge Gonzalez in the underlying lawsuit, p. 83 line 8 to p. 84 line 20, attached as Exhibit "F" to St. Paul's Motion for Summary Judgment. Even had the "marine insurance fee" been specifically produced for Mr. Rivera's repair invoice, Border and Mr. Rivera would have failed their burden of showing that Mr. Rivera was unambiguously provided additional insured status pursuant to the contract.[7]

24.     As St. Paul has noted earlier, Mr. Rivera may have some recourse somewhere against someone. Where an insured promises and fails to secure "additional insured" status, the would-be additional insured's remedy is not against the insurance company for defense and indemnification, but rather against the insured for breach of its contract to procure the insurance. See, *e.g., Voison, supra; Lulich v. Sherwin-Williams Co.*, 799 F.Supp. 64, 69 (N.D. Ill. 1992)(Illinois law); *Kinney v. G.W. Lisk Co.*, 556 N.E.2d 1090, 1092 (N.Y. 1990).

### III. BORDER'S/MR. RIVERA'S CITED CASES PROVE NOTHING

25.     Border/Mr. Rivera cite two cases as lending support to their position on incidental contracts. Joint Response, ¶¶ 6.08, 6.09. Truth be told, it is hard to imagine two less probative cases. The first, *Gibson and Associates, Inc. v. Home Ins. Co.*, 966 F.Supp. 468 (N.D. Tex. 1997) involves a *written* contract, including an indemnity agreement, in which the indemnitee (the City of Dallas) is asking the indemnitor (Gibson) to respond to third parties *for Gibson's own fault* (here, a breach of contract). 966 F.Supp. at 470-71. *Gibson* says nothing about an *oral* agreement to

---

[7] Border Shipyards may believe that "marine insurance fee" qualifies as such a statement -- although if that is the case one would have expected the phrase "additional insured" to have cropped up *somewhere* in its pleadings or motions by this date.

indemnify another for the *indemnitee's* own fault, let alone an agreement involving the purported indemnification of a vessel by the employer of a deceased longshoreman.

26. The other case cited in the Joint Response, *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389 (5th Cir. 1995), also does nothing to promote Border's position. In its brief discussion of incidental contracts, the Court (which held for Hartford that there was no coverage under this provision) does little more than note that a guarantee or surety agreement by a parent corporation on behalf of its subsidiary is not an incidental contract. 61 F.3d at 395-96.

Border Shipyards and Mr. Rivera's Response to the St. Paul Motion for Summary Judgment completely misses the point. Respondents have not even offered any evidence that an "incidental contract" ever existed between Border and Mr. Rivera. St. Paul's Motion for Summary Judgment against Border Shipyards and its shareholders/directors should be granted.

Respectfully submitted,

**RATHWELL & NIZIALEK, P.C.**

BY: *Philip D. Nizialek*

Philip D. Nizialek
State Bar No. 15045250
S.D. No. 14582
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

ATTORNEY-IN-CHARGE FOR
ST. PAUL MERCURY INSURANCE COMPANY

16

OF COUNSEL:

RATHWELL & NIZIALEK, P.C.
Richard Virnig
State Bar No. 20593220
S.D. Bar No. 9464
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970


Attachment:

Exhibit "A":   Deposition testimony of Morgan Gross in the underlying lawsuit; cover page and
page 59 line 22 to page 60 line 5

17

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the parties listed below via certified mail, return receipt requested, on this the 30th day of _____, 2001.

Mr. Dennis M. Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 N. Expressway 83
Brownsville, Texas 78521-2284

Mr. Jack G. Carinhas, Jr.
302 Kings Highway, Suite 109
Brownsville, Texas 78521

_____
Philip D. Nizialek

18

# EXHIBIT "A"

CutePDF – www.fastio.com

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:

J. MICHAEL MOORE

GUERRA & MOORE, L.L.P.

4201 North McColl Road

McAllen, Texas  78504

COUNSEL FOR DEFENDANT BORDER SHIPYARDS, INC.:

JAVIER GONZALEZ

ROYSTON, RAYZOR, VICKERY & WILLIAMS

55 Cove Circle

Brownsville, Texas  78521

COUNSEL FOR DEFENDANTS JORGE GONZALEZ, RUBEN
BARRERA, AND CARL GAYMAN:

ROBERT PATRICK RODRIGUEZ

RODRIGUEZ, COLVIN & CHANEY, L.L.P.

1201 East Van Buren

Brownsville, Texas  78521

COUNSEL FOR DEFENDANT RICK RIVERA:

JACK G. CARINHAS, JR.

LAW OFFICE OF JACK G. CARINHAS, JR.

302 Kings Highway, Suite 109

Brownsville, Texas  78521

ALSO PRESENT:

Rene Ortiz, Videographer

Ruben Barrera

Page 3

INDEX

                                          PAGE
Appearances ................................  2
MORGAN GROSS
Examination by Mr. Moore ....................  4
Examination by Mr. Carinhas ................ 136
Examination by Mr. Rodriguez ............... 145

Errata Sheet/Signature Page ................ 148

Reporter's Certificate ..................... 149

Attached to the end of the transcript:  Stipulations

EXHIBITS

                                          PAGE
NUMBER  DESCRIPTION                        IDEN.

  1     Notice of Deposition ...............  65

  2     Invoices, Sea Garden Sales Co., Inc. ..  38

  3     Invoices, Zimco Marine, Inc. .........  42

  4     Invoice, Buckner Rental Services ......  45

  5     Invoices, Buckner Rental Services .....  48

  6     Bill, Kentucky Lady ..................  68

  7     Photograph ...........................  80

  8     Safety Program ...................... 109

  9     Safety Pamphlet, Spanish ............ 110

 10     Safety Pamphlet, Spanish ............ 110

 11     Safety Pamphlet, Spanish ............ 110

 12     Safety Documents .................... 111

 13     OSHA Inspection Record .............. 114

Page 4

1          MORGAN GROSS,
2 having been duly sworn, testified as follows:
3          EXAMINATION
4 BY MR. MOORE:
5    Q.  Could you please state your full name for
6 the --
7    A.  Morgan Gross, Jr.
8    Q.  Mr. Gross, my name is Michael Moore.  I guess
9 you know that --
10   A.  Yes, I do.
11   Q.  -- because you've been around all the other
12 depositions we took yesterday, and you also know that
13 I'll be asking you questions and you need to give me a
14 verbal response.  You know that too?
15   A.  Yes, sir.
16   Q.  Okay.  And if you don't understand a question,
17 just let me know.  I'll be glad to rephrase it, like we
18 did that yesterday too.  Okay?
19   A.  Right.  Okay.
20   Q.  Have you ever had your deposition taken before?
21   A.  No, I haven't.
22   Q.  So this is your first time?
23   A.  A first time.
24   Q.  Before you came in here today, did you review
25 any documents in anticipation of your testimony?

Page 5

1    A.  No.
2    Q.  Have you seen your responses to discovery?  As
3 I understand, you're the designated corporate
4 representative for Border Shipyards, Inc.
5    A.  Yes, sir.
6    Q.  Is that right?
7    A.  Yes.
8    Q.  And you are also the president of the
9 corporation?
10   A.  Yes, sir.
11   Q.  And chairman of the board too, right?
12   A.  Yes, sir.
13        MR. GONZALEZ:  Michael, just to -- do you
14 want to explain to him?  Let him finish his --
15        THE WITNESS:  Oh, okay.
16        MR. GONZALEZ:  -- question before you
17 answer.  You're cutting into him.
18        THE WITNESS:  Oh, sorry.
19   Q.  Yeah.  Because it's hard for her to take that
20 down if we're both talking over each other.
21   A.  Okay.
22   Q.  Okay?  As I understand it, back in January 4th
23 of 1999, the various shareholders resigned, and you
24 were elected as the president of the corporation; is
25 that right?

Page 58

1    Q. Well, what did Mr. Abrego do that you decided
2 to change at Border Shipyards?
3    A. I changed because of an increase in salary is
4 why I changed.
5    Q. But what kind of things are going on at Border
6 Shipyards that you decided to change, or did you change
7 anything the way things were run over there at Border
8 Shipyards?
9    A. I don't know how he ran it before I got there.
10 I run it the way I want to now.
11    Q. When you showed up for your first day of work,
12 were any of the shareholders there?
13    A. Mr. Gayman was there.
14    Q. Did Mr. Gayman give you instructions as to what
15 you were supposed to do?
16    A. No.
17    Q. What did you -- what were you told to do?
18    A. To come in and take over the operation. We had
19 three boats on the railway, I think, at that time, and
20 they wanted the three boats in the water.
21    Q. Do you know which three boats we're talking
22 about?
23    A. No. One of them for Mr. Barrera. I remember
24 it.
25    Q. One of the shareholders?

Page 59

1    A. Right.
2    Q. Who's sitting in the room right now?
3    A. Yes.
4    Q. Okay. And who else?
5    A. And Rivera.
6    Q. Okay. Was that -- had the work already been
7 completed on that boat?
8    A. I'm pretty sure, yes.
9    Q. Did you ever go and inspect where the incident
10 occurred?
11    A. I looked where the incident occurred, yeah.
12    Q. And did you -- well, did you find anything that
13 was the welder or its pieces still in that same area in
14 the hull or the icebox where Mr. Lopez was working?
15 Were any of those pieces still there?
16    A. Like the welder? What --
17    Q. Or any of his tools?
18    A. No.
19    Q. It had been cleaned out by the time you'd
20 inspected it?
21    A. Yeah. That was a couple days after, I'm sure.
22    Q. Okay. Well, we know that the incident occurred
23 back in May the 11th, 1998.
24    A. Uh-huh.
25    Q. So the time you would have inspected the La

Page 60

1 Negrita would have been at least a few days after that?
2    A. Right.
3    Q. And that would have been your first day of
4 employment?
5    A. Yes.
6    Q. Were you on the yard the day of the incident?
7    A. No.
8    Q. Had you been -- when was the last time you'd
9 been in the yard?
10    A. I might have been there, you know, that day. I
11 can't say for sure, because I went from here to there.
12    Q. Did Mr. Harris have any of his boats over
13 there?
14    A. I think one of his boats were on the railway
15 also.
16    Q. So Mr. Harris had a boat, Mr. Barrera had a
17 boat, and the La Negrita was there?
18    A. The Negrita.
19    Q. And those are the three boats that were there
20 on the --
21    A. I'm pretty sure, yes.
22    Q. And Mr. Gayman told you that he wanted to get
23 the boats that had been finished back off the railway.
24 Is that -- or --
25    A. Right.

Page 61

1    Q. Okay. And the time you arrived a few days
2 after the accident, had all the work that needed to be
3 completed on the La Negrita, had that been performed?
4    A. I'm pretty sure, yes.
5    Q. Did you prepare the bill for the La Negrita?
6    A. Yes, I did.
7    Q. Pardon me?
8    A. Yes.
9    Q. You did. Okay.
10      MR. MOORE: Let's go off the video for
11 just a second so I can locate this.
12      (Brief pause)
13    Q. We've taken a short break. I've located the La
14 Negrita invoice dated 5/21, 1998, and I'll hand that to
15 you.
16    A. Okay, sir.
17    Q. Are you familiar with that document?
18    A. Yes, sir.
19    Q. And this is a document that you prepared as an
20 employee of Border Shipyards?
21    A. Yes, sir.
22    Q. And you were employed by this time, by --
23    A. By the 21st, yes.
24    Q. By May the 21st, 1998, you were an employee of
25 Border Shipyards?

# EXHIBIT "B"

CVISPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. et al. | § | |
| | § | |
| VS. | § | CIVIL ACTION No. B-99-019 |
| | § | |
| St. PAUL MERCURY INSURANCE CO. | § | |

## ST. PAUL MERCURY INSURANCE COMPANY'S MOTION TO STRIKE AND OBJECTIONS TO THE AFFIDAVIT OF MORGAN GROSS

TO THE HONORABLE JUDGE OF THE COURT:

Defendant St. Paul Mercury Insurance Company ("St. Paul") files this its motion to strike and objections to the affidavit of Morgan Gross and in support thereof would show the Court as follows:

1.    St. Paul moves to strike certain portions of Mr. Gross' affidavit filed in support of Plaintiffs' response to St. Paul's motion for summary judgment in that those portions of the affidavit are incompetent and inadmissable summary judgment proof. Federal Rule of Civil Procedure 56(e) requires that affidavits be based on personal knowledge and set forth facts which would be admissible in evidence. Mere allegations of fact, ultimate or conclusory, do not satisfy these requirements and are inadmissable to support a motion for summary judgment. *See, e.g. Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 324 (5ᵗʰ Cir. 1998); *Bell South Telecom., Inc. v. W. R. Grace Co.,* 77 F.3d 603, 615 (2ⁿᵈ Cir. 1996). The affidavit of Morgan Gross contains such inadmissable, conclusory statements, as well as statements which are inadmissable because they are hearsay. All those inadmissable statements should be stricken. In particular, the affidavit of Morgan Gross contains the following inadmissable conclusory statements of fact that should be stricken pursuant to the requirements of Federal Rules of Civil Procedure 56(e).

At paragraph 5. "[T]he St. Paul policy contained a provision which <u>allowed liability to be assigned</u> to Border by virtue of agreements which it would make with the vessel owners. . . ."

CMxPDF - www.fexhs.com

Paragraph 6.  "[A]t all relevant times, and it has been the understanding and agreement of Border that insurance would be provided by Border to the vessel owners and would cover all of the risks, both for personal injury, death and property damage, which could occur to the vessel irregardless (sic) of whose fault caused such injury, death or property damage. . . ."

Paragraph 8.  Furthermore, as president of Border Shipyards, Inc. and with the knowledge that both Border and the vessel owner would have insurance coverage under the terms of the policy, the agreement by Border to its vessel owner clients was to be totally responsible for any damages or injuries incurred by the vessel owner or its employees and representatives, even if such damages or injuries occurred as a result of the negligence of the vessel owner or its employee or representatives.  I say this because with the knowledge and confidence that all parties were covered by insurance, it was of no concern to Border Shipyards, Inc. as to whose negligence caused the damages.

2.      The quotes from paragraph 5, 6 and 8 of Mr. Gross' affidavit concern one of the ultimate issues in this case, whether the St. Paul policy at issue provides coverage to Border Shipyards for alleged oral obligations Border Shipyards entered into to defend and indemnify a third party vessel owner.  Mr. Gross' statement that such coverage is available, repeated throughout his affidavit, is nothing more than an unsupported conclusory allegation on the ultimate issue in the case. Mr. Gross cites nothing in his affidavit which supports his claim of personal knowledge of the coverage provided under the St. Paul policy at issue, other than his personal opinion.  All statements of Mr. Gross to the effect of coverage attached under the St. Paul policy should be struck, in that they are conclusory and fail to set forth the alleged basis for his claim personal knowledge regarding coverage under the policy.

WHEREFORE, PREMISES CONSIDERED, St. Paul Mercury Insurance Company respectfully requests that this Court grant its motion to strike and for such other and further relief as the Court deems proper.

Respectfully submitted,

**RATHWELL & NIZIALEK, P.C.**

BY: _Philip D. Nizialek_

Philip D. Nizialek
State Bar No. 15045250
Town Center One
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970

ATTORNEYS FOR DEFENDANT
ST. PAUL MERCURY INSURANCE
COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the parties listed below via certified mail, return receipt requested, on this the 30th day of April, 2001.

Mr. Dennis M. Sanchez
SANCHEZ, WHITTINGTON, JANIS & ZABARTE, L.L.P.
100 N. Expressway 83
Brownsville, Texas 78521-2284

Mr. Jack G. Carinhas, Jr.
302 Kings Highway, Suite 109
Brownsville, Texas 78521

_Philip D. Nizialek_

Philip D. Nizialek

# EXHIBIT "C"

CibiPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BORDER SHIPYARDS, INC. et al.　　　§
　　　　　　　　　　　　　　　　　　§
VS.　　　　　　　　　　　　　　　　§　　　CIVIL ACTION No. B-99-019
　　　　　　　　　　　　　　　　　　§
St. PAUL MERCURY INSURANCE CO.　　§

## ST. PAUL MERCURY INSURANCE COMPANY'S MOTION TO STRIKE AND OBJECTIONS TO THE REPORT OF MICHAEL SWETNAM

TO THE HONORABLE JUDGE OF THE COURT:

Defendant St. Paul Mercury Insurance Company ("St. Paul") files this its motion to strike and objections to the report of Michael Swetnam and in support thereof would show the Court as follows:

1.　　　St. Paul respectfully moves to strike the report of Mr. Swetnam attached at Exhibit D to Plaintiffs' Response to St. Paul's Motion for Summary Judgment. The report is inadmissable summary judgment proof. As an initial matter, Plaintiffs in their response refer to Mr. Swetnam as their "expert insurance coverage witness." The Court's scheduling order set January 15, 2001 as the deadline for the disclosure of Plaintiffs' expert witnesses. St. Paul entered into an agreement to extend that designation date to January 29, 2001, and the Plaintiffs moved the court for an extension of the deadline as well. The Court denied the Plaintiffs' motion. In any case, Plaintiffs have never, either before or after the Court's deadline, disclosed to St. Paul Mr. Swetnam's status as an expert witness. Moreover, Mr. Swetnam's report was never disclosed to St. Paul prior to its attachment as Exhibit D to Plaintiffs' response in opposition to St. Paul's motion for summary judgment.

2.　　　With regard to expert witnesses, failure to disclose in a timely fashion should result in the exclusion of the expert's testimony. *See, e.g., Derby v. God Father's Pizza, Inc.,* 45 F.3d 1212, 1214-15 (8th Cir. 1995). For this reason alone, Mr. Swetnam's report should be struck from the record.

3.   Mr. Swetnam's alleged status as an insurance coverage "expert" presents additional reasons why the statements in his report should be stricken and not considered by the Court.  For a witness to be able to testify as an expert, Federal Rule of Evidence 702 requires the witness have:

Scientific, technical or other specialized knowledge to assist the trier of fact to understand the evidence or to determine a fact and issue, a witness qualified as an expert by knowledge, skill, experience, training, or education.

4.   Nothing in Mr. Swetnam's report qualifies him as an expert on insurance coverage issues.  Mr. Swetnam's report makes no mention whatsoever of his experience as an insurance professional, or any other reason why he might be qualified, "as a result of his specialized knowledge," to assist the trier of fact in understanding the evidence.  Moreover, Mr. Swetnam's report contains no qualifications of any kind which support the basis for his opinions.  Expert testimony is admissible and may defeat summary judgment only when it appears that the affiant is competent to give an expert opinion.  *Garside v. Ossco Drug, Inc.,* 895 F.2d 46 (1st Cir. 1990).  Mr. Swetnam's report should be stricken on this basis as well.

WHEREFORE, PREMISES CONSIDERED, St. Paul Mercury Insurance Company respectfully requests that this Court grant its motion to strike and for such other and further relief as the Court deems proper.

Respectfully submitted,

**RATHWELL & NIZIALEK, P.C.**

BY: _Philip D. Nizialek_

Philip D. Nizialek
State Bar No. 15045250
Town Center One
1450 Lake Robbins Drive, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 296-8900
Telecopier: (281) 296-6970
ATTORNEYS FOR DEFENDANT St. PAUL
MERCURY INSURANCE COMPANY

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the parties listed below via certified mail, return receipt requested, on this the *30th* day of April, 2001.

Mr. Dennis M. Sanchez
SANCHEZ, WHITTINGTON, JANIS & ZABARTE, L.L.P.
100 N. Expressway 83
Brownsville, Texas 78521-2284

Mr. Jack G. Carinhas, Jr.
302 Kings Highway, Suite 109
Brownsville, Texas 78521

Philip D. Nizialek