3̃c̃

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUL 0 3 2001**

**Michael N. Milby**
**Clerk of Court**

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR WILLIAM | § | |
| E. KENON | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| vs. | § | |
| | § | |
| RICARDO RIVERA | § | |

## THIRD PARTY DEFENDANT RICARDO RIVERA'S RESPONSE
## IN OPPOSITION TO ST. PAUL MERCURY INSURANCE
## COMPANY'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Citations...........................................................................................ii-iv

I.    Statement of the Nature of the Proceeding.........................................1

II.   Statement of the Issues Presented for Ruling......................................2

III.  Summary of Rivera's Argument............................................................3

IV.   Pleadings and Evidence in Support of Rivera's Opposition to St. Paul's Motion..............4

V.    Summary Judgment Standard of Review.............................................5

      Incorporation by Reference..........................................................7

VI.   Argument...............................................................................................6

      A.    Additional Insured Status of Rivera.......................................6

      B.    Valid *Incidental Contract* Shown Triggering
            Contractual Liability Coverage..............................................9

      C.    St. Paul's Duty to Defend......................................................12

      D.    The Incidental Contract Not Void by LHWCA......................14

VII.  Conclusion............................................................................................16

PRAYER...........................................................................................................17

Certificate of Service......................................................................................17

Appendix

        Exhibit "R-1"  Affidavit of Jorge Gonzalez
        Exhibit "R-2"  Border invoice to Vessel *Lady Evelyn*
        Exhibit "R-3"  Plaintiff's Original Petition in John Howard v. Jesse LaChico
        Exhibit "R-4"  Affidavit of Jack G. Carinhas, Jr.
        Exhibit "R-5"  Transcript of extracted deposition testimony of Francisco Abrego
        Exhibit "R-6"  Transcript of extracted deposition testimony of Jorge Gonzalez
        Exhibit "R-7"  Transcript of extracted deposition testimony of Morgan Gross

CHMPDF - www.texto.com

# TABLE OF CITATIONS

## CASES

Aboussie v. Aboussie, 441 F.2d 150, 154 (5th Cir. 1971)..........................................7,14

Admiral Ins. Co. v. Trident NGL, Inc., 988 S.W.2d 451, 455-456...............................14
    (Tex.App.-Houston [1st Dist.] 1999, writ den'd)

American Casualty Co. of Reading, Pa. v. Myrick, 304 F.2d 179, 184.........................11
    (5th Cir.1962)

American National Ins. Co. v. Wilson State Bank, 480 S.W.2d 296, 299-300..............11
    (Tex.Civ.App.-Amarillo 1972, no writ)

Amoco Canada Petroleum v. Wild Well Control, 889 F.2d 585, 587.............................12
    (5th Cir. 1989)

Anderson v. Liberty Lobby, Inc., 477 U.S. 2425 248, 106 S.Ct. 2505, 2510...............5
    91 L.Ed.2d 202 (1986)

Argonaut Southwest Ins. Co. v. Maupin, 500 S.W.2d 633, 635 (Tex.1973).................13

Balandran v. Safeco Ins. Co. of America, 972 S.W.2d 738, 741 (Tex.1998)................11

Bankers Life & Loan Ass'n v. Jayroe, 103 S.W.2d 388, 390....................................9, 15
    (Tex.Civ.App.-FortWorth 1937, affirmed in 127 S.W.2d 291 (Tex.1939)

Board of County Com'rs v. Amarillo Hosp., 835 S.W.2d 115, 125...............................6
    (Tex.App.-Amarillo 1992, no writ)

Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54,.................5
    91 L.Ed.2d 265 (1986)

Commercial Standard Insurance Company  v. Ford, 400 S.W.2d 934, 936..................16
    (Tex.Civ.App.-Amarillo 1966, writ ref'd n.r.e.)

Darnell v. Southwestern American Ins. Co., 240 S.W.2d 509, 511...............................11
    (Tex.Civ.App.-Dallas 1951, no writ)

DeWitt County Elec. Co-Op v. Parks, 1 S.W.3d 96, 102 (Tex.1999)........................7, 11

Farmers Mutual Insurance  Ass'n v. Gilbreath, 270 S.W.2d 696, 698-700....................................15
    (Tex.Civ.App.-Eastland 1954, writ ref'd n.r.e.)

Federated Mut. Ins. Co. v. Grapevine Excavation, 197 F.3d 720, 726........................................14
    (5th Cir. 1999)

Gibson & Associates, Inc. v. Home Insurance Company,........................................................14
    966 F.Supp. 468, 475 - 477 (N.D. 1997)

Griffin v. Travelers Indemn. Co. of R. I., 4 S.W.2d 915, 919......................................................11
    (Tex.App.-Dallas 1999, no writ)

Guardian Life Ins. Co. of Texas v. Johnson, 172 S.W.2d 993, 995....................................................9
    (Tex.Civ.App.-Texarkana 1943, writ dism'd by agr.)

Guidry v. Texaco, Inc., 430 F.2d 781, 785 (5th Cir. 1970)..........................................................15

Heyden Newport Chem Corp. v. Southern General Ins. Co.,........................................................13
    387 S.W.2d 22, 24 (Tex.1965)

Lafarge Corp. v. Hartford Cas. Ins. Co., 61 F.3d 389, 395 (5th Cir. 1995)............................13, 14

Lloyds of London v. Oryx Energy Co., 142 F.3d 255, 258, 259 (5th Cir. 1998)..........................15

Lubbock County Hosp. v. National Union Fire Ins.,........................................................11, 12
    143 F.3d 239, 242 (5th Cir.1998)

M.C. Winters, Inc. v. Cope, 498 S.W.2d 484, 488....................................................................6
    (Tex.Civ.App. - Texarkana 1973, no writ)

Marshall v. Victoria Transp. Co., 603 F.2d 1122, 1123 (5th Cir. 1979)..........................................5

Martin Thom v. State Farm Lloyds, 10 F.Supp.2d 639, 699 (S.D. 1997)......................................11

Matador Petroleum v. St. Paul Surplus Lines Ins.,........................................................8, 11
    174 F.3d 653, 660 (5th Cir. 1999)

McCaleb v. Continental Casualty  Co., 116 S.W.2d 679, 682 (Tex.1938)..................................15

Members Ins. Co. v. English, 706 S.W.2d 779, 782.............................................9
     (Tex.App.-San Antonio 1986, no writ)

Miller v. Vaughn & Taylor Construction Company, 345 S.W.2d 852, 854............................6
     (Tex.Civ.App.-Fort Worth 1961, writ ref'd n.r.e.).

National Emblem Insurance Company v. McClendon, 481 S.W.2d 186, 190.......................16
     (Tex.Civ.App.-Texarkana 1972, writ ref'd n.r.e.)

Peoples Life Ins. Co. v. Whiteside, 94 F.2d 409, 411-412 (5th Cir. 1938)...........................9

Potomac Ins. Co. of Ill. v. Jayhawk Medical, 198 F.3d 548, 551 (5th Cir.2000).................13

Republic Nat. Life Ins. Co. v. Hall, 232 S.W.2d 697, 699 (Tex.1950).................................11

Ruiz v. Government Employees Ins. Co., 4 S.W.3d 838.....................................................16
     (Tex.App.-El Paso 1999, no writ)

Steere Tank Lines, Inc. v. U. S., 577 F.2d 279, 280 (5th Cir. 1978).....................................16

Stonewall Ins. Co. v. Villarreal, 591 F.2d 345, 347 (5th Cir. 1979)........................................8

Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 825 (Tex.1997)..........................11, 13

United Services Automobile Ass'n v. Zeller, 135 S.W.2d 161, 165-166.................................9
     (Tex.Civ.App.-San Antonio 1939, writ dism'd judgm't cor.)

United States v. Diebold, 369, U.S. 654, 655, 82 S.Ct. 993, 994,........................................15
     8 L.Ed.2d 176 (1962)

United States Nat. Bank of Galveston v. Maryland Nat. Ins. Co.,...........................................9
     218 F.Supp. 247, 250-251(S.D. Texas 1963)

## STATUTES

33. U.S.C. §905(b).....................................................................................................14

CSMPDF - www.fastio.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC., *et. al.* | § | |
| | § | |
| vs. | § | |
| | § | |
| ST. PAUL MERCURY INSURANCE CO. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| vs. | § | |
| | § | |
| RICARDO RIVERA | § | |

**THIRD PARTY DEFENDANT RICARDO RIVERA'S RESPONSE**
**IN OPPOSITION TO ST. PAUL MERCURY INSURANCE**
**COMPANY'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Third Party Defendant **Ricardo Rivera ("Rivera")**, subject to and without waiving his previously filed Motion to Remand this case to state court, and for his response in opposition to the motion for summary judgment of St. Paul Mercury Insurance Company ("St. Paul), would respectfully show unto the Court, the following:

**I.**

**STATEMENT OF THE NATURE OF THE PROCEEDING**

1.01   Mr. Rivera does not dispute St. Paul's summary of the nature of this case and proceedings as set forth in Paragraph 1-10 of its motion, and to avoid duplication, incorporates by reference St. Paul's Exhibits "A" through "F" described therein plus Exhibits "G" (Mr. Rivera's affidavit) and "H" (extract of Jorge Gonzalez deposition testimony).

1.02   However, Mr. Rivera would call to the Court's attention that his cross-claim against Border Shipyards, as presently structured consists of the following elements:

(1)    Border entered into a contract or agreement with Mr. Rivera, which included the agreement, benefit and representation that any claim for injury or death of an employee, worker, agent, invitee and/or sub-contractor of Border's as a result of performing repairs on the F/V *Negrita*, would be insured, defended and paid for by Border's insurance carrier, St. Paul Insurance Company, as memorialized by the "marine insurance" charge on Border's invoice to Rivera; and

(2)    Border assumed the liability of Rivera and such incidental contract or agreement related to Border's business of ship repairing, and as such, was an undertaking to indemnify.

1.03   Aside from the pending Motion to Remand jointly filed by Mr. Rivera and Border Shipyards, the parties in this case await the Court's ruling on St. Paul's opposed motion for summary judgment against Border Shipyards filed on March 29, 2000 to which Border Shipyard joined by Mr. Rivera timely filed their well-supported opposition in response thereto.

1.04   As will be documented by the pleadings and evidence presented in this response, St. Paul's motion for summary judgment not only fails to meet the requirements for summary judgment but is premature in that substantial discovery is necessary to resolve the issues presented in this complex insurance controversy.

## II.

## STATEMENT OF THE ISSUES PRESENTED FOR RULING

2.01   Mr. Rivera likewise does not quarrel with St. Paul's statement of the issues presented for the Court's ruling.

2.02   Stated more concisely, there are three issues to be resolved in this declaratory judgment action initiated by Border Shipyards and its shareholders with respect to Mr. Rivera:

(1)    Whether or not St. Paul has a duty to defend Mr. Rivera under its policy;

(2)     Whether or not coverage under St. Paul's policy is extended to Mr. Rivera as an **additional insured** for any liability which he may have for the death of Mr. Lopez;

(3)     Whether or not coverage under St. Paul's policy is extended to Mr. Rivera under the **incidental contract** provisions thereof.

2.03    Although Mr. Rivera respectfully submits that as a matter of law St. Paul has a duty to defend him in the underlying lawsuit brought by the Lopez family, there exists significant disputed facts and controversy over interpretation of St. Paul's policy which compel denial of summary judgment to St. Paul.

### III.
## SUMMARY OF RIVERA'S ARGUMENT

3.01    Mr. Rivera respectfully submits that St. Paul is not entitled to summary judgment as against him for the following reasons:

(1)     Rivera should be treated as **an additional insured** under the St. Paul policy because the "marine insurance" charge in Border's invoice to him (attached to Rivera's First Amended Cross-Claim against Border and marked Exhibit "F" in St. Paul's motion for summary judgment) is written evidence of a contract or agreement, obligating Border to name Rivera as an additional insured in St. Paul's policy;

(2)     In the alternative, St. Paul is **estopped** from denying that Rivera an additional insured under the policy and has waived any position to the contrary because St. Paul's insurance agent, Ms. Perk English, had an insurance office within Border's bookkeeper's office at the Brownsville Shrimp Basin and was aware of Border's business of drydocking boats at its shipyard and frequency and had access to the invoices whereby Border charged boat owners for "marine insurance". Additionally, St. Paul paid and covered two prior losses wherein the claimants were vessel owners or crewmembers of vessels that had been drydocked at the yard and had the same customer/additional insured status as Mr. Rivera has in the instant case;

(3)     The *incidental contracts* provisions of the policy provides coverage to Rivera because of Border's assumption of Rivera's tort liability through an oral undertaking to indemnify;

(4)     Pursuant to the **complaint allegation rule**, the allegations of the underlying Lopez plaintiffs' live pleadings and Rivera's cross-claim against Border Shipyards in conjunction with the insurance policy's definition of *incidental contracts,* the affidavits of Morgan Gross, Ricardo Rivera and Jorge Gonzalez, and the "marine insurance" charge on Border's invoice for work on the F/V *Negrita*, impose on St. Paul a **duty to defend** Mr. Rivera, as well as Border Shipyards and its shareholders ;

(5)     The agreement by Border to indemnify Rivera as a vessel owner is valid and enforceable.

# IV.

## PLEADINGS AND EVIDENCE IN SUPPORT OF RIVERA'S OPPOSITION TO ST. PAUL'S MOTION

4.01   In addition to the exhibits identified by St. Paul in its motion ("A" through "H"), Mr. Rivera relies upon the following pleadings and evidence in support of his response in opposition to St. Paul's motion for summary judgment:

(1)     Live pleadings on file in State Court of the Lopez plaintiffs, Border Shipyards answer and Rivera's cross-claim;

(2)     Border Shipyards petition for declaratory judgment and Rivera's cross-claim against Border filed in this court;

(3)     Border and Rivera's joint response in opposition to St. Paul's motion for summary judgment as against Border Shipyards and the exhibits identified in such response;

(4)   The Affidavit of Jorge Gonzalez marked as Exhibit "R-1" to which is attached Border's invoice no. 0827 dated October 10, 1995 for the F/V *Lady Evelyn* (marked Exhibit "R-2"), and the Original Petition of Plaintiff John Howard vs. Jesse LaChico (marked Exhibit "R-3");

(5)   The authenticating affidavit of Jack G. Carinhas, Jr. marked Exhibit "R-4";

(6)   The deposition transcript excerpt of Francisco Abrego marked Exhibit "R-5";

(7)   The deposition transcript excerpt of Jorge Gonzalez marked Exhibit "R-6"; and

(8)   The deposition transcript excerpt of Morgan Gross marked Exhibit "R-7".

## V.
## SUMMARY JUDGMENT STANDARD OF REVIEW

5.01   Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 2425 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

5.02   All evidence and the inferences to be drawn from the evidence produced in the motion for summary judgment must be viewed in light most favorable to the party opposing the motion. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); and *Marshall v. Victoria Transp. Co.*, 603 F.2d 1122, 1123 (5th Cir. 1979).

# VI.
# ARGUMENT

## A.    Additional Insured Status of Rivera

6.01   As St. Paul correctly points out in Paragraph 32 of its motion, its policy at Art. XII of §III ("Additional Coverage") grants the Named Insured (Border Shipyards) the right to extend "additional insured" status to third parties and provides as follows:

> It is further agreed that to the extent the Named Assured is obligated by written contract to name any one person(s) or company as Additional Assured hereunder, the Underwriters agree that such person(s) or companies shall be considered as additional Assureds but only with respect to and while said third party additional assured's party vessels are being repaired or constructed.

6.02   It is undisputed that Mr. Rivera's shrimp boat *Negrita* was drydocked at Border Shipyards on May 11, 1998 when Ernesto Lopez was found dead in the ice hold.   The question raised is whether Border became "obligated by written contract" to name Rivera as an additional assured under the policy.   As St. Paul correctly observes in Paragraph 18 of its motion, Texas law controls the substantive issues of insurance contract construction before this Court. Under Texas law, contracts can be partly in writing and partly in parol. *M.C. Winters, Inc. v. Cope*, 498 S.W.2d 484, 488 (Tex.Civ.App. - Texarkana 1973, no writ) and *Miller v. Vaughn & Taylor Construction Company*, 345 S.W.2d 852, 854 (Tex.Civ.App.-Fort Worth 1961, writ ref'd n.r.e.).

6.03 The essentials for formation of a viable contract are not limited to verbal or written agreements. *Board of County Com'rs v. Amarillo Hosp.*, 835 S.W.2d 115, 125 (Tex.App.-Amarillo 1992, no writ).   In fact, parties can make their contracts as they see fit, reducing some agreements to writing and leaving others to oral expression and still others to partially oral and partially written form.

*Aboussie v. Aboussie,* 441 F.2d 150, 154 (5th Cir. 1971). Furthermore, writings that pertain to the same transaction are considered together. *DeWitt County Elec. Co-Op v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). In this case there is a writing memorializing the parties agreement whereby Border agreed to provide Rivera with the benefit of its insurance under the St. Paul policy for casualties such as the death of Ernesto Lopez. Border in its invoice to Rivera memorialized this *in writing* when it charged Rivera for "marine insurance". in its invoice. Consequently, Border Shipyards clearly intended to name Rivera as an additional insured under the St. Paul policy.

6.04   In the alternative, St. Paul is **estopped** and has waived any contention or defense that Rivera was not an additional insured. St. Paul ratified its insurance agent's (Mr. Perk English) practice whereby her insurance agency office was located within the Brownsville Shrimp Basin in the same office building of Border Shipyard's bookkeepers. Ms. English had access to and knew of Border's practice of charging its customers for "marine insurance". St. Paul for at least four policy periods beginning in April 28, 1995 until April 28, 1999, accepted Border's premiums and practice of invoicing customers for "marine insurance", such that it is now estopped now from denying coverage to Rivera as an additional insured or arguing the incidental contract between Border Shipyards and Mr. Rivera is not clear and unequivocal or that the LHWCA voids such an agreement. *(See the Affidavit of **Jorge Gonzalez** marked Exhibit "R-1"; the deposition transcript excerpts of **Francisco Abrego** (Exhibit "R-5"), **Jorge Gonzalez** (Exhibit "R-6") and Morgan Gross (Exhibit "R-7"); incorporated herein by reference.* Moreover, as Morgan Gross' affidavit (attached to Border's response in opposition to St. Paul's motion for summary judgment) indicates, business at the Port of Brownsville is conducted rather simply and informally. The logistics and frequency of drydocking vessels at Border Shipyards, makes it impractical to have

notified St. Paul or its insurance agent each time a vessel was drydocked at the yard of that fact, especially when St. Paul's agent knew or should have known of Border's practice of adding vessel owners as additional insureds.

6.05   Additional evidence in support of Rivera and Border Shipyards' *estoppel* argument is based on the fact that prior to 1996 St. Paul paid a property loss claim of approximately $125,000 to the owner of the F/V *High Chapparal* when that vessel  sustained fire damage while drydocked at the shipyard.   That customer was also invoiced by Border for marine insurance and is argued to have had the same status of additional insured as maintained by Rivera.   Similarly, in the personal injury claim of John Howard (lawsuit styled *John Howard vs. Jesse LaChico, et al.* in Cause No. 95-11-6445-D, filed in the 103rd Judicial District Court of Cameron County, Texas), Howard alleged that on or about October 31, 1995 while serving as captain on board the fishing vessel *Lady Evelyn*, a pipe or hose on the engine sprayed him with extremely hot water causing severe burn injuries.   Prior to the accident the vessel had been drydocked at Border's shipyard and was invoiced for "marine insurance".   St. Paul covered the loss and paid Howard approximately $820,000 notwithstanding that LaChico, as owner of the F/V *Lady Evelyn*, was not formally named an additional insured in the St. Paul policy. (*See the Affidavit of Jorge Gonzalez (Exhibit "R-1"), the deposition transcript excerpt of Francisco Abrego (Exhibit "R-5"), John Howard's Original Petition (Exhibit "R-3"), and Border Shipyards' invoice dated October 10, 1995, (Exhibit "R-2"),   all of which are incorporated herein by reference).* Accordingly, Mr. Rivera submits that St. Paul is estopped from denying that Rivera was not an additional insured.

6.06   The legal concepts of waiver, estoppel  and  ratification are entrenched in federal and state law.  *See Stonewall Ins. Co. v. Villarreal, 591 F.2d 345, 347 (5th Cir. 1979); Matador Petroleum v. St. Paul Surplus Lines Ins., 174 F.3d 653,*

660 (5th Cir. 1999); *Peoples Life Ins. Co. v. Whiteside*, 94 F.2d 409, 411-412 (5th
Cir. 1938); *United States Nat. Bank of Galveston v. Maryland Nat. Ins. Co.*, 218
F.Supp. 247, 250-251(S.D. Texas 1963); *United Services Automobile Ass'n v.*
*Zeller*, 135 S.W.2d 161, 165-166 (Tex.Civ.App.-San Antonio 1939, writ dism'd
judgm't cor.); *Guardian Life Ins. Co. of Texas v. Johnson*, 172 S.W.2d 993, 995
(Tex.Civ.App.-Texarkana 1943, writ dism'd by agr.); *Bankers Life & Loan Ass'n*
*v. Jayroe*, 103 S.W.2d 388, 390 (Tex.Civ.App.-FortWorth 1937, affirmed in 127
S.W.2d 291 (Tex.1939); and *Members Ins. Co. v. English*, 706 S.W.2d 779, 782
(Tex.App.-San Antonio 1986, no writ).

## B.  Valid *Incidental Contract* Shown Triggering Contractual Liability Coverage

6.07  St. Paul's marine general liability policy (Exhibit "A") at Section II
(1) provides:

> "the company will pay on behalf of the insured all sums
> which the insured shall become legally obligated to pay
> as damages because of:
>
> coverage (a) bodily injury
>
> coverage (b) property damage
>
> to which this insurance applies caused by an occurrence,
> and the company shall have the right and the duty to
> defend any suit against the insured seeking damages
> even if the allegations of the suit are groundless, false, or
> fraudulent ..."

The policy however, contains certain exclusions of coverage, one of which
is as follows:

> "(J) the bodily injury to any employee of the insured
> arising out of or in the course of his employment by the
> insured or to any obligation of the insured to indemnify
> another because of damages arising out of such injury;

but this exclusion does not apply to liability assumed by the insured under an *incidental contract.*" *(emphasis ours). See Exhibit "A" to Border's Third-Party Petition marked as Exhibit "B" to Border's Response in Opposition, Section II [2][J].*

6.08   As St. Paul correctly recognizes in Paragraph 25 of its motion, that Section III(1)(A) of its policy expands the definition of **incidental contract** as follows:

"The definition of incidental contract is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business." *(See Exhibit "A").*

6.09   Rivera and Border Shipyards in their previously filed joint response to St. Paul's pending motion for summary judgment as against Border Shipyards have established that an **incidental contract**, as that term is defined above, existed in favor of Rivera.   See Affidavit of Morgan Gross (marked as Exhibit "R-7") to their joint response; Affidavit of Ricardo Rivera (Exhibit "G"); Affidavit of Jorge Gonzalez (Exhibit "R-1"); deposition transcript excerpts of Francisco Abrego (Exhibit "R-5"); the deposition transcript excerpts of Jorge Gonzalez (Exhibit "R-6"); and Morgan Gross (Exhibit "R-7"); and Border's invoice to Rivera (marked Exhibit "F").   Such evidence clearly establish there was an assumption by Border Shipyards of Rivera's tort liability by virtue of its agreement to indemnify Rivera.

6.10   The undertaking to indemnify related to Border's business of ship repairing.   The insurance was to protect the boat owner "in case anything happened to his boat or on his boat" and the intent was to cover the boat owner. *(See page 82, lines 5-11 of Francisco Abrego's deposition excerpt marked Exhibit "R-5"; the deposition transcript excerpts of Jorge Gonzalez marked Exhibit "R-6" and Morgan Gross marked Exhibit "R-7", incorporated herein by reference.)* Under the express terms of the insurance policy this *incidental contract* could be **oral or written**.   Consequently, St. Paul's attempt to distinguish whether this

indemnity undertaking by Border was oral or written is misplaced and irrelevant for coverage purposes. Either way, coverage is afforded under the insurance policy. It must be remembered that language in insurance policies should be given the meaning of that which would be attached by the ordinary person of average understanding in purchasing insurance. The primary object of a policy is to insure that any ambiguities or reluctance in construing insurance contracts, should be in favor of coverage for the insured and against the insurer. *See Lubbock County Hosp. v. National Union Fire Ins.*, 143 F.3d 239, 242 (5th Cir.1998); *Matador Supra at 657; Martin Thom v. State Farm Lloyds*, 10 F.Supp.2d 639, 699 (S.D. 1997); *American National Ins. Co. v. Wilson State Bank*, 480 S.W.2d 296, 299-300 (Tex.Civ.App.-Amarillo 1972, no writ); *DeWitt County Elec.* Supra at 101; *Griffin v. Travelers Indemn. Co. of R. I.*, 4 S.W.2d 915, 919 (Tex.App.-Dallas 1999, no writ); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 825 (Tex.1997); and *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex.1998).

6.11   Further, St. Paul's attempt to avoid its insuring responsibility should be rejected as being contrary to its own drafted definition of *incidental contracts* - one which is **written or oral**. The insurance policy was written by St. Paul, and as the drafter, any presumptions should be against it. The policy is enforceable as written and its terms and definitions are controlling for which St. Paul is bound. *See Trinity Universal* Supra at 823; *Republic Nat. Life Ins. Co. v. Hall*, 232 S.W.2d 697, 699 (Tex.1950); and *Darnell v. Southwestern American Ins. Co.*, 240 S.W.2d 509, 511 (Tex.Civ.App.-Dallas 1951, no writ).

6.12   Without conceding that the *incidental contract* between Border and Rivera was not written, Mr. Rivera submits that if St. Paul wanted to exclude oral incidental contracts, it simply could have stated that in the insuring agreement. *See American Casualty Co. of Reading, Pa. v. Myrick*, 304 F.2d 179, 184 (5th

Cir.1962) [where parties' intent is to exclude from policy certain item, that intention must be clearly expressed; and incidental contract provision such as one at issue approved as specifically calling for liability of such assumption by written contract, therefore oral agreement found invalid]; and *Amoco Canada Petroleum v. Wild Well Control*, 889 F.2d 585, 587 (5th Cir. 1989)] [incidental contract provision approval and discussion for "liability of others assumed by the Named insured under contract or agreement" not words of limitation, so hold harmless agreement could be either written or oral].

## C.   St. Paul's Duty to Defend

6.13   St. Paul correctly states that the duty to defend is broader than the duty to indemnify, and that the Court may look past the pleadings to determine whether a duty to defend exists.   Yet unexplainably it overlooks that the Court may, when asking "does a duty to defend exist?", consider the invoiced charge to the F/V *Negrita* for "marine insurance", the Affidavits of Ricardo Rivera, Morgan Gross and Jorge Gonzalez, and the deposition testimony of Border's former foreman, Francisco Abrego, and current foreman, Morgan Gross, in determining whether an *incidental contract* existed.   St. Paul arbitrarily continues to deny coverage, exposing itself to bad faith claims.   Border and Rivera's interpretation of St. Paul's policy is reasonable and coverage for the insured should be indulged. *See Lubbock County Hosp. supra at 242 [under Texas law, Court must adopt the insured's construction of policy provision as long as not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent].*

6.14   In determining whether an insurer has a duty to defend its insured Texas courts generally look only to the allegations of the plaintiff's complaint and the terms of the insurance contract.   Under this so-called "eight corners rule" or "complaint allegation rule," the allegations of the complaint are taken as true and

the duty to defend arises if the complaint that is construed asserts a claim potentially within the coverage of the policy reflected by its terms. A Federal District Court is to give the petition **the most liberal reading possible resolving all legitimate doubts in favor of coverage.** *Lafarge Corp. supra* at *393-394.* In fact, the Fifth Circuit has indicated that its decision regarding the duty to defend is not influenced by "facts ascertained before the suit, developed in the process of litigation or by the ultimate outcome of the suit". An insurer must defend an insured only when facts alleged in the complaint **if taken as true,** "potentially state a cause of action within the terms of the policy". *Potomac Ins. Co. of Ill. v. Jayhawk Medical,* 198 F.3d 548, 551 (5th Cir.2000) *(emphasis ours). See also Trinity Universal Ins. Co. supra* at 821-829 [insurer entitled to look solely at the factual allegations in the suit in conjunction with the terms of the policy].

6.15   As indicated above, the evidence before this Court clearly establish an oral or written undertaking by Border to assume Rivera's liability. Such evidence in conjunction with the pleadings in the underlying wrongful death suit also establish contractual liability coverage being triggered by Border Shipyards assumption of Rivera's liability through the contract or agreement to indemnify.

6.16   St. Paul should be reminded that under Section II ("Coverage"), Paragraph (1) provides "...the Company [St. Paul] shall have the right and duty to defend any suit against the insured seeking damages even if any of the allegations of the suit are groundless, false, or fraudulent . . ." An alleged void indemnity agreement, assuming St. Paul's logic, would still trigger its duty as a fiduciary of Border to defend Border and Rivera against the Lopez family's claims. *See Argonaut Southwest Ins. Co. v. Maupin, 500 S.W.2d 633, 635 (Tex.1973) and Heyden Newport Chem. Corp. v. Southern General Ins. Co., 387 S.W.2d 22, 24 (Tex.1965).*

## D.    The Incidental Contract Not Void Under the LHWCA

6.17  In the instant case St. Paul also seeks to deny coverage by arguing that the Longshore and Harbor Workers' Compensation Act (33 USC Section 905(b) *et seq.* ("LHWCA") prohibits any agreements to indemnify running from an employer to a vessel owner and that therefor the *incidental contract* between Border Shipyards and Rivera is void.

6.18  St. Paul's contention that the LHWCA  or general maritime law's requirement of a  "clear and unequivocal" expression of indemnity voids the *incidental contract* reached by Border and Rivera is unfair and unequitable in the face of St. Paul's own definition of *incidental contract* as including **oral or written** contracts or agreements whereby Border undertakes to indemnify a third party related to Border's business.  Border Shipyards reaches such an agreement with Mr. Rivera and pages and pages of motions and memoranda do not change this.   As the Court is aware, parties are free to contract to terms they see fit and agreements can be a hybrid of verbal and written.  *See Aboussie Supra at  154 - 155.*  Even a  requirement that Rivera have  cross-claimed under such *incidental contract* against Border in the underlying wrongful death litigation for purposes of triggering insurance is unnecessary.  *See Lafarge Corp. v. Hartford Cas. Ins. Co., 61 F.3d 389, 395 (5th Cir. 1995)* [same incidental contract provision allowing oral or a written contract or relating to the conduct  of the named insured  business and footnote  10  therein,    presumably,    not  requiring  suit  by  indemnitee    of indemnitor]; *See also Federated Mut. Ins. Co. v. Grapevine Excavation,* 197 F.3d 720, 726 (5th Cir. 1999) and *Admiral Ins. Co. v. Trident NGL, Inc.,* 988 S.W.2d 451, 455-456 (Tex.App.-Houston [1st Dist.] 1999, writ den'd) [both cases approving use of incidental contract provisions in insurance policy];  *See also Gibson & Associates, Inc. v. Home Insurance Company,* 966 F.Supp. 468, 475 -

477 (N.D. 1997) [contractual liability coverage recognized];  and *Bankers Life &
Loan Ass'n Supra at*  390 [oral incidental contract must be specifically excluded].

6.19  St. Paul proffers this argument notwithstanding its collecting and
accepting insurance premiums by  it for at least  four years from Border Shipyards.
The insuring contract for each of these years from April 28, 1995 until April 28,
1999,  contains  the exact same definition for *incidental contract.*   As indicated
above, St. Paul is estopped from making this argument. The Fifth Circuit case law
appears to allow indemnity to be enforced in the face of the Longshore and Harbor
Workers' Compensation Act's apparent bar and other anti-indemnity statutes. *See
Guidry v. Texaco, Inc., 430 F.2d 781, 785 (5th Cir. 1970) and Lloyds of London v.
Oryx Energy Co., 142 F.3d 255, 258, 259 (5th Cir. 1998).*   Two Texas cases
appear to allow insurance in the face of arguments that the act of insuring is
without authority and contrary to statute. *See McCaleb v. Continental Casualty
Co., 116 S.W.2d 679, 682 (Tex.1938) and Farmers Mutual Insurance  Ass'n v.
Gilbreath, 270 S.W.2d 696, 698-700 (Tex.Civ.App.-Eastland 1954, writ ref'd
n.r.e.).*

6.20    As indicated, St. Paul is estopped from arguing that the LHWCA's
anti-indemnity provision makes void the undertaking of indemnity by Border
Shipyards of Rivera because for at least four years it collected premiums and
issued an insurance policy allowing oral or written contracts or agreements for
liability assumed by an insured relating to the conduct of the insured's  business.
To allow St. Paul to avoid responsibility in the face of it being the drafter of the
coverage and the definition of incidental contract, would promote an injustice and
allow deception.  This would amount to fraud because Border is buying nothing.

# VII.
## CONCLUSION

7.01   Mr. Rivera, Border Shipyards and its shareholders are and have been defending themselves against the Lopez wrongful death lawsuit filed in State Court at substantial cost, with Rivera carrying the addition burden of prosecuting its cross-claim against Border arising out of Border's agreement to insure and indemnify Rivera against potential liability presented by the Lopez litigation.  The responsibility for such defense efforts rightfully should be borne by St. Paul.

7.02   Rivera submits that St. Paul's motion for summary judgment is totally flawed  because the pleadings on file in both the State and Federal courts and the evidence presented by affidavit and deposition testimony demonstrate that there exists genuine issues of material fact on the issues of (1) St. Paul's duty to defend, (2) whether Mr. Rivera should be treated as an additional insured under the St. Paul's policy, and (3) whether Border's incidental contract with Rivera to indemnify and hold him harmless for tort liability exposure presented by the Lopez claim and litigation is covered by the St. Paul policy.

7.03   In this case St. Paul has overlooked the fundamental principle that the purpose of an insurance contract is to furnish indemnity against loss and such a contract should be construed in such a way as to effectuate this purpose rather than to defeat coverage.  *See Commercial Standard Insurance Company v. Ford*, 400 *S.W.2d 934, 936 (Tex.Civ.App.-Amarillo 1966, writ ref'd n.r.e.); National Emblem Insurance Company v. McClendon*, 481 *S.W.2d 186, 190 (Tex.Civ.App.-Texarkana 1972, writ ref'd n.r.e.); Steere Tank Lines, Inc. v. U. S.*, 577 F.2d 279, 280 (5th Cir. 1978); *and Ruiz v. Government Employees Ins. Co.*, 4 S.W.3d 838 *(Tex.App.-El Paso 1999, no writ).*

## PRAYER

For the reasons stated, Third Party Defendant Ricardo Rivera prays that St. Paul's motion for summary judgment be denied, and for such other and further relief at law or in equity to which he may be justly entitled.

Respectfully submitted,

Jack G. Carinhas, Jr.
Fed. I.D. 1179
S.B. No. 03795000
302 Kings Highway, Suite 109
Brownsville, Texas 78521
Telephone:  956/542-9161
Telefax:     956/542-3651

ATTORNEY-IN-CHARGE
FOR THIRD PARTY DEFENDANT,
RICARDO RIVERA

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing pleading has been served upon Hon. Philip D. Nizialek, Rathwell & Nizialek, P.C., Town Center One, 1450 Lake Robbins Drive, Suite 300, The Woodlands, Texas 77380, and upon the Hon. Dennis Sanchez, Sanchez, Whittington, Janis & Zabarte, L.L.P., 100 North Expressway 83, Brownsville, Texas 78521-3731, by First Class letter, postage prepaid and properly addressed on this _2nd_ day of July, 2001.

Jack G. Carinhas, Jr.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC. | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR WILLIAM | § | |
| E. KENON | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| vs. | § | |
| | § | |
| RICARDO RIVERA | § | |

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | **AFFIDAVIT OF JORGE GONZALEZ** |
| COUNTY OF CAMERON | § | |

**RICARDO RIVERA,** Third Party Defendant submits this affidavit in support of his Response in Opposition to St. Paul Mercury Insurance Company's Motion for Summary Judgment.

Before me, the undersigned notary, on this day, personally appeared, **JORGE GONZALEZ,** a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.    "My name is Jorge Gonzalez. I am capable of making this affidavit. I am over the age of eighteen (18) years; have never been convicted of a felony; and am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct, to the best of my knowledge and belief.

2.    Back on May 11, 1998, and since the incorporation of Border Shipyards, Inc. on or about June 25, 1985, I had been President of this company. I am testifying to the matters herein to the best of my knowledge, belief and recollection. St. Paul Insurance Company had been our insurer since at least April 28, 1995 until April 28, 1999. It's possible they could have insured us for more time. St. Paul's insurance agent during this time period has been Perk English.



Exhibit
"R-1"

3.  The shipyard at the Port of Brownsville for Border Shipyards, Inc. has four cradles capable of dry-docking four boats at a time at the shipyard for repairs and maintenance. In any given year, numerous shrimpboats can be hauled out at the shipyard, making it impracticable to add as an additional insured a vesselowner, whose boat is being dry-docked at the shipyard to our insurance to St. Paul's satisfaction. Furthermore, Border Shipyards was never told during this time period to consult with Perk English or St. Paul Insurance Company or how to formally add a vesselowner to our insurance policy to St. Paul's satisfaction as an additional insured. I have been around the Port of Brownsville and shipyard for over 15 years and things at times, are done informally and without the sophistication of other paper-intensive businesses.

4.  At least since April 28, 1995, Border Shipyards, Inc. has been charging "marine insurance" to all vesselowners as we did for Ricardo Rivera when hauling out his boat the F/V Negrita on May 11, 1998. Border Shipyards had a contract and/or agreement with Rivera wherein Border Shipyards, Inc. assumed his liability which related to Border Shipyards' shiprepairing business. In essence, Border undertook to indemnify and assumed Rivera's liability, which was memorialized or corroborated by the "marine insurance" item reflected on the invoice to the owner of the F/V Negrita, Ricardo Rivera dated May 21, 1998. This memorialization reflected an agreement or contract by Border that anything that happened onboard a customer's boat while dry-docked at Border Shipyards' yard, would be covered under the insurance policy for contractual liability, as part of a service Border Shipyard's provides to it customers . We have always been operating under this premise and common sense since St. Paul began insuring us. The reason we buy general insurance it to make sure each boat hauled-out is protected by the policy.

5.  Sometime prior to 1996, the F/V "High Chapparal" was dry-docked at the shipyard and burned while in Border Shipyard's custody. My understanding is that approximately, more or less, $125,000 was paid to the owner of the vessel for this claim by I believe, St. Paul Insurance Company. The owner of the F/V "High Chaparral" I believe had the same status as Ricardo Rivera has in this case. The owner was charged for "marine insurance" on his invoice and never formally added as an additional insured to the insurers' satisfaction under a policy. Nonetheless, St. Paul paid the loss for the F/V "High Chapparal.

6.  Similarly, Border Shipyards was sued by John Howard in a lawsuit styled *John Howard vs. Jesse LaChico, et al* in Cause No. 95-11-6445-D, which was pending in the 103rd Judicial District Court of Cameron County, Texas. Howard claimed he was onboard the F/V "Lady Evelyn" serving as a captain, when he claims that a pipe or hose on the engine or its cooling system sprayed him with extremely hot water, causing him severe burn injuries. Prior to this alleged injury, the vessel had been dry-docked at the shipyard and hauled out. The owner of the vessel, Jesse LaChico, paid for "marine insurance" too such as Rivera did for the purpose of having his vessel and any injuries on it covered by the St. Paul Insurance Company policy. I

believe Mr. Howard was paid approximately $820,000. Attached as Exhibit "E" is John Howard's Original Petition and attached as Exhibit "F" is Border Shipyards, Inc.'s invoice no. 0827 to Jesse LaChico for the hauling out of the F/V "Lady Evelyn," which are true and correct copies.

7.   I wish to further state that it is my opinion when I was President of Border Shipyards, Inc. on May 11, 1998, Border Shipyards had an agreement or contract if you want to call it that, whereby it assumed and agreed to cover the liability of Ricardo Rivera because he was owner of the F/V Negrita and his vessel was dry-docked at our yard at the time that Ernesto Lopez was found dead in the icehold of the F/V Negrita and now is being sued. This was Border Shipyards' practice and custom.

8.   Furthermore, Border Shipyards, Inc. has always timely paid its premiums to St. Paul Insurance Company and paid approximately $12,000 for the insuring agreement for the term April 28, 1998 until April 28, 1999. Our agreement to assume or cover the liability of Rivera for anything that happened on his vessel was clear and unequivocal in my opinion and while maybe not to the level of sophistication St. Paul Insurance Company would like, was nonetheless a valid and covered agreement which should be honored."

Further affiant sayeth naught.

_____
JORGE GONZALEZ

**SUBSCRIBED AND SWORN TO BEFORE ME** on this the _2nd_ day of **July, 2001.**

_____
Notary Public, State of Texas
My Commission Expires: _10-23-2001_

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2001

Case 1:99-cv-00019  Document 32  Filed in TXSD on 07/03/2001  Page 26 of 47

# BORDER SHIPYARDS, INC.

Star Route Box 5
Brownsville, Texas 78521
Phone: (512) 831-3400 - 831-4083

VESSEL: LADY EVELYN                          INV. #   0827
OWNER: JESSE LACHICO                         DATE:    10/10/1995
                                             PHONE:
                                             FEET:              72

| ITEM | DESCRIPTION | |
|---|---|---|
| 1 | HAUL-OUT. | 216.00 |
| 2 | SCRAPE & WASH BOTTOM & SIDES. / SCAFOULING. | 684.00 |
| 3 | RENEW ZINCS. | 144.00 |
| 4 | RENEW PACKING. | .00 |
| 5 | SWEEP-BLAST BOTTOM. | 420.00 |
| 6 | PAINT BOTTOM. | 288.00 |
| 7 | SPOT-BLAST SIDES. | .00 |
| 8 | PAINT SIDES, NAME AND HOMEPORT. | .00 |
| 9 | REMOVE & REINSTALLED RUDDER. | .00 |
| 10 | REMOVE & REINSTALLED PROPELLER. | .00 |
| 11 | REMOVE & REINSTALLED PROPELLER, COUPLING & SHAFT. | .00 |
| 12 | WELDING ON BOTTOM. | 360.00 |
| | ADD 105 FT. OF 2" PIPE ON MAIN KEEL COOLER. | 560.00 |
| | ADD 42 FT. OF 1 1/2" PIPE ON FREON KEEL COOLER. | 380.00 |
| | RELOCTE SMALL ENGINE KEEL COOLER. | 480.00 |
| | | .00 |
| | | .00 |
| | | .00 |
| | | .00 |
| | | .00 |
| | | .00 |
| | TOTAL LABOR COST::::::::::::::: | 3532.00 |

| QTY | MATERIAL LIST | | | |
|---|---|---|---|---|
| 0 | OSPHO | .00 | HAUL-OUT FEE'S---------- | 126.00 |
| 0 | ZINC-PRIMER | .00 | | |
| 0 | THINNER | .00 | OUTSIDE SERVICES--------- | .00 |
| 0 | NAVELON PACKING | .00 | | |
| 0 | TEFLON PACKING | .00 | TOTAL LABOR--------- | 3532.00 |
| 3 | MASKING TAPE | 9.00 | | |
| 0 | PAINT ROLLERS | .00 | TOTAL MATERIAL LIST------ | 30.00 |
| 2 | PAINT BRUSHES | 6.00 | | |
| 1 | NITROGEN | 15.00 | MARINE INSURANCE--------- | 176.60 |
| 0 | OTHER | .00 | | |
| 0 | OTHER: | .00 | SALES TAX--------------- | EXEMPT |
| 0 | OTHER: | .00 | | |
| | | 30.00 | TOTAL AMOUNT DUE:::::::::: | 3864.60 |

Exhibit
"R-2"

CutePDF - www.texisi.com

NO. 95-11-6445-D

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA, DIST. CLERK

NOV 1 3 1995

DISTRICT COURT, CAMERON COUNTY, TEXAS
BY _____ DEPUTY

| | | |
|---|---|---|
| JOHN HOWARD | * | IN THE DISTRICT COURT OF |
| VS. | * | 103 JUDICIAL DISTRICT |
| JESSIE LACHICO | * | CAMERON COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOHN HOWARD, Plaintiff, and complains of JESSIE LACHICO, Defendant, and for cause of action shows:

### I.

Plaintiff is a resident of Cameron County, Texas.

Defendant JESSIE LACHICO is a resident of Cameron County, Texas, and may be served at 1747 Marquette Ave., Brownsville, TX 78520.

### II.

At all times material, defendant Lachico was the owner and operator of the Fishing Vessel LADY EVELYN, a vessel that was being used to harvest shrimp, operating out of the Shrimp Turning Basin in Brownsville, Texas, at the time of the occurrence of this action.

### III.

At all times material, Plaintiff was aboard the vessel as an employee of Defendant Lachico and was acting in the course and scope of employment as a seaman and was in the service of the vessel LADY EVELYN.

### IV.

Defendant Lachico was aware that the engine of the vessel LADY EVELYN was overheating. For approximately a month prior to an

Exhibit
"R-3"

October 31, 1995, voyage, the vessel LADY EVELYN was supposed to be undergoing repairs.   On or about October 31, 1995, Plaintiff commenced a voyage, working in his employment with Defendant Lachico as the captain of the fishing vessel LADY EVELYN. Plaintiff noticed that the engine was overheating.   Plaintiff was investigating the problem, when suddenly a pipe or hose on the engine or its cooling system sprayed Plaintiff with extremely hot water.   The hot water severely burned a large part of Plainitff's body, and injured his body generally.   Plaintiff was transported back to shore, so that he could receive medical attention.

V.

While in the course and scope of his employment with Defendant Lachico, Plaintiff suffered serious and permanent bodily injuries as a direct result of the burns proximately caused by the hazardous condition of the boat which Defendant Lachico, his agents, servants, or employees knew, or, in the exercise of ordinary care, should have known existed.   plaintiff further alleges that Defendant Lachico, his agents, servants, or employees negligently caused and/or negligently permitted such condition to exist and negligently failed to warn Plaintiff of the condition of the engine and cooling system, despite the fact that Defendant, his agents, servants, or employees knew, or in the exercise of ordinary care, should have known of the existence of the condition and that there was a likelihood of someone being injured as happened to Plaintiff.

VI.

On the occasion in question, Defendant Lachico and his agents, servants, or employees, who were at all times acting in the course

and scope of their employment, were guilty of negligence toward the
Plaintiff in several respects, including but not limited to the
following:

    1.  In failing to exercise that degree of care as would have
been exercised by a person of ordinary prudence under the same
or similar circumstances.

    2.  In failing to maintain the engine and the surrounding area
in a reasonably safe condition;

    3.  In failing to furnish reasonably safe equipment and tools;

    4.  In failing to maintain a safe workplace;

    5.  In failing to properly repair the engine;

    6.  In failing to provide adequate warning of dangers;

Each of the foregoing acts negligent acts and omissions,
whether taken singularly or in any combination, was a proximate
cause of Plaintiff's injuries and damages which are described
below.

## VII.

Pleading in the alternative, Defendant Lachico failed to
provide to Plaintiff a seaworthy vessel, and consequently caused
Plaintiff great damage, for which he is entitled to recover
compensation.

## VIII.

As a proximate result of the accident, and of the aforesaid
negligence and/or unseaworthiness, the Plaintiff has suffered
severe injuries to his person. As a direct and proximate result of
the incident and of the aforesaid negligence and/or
unseaworthiness, the Plaintiff has incurred the following damages:

A.    Reasonable and necessary medical expenses in the past;

B.    Reasonable and necessary medical expenses which will, in
      all reasonable probability, be incurred in the future;

C.    Pain and mental anguish in the past;

D.    Pain and mental anguish in the future;

E.    Physical impairment in the past;

F.    Physical impairment which, in all reasonable probability,
      will be suffered in the future;

G.    Loss of wages in the past;

H.    Loss of wage earning capacity which will, in all
      reasonable probability, be incurred in the future.

I.    Disfigurement

K.    Loss of enjoyment of life.

By reason of all of the above, Plaintiff has suffered losses
and damages in a sum within the jurisdictional limits of the Court
and for which he brings suit.

WHEREFORE, Plaintiff requests that Defendant be cited to
appear and answer and that on final trial Plaintiff have:

1.    Judgment against Defendant for actual damages in a sum
within the jurisdictional limits of the Court;

2.    Pre-judgment and post-judgment interest at lawful rates;

3.    Costs of suit;

4.    Such other and further relief to which Plaintiff may be
justly entitled.

Respectfully submitted,

John F. Hood -- SB#09943050
847 E. Harrison St.
Brownsville, TX  78520
(210) 544-6614
C.C.I.D. NO. 52501

ATTORNEY FOR PLAINTIFF

JURY TRIAL REQUESTED

PLEASE NOTE:  A SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION
ACCOMPANIES THIS ORIGINAL PETITION.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BORDER SHIPYARDS, INC., | § | |
| JORGE GONZALEZ, CARL "JOE" | § | |
| GAYMAN, RUBEN BARRERA AND | § | |
| BUSTER HARRIS, AND FOR | § | |
| WILLIAM E. KENON | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-99-019 |
| | § | |
| ST. PAUL MERCURY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| vs. | § | |
| | § | |
| RICARDO RIVERA | § | |

### AFFIDAVIT OF JACK G. CARINHAS, JR.

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF CAMERON | § |

Before me, the undersigned notary, on this day, personally appeared, **JACK G. CARINHAS, JR.**, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.   "My name is Jack G. Carinhas, Jr. and I am the attorney representing third party defendant, Ricardo ("Rick") Rivera d/b/a *La Negrita* in the above-referenced litigation. I am over the age of eighteen (18) years; have never been convicted of a felony; and am fully competent to make this affidavit, based on personal knowledge to the best of my ability.

2.   The deposition transcript excerpts of Francisco Abrego, Jorge Gonzalez and Morgan Gross marked as Exhibits "B" "C" and "D" respectively, appear to be and/or are true and correct copies to the best of my knowledge and belief at this time."

Further affiant sayeth naught.

JACK G. CARINHAS, JR.

**SUBSCRIBED AND SWORN TO BEFORE ME** on this the ___2nd___ day of July, 2001.

Patricia M. Rivera

Notary Public, State of Texas
My Commission Expires: 10-23-2001

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2001

Exhibit
" R-4 "

CAUSE NO. 2000-02-758-D

PETRA LOPEZ, INDIVIDUALLY,    )(   IN THE DISTRICT COURT
AND AS REPRESENTATIVE OF THE  )(
ESTATE OF ERNESTO LOPEZ,      )(
DECEASED, AND AS NEXT FRIEND  )(
OF PERLA IVON LOPEZ AND       )(
ERNESTO LOPEZ, MINORS         )(
                              )(
VS.                           )(   103RD JUDICIAL DISTRICT
                              )(
BORDER SHIPYARDS, INC.,       )(
JORGE GONZALEZ, RUBEN         )(
BARRERA, AND CARL GAYMAN,     )(
RICK RIVERA, INDIVIDUALLY,    )(
AND D/B/A LA NEGRITA          )(   CAMERON COUNTY, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

FRANCISCO ABREGO

June 14, 2001

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

FRANCISCO ABREGO, produced as a witness at the instance

of the Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 14th day of June,

2001, from 11:51 a.m. to 5:29 p.m., before TERRI L.

HILL, CSR in and for the State of Texas, reported by

stenograph, at the Law Offices of Jack G. Carinhas, Jr.,

302 Kings Highway, Suite 109, Brownsville, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached herein.

ORIGINAL

Hill & Romero
*Certified Court Reporters*



Exhibit
"R-5"

13:27   1        Q.    And what -- do you know what kind of insurance
13:27   2   was being provided based on that charge?
13:27   3        A.    Well, it was never explained well to me, but I
13:27   4   do know that had -- it had to do with whether -- if
13:27   5   something happened to the ship.
13:27   6        Q.    Who in the company would know in your
13:27   7   estimation what that insurance was for that was being
13:27   8   charged to the customers?
13:27   9              MR. GONZALEZ:  Objection, form.
13:27  10              MR. RODRIGUEZ:  Objection, form.
13:28  11        A.    Well, I would imagine the president of the
13:28  12   company.
3:28   13        Q.    Who made the decision to charge the customers
13:28  14   for that insurance?
13:28  15        A.    The president, Jorge Gonzalez.
13:28  16        Q.    And you were not involved in that decision.
13:28  17   Right?
13:28  18        A.    No.
13:28  19        Q.    Do you know whether or not prior to May 11th,
13:28  20   1998, any -- any customers of Border Shipyards had made
13:28  21   any claims on that insurance that had been charged as
13:28  22   part of the services?
13:29  23        A.    Yes.  I don't remember the date, but a bar -- a
13:29  24   boat burned, the cabin burned, but I -- and I know they
13:29  25   were paid from that.

                          Hill & Romero
                    Certified Court Reporters

13:29  1      Q.   And do you know which agency responded to that

13:29  2  situation?  Was it -- was it Brownsville Fire Department

13:29  3  or the sheriff's department or any kind of agency like

13:29  4  that?

13:29  5      A.   Well, when I arrived the firemen were already

13:29  6  there, because this happened around 8 o'clock at night.

13:30  7      Q.   And do you know -- do you know which fire

13:30  8  department responded to that fire?

13:30  9      A.   No.

13:30  10     Q.   Do you recall any decision as to what caused

13:30  11  that fire?

13:30  12     A.   We never knew, because it was a Friday and we

3:30   13  had left at 4:30 and that was everything.  We never knew

13:30  14  what happened.

13:30  15     Q.   So as far as you know, no Border Shipyards

13:30  16  employees were present at the yard when the fire

13:30  17  started?

13:31  18     A.   No.  They had been working, but up until 4:30.

13:31  19     Q.   And you don't know -- you don't know the

13:31  20  results of any investigation that may have been done as

13:31  21  to the cause of that fire?

13:31  22     A.   No.

13:31  23     Q.   Do you recall -- well, Mr. Gonzalez was made

13:31  24  aware of that particular fire; is that right?

13:31  25          MR. RODRIGUEZ:  Objection, form.

MR. GONZALEZ:   Join.

A.   Well, I am remembering that the person who let everybody know was one of the owners because he was working on the other side of the canal and he saw the fire, and he is the one that let everybody know.

Q.   But Javier Gonzalez, the president of the company --

A.   Javier, no.

Q.   I am sorry.  Strike that.  Sorry, Javier. Jorge Gonzalez was the president of the company when that fire took place; is that right?

A.   Yes.

Q.   And were you ever asked to give any kind of formal statement regarding that particular fire?

A.   I don't remember.

Q.   Do you know of any other claims that any persons or customers have made on the insurance that was charged to the customers through Border Shipyards invoicing?

A.   No.

MR. RIOS:   I will pass the witness.

MR. RODRIGUEZ:   It is my turn?

MR. WALSH:   Go ahead.

MR. RODRIGUEZ:   Do you guys want to take a break?

14:57  1    go.

14:57  2        Q.    Why not?

14:57  3        A.    Because he was doing another job on another

14:57  4    boat.

14:57  5        Q.    To this day, do you know why his brother-in-law

14:57  6    Diego had gone up to check on him in the Negrita 20

14:57  7    minutes after they got back from lunch?

14:57  8              MR. RIOS:   I am going to object as to form.

14:57  9        A.    Well, they had mentioned there that the

14:58  10   deceased one had a magazine and that he was going to

14:58  11   loan it to him.

14:58  12       Q.    Pancho, the -- you talked about a prior claim

4:58   13   involving a boat cabin burning?

14:58  14       A.    Yes.

14:58  15       Q.    Okay.  And your understanding was that the

14:58  16   claim -- a claim was made and then it was paid.

14:58  17   Correct?

14:58  18       A.    I am not sure, but they told me that it was

14:58  19   paid.

14:58  20       Q.    Do you know what insurance company that was

14:58  21   with?

14:59  22       A.    The only thing that I know is that the

14:59  23   representative is Ms. English.

14:59  24       Q.    That would be Perk English?

14:59  25       A.    Something like that, yes.

14:59   1          Q.    What boat was that?

14:59   2          A.    High Chaparral.

14:59   3          Q.    Okay.  When the high -- do you remember -- do

14:59   4   you remember what year this would have been?

14:59   5          A.    Well, it was after we opened.  I don't

14:59   6   remember.  I don't remember exactly.

14:59   7          Q.    Did you have any dealings with Ms. English?

14:59   8          A.    Yes.  Well, one time she brought me a little

14:59   9   job there at the company.

14:59   10         Q.    She saw that the boats were being pulled up on

14:59   11  dry-dock?

15:00   12         A.    I don't remember.

5:00    13         Q.    Okay.  But did she ever go -- go out in the

15:00   14  open yard?

15:00   15         A.    No.

15:00   16         Q.    Okay.

15:00   17         A.    Just outside.

15:00   18         Q.    Outside where?

15:00   19         A.    Outside the gate, outside the fence.

15:00   20         Q.    Okay.  And this is just so the ladies and

15:00   21  gentlemen of the jury -- ladies and gentlemen of the

15:00   22  jury know, this is an open yard.  Correct?

15:00   23         A.    Yes.

15:00   24         Q.    Prior to the burning of the cabin, did you

15:00   25  ever -- did you ever remember signing any or filling out

| | | |
|---|---|---|
| 15:00 | 1 | any paperwork regarding the High Chaparral being |
| 15:00 | 2 | dry-docked at Border Shipyards? |
| 15:01 | 3 | A.    No. |
| 15:01 | 4 | Q.    Were you ever asked by Ms. English or anybody |
| 15:01 | 5 | else to fill out paperwork prior to the -- on the High |
| 15:01 | 6 | Chaparral being dry-docked prior to the fire? |
| 15:01 | 7 | A.    No. |
| 15:01 | 8 | MR. GONZALEZ:  Okay.  Pancho, I am going to |
| 15:01 | 9 | pass you now.  Thank you.  If somebody wants to move |
| 15:01 | 10 | here in my seat. |
| 15:01 | 11 | MR. WALSH:  No.  I can do it from here, I |
| 15:01 | 12 | think. |
| 5:01 | 13 | MR. CARINHAS:  I think I am the next |
| 15:01 | 14 | defendant. |
| | 15 | MR. WALSH:  Oh, you are next.  Go right |
| 15:01 | 16 | ahead then.  I am sorry. |
| 15:01 | 17 | MR. RIOS:  Do you mind if I take a look at |
| 15:01 | 18 | these exhibits? |
| 15:01 | 19 | MR. GONZALEZ:  Sure. |
| | 20 | MR. WALSH:  If he wants to go next, it is |
| 15:01 | 21 | fine with me.  We are all going to get our turn. |
| | 22 | MR. GONZALEZ:  Do you want to move up here, |
| 15:01 | 23 | Mr. Carinhas? |
| | 24 | MR. CARINHAS:  I can do it from right here. |
| | 25 | MR. BLOMQUIST:  Do you want a mike? |

Hill & Romero
*Certified Court Reporters*

```
·5:01   1              MR. CARINHAS:  I don't need a mike.
15:01   2              MR. BLOMQUIST:  I think he may want you to
15:01   3   have one.
15:01   4              MR. RODRIGUEZ:  It would be nice to be able
15:02   5   to hear you on the video.
15:02   6              MR. WALSH:  Yeah.  The witness will hear
15:02   7   you, but we won't later, and that is a problem.
        8                       EXAMINATION
15:02   9   BY MR. CARINHAS:
15:02  10       Q.   Mr. Abrego, my name is Jack Carinhas, and I
15:02  11   represent Ricardo Rivera in this -- in this lawsuit,
15:02  12   this case.  As you have testified before, Mr. Rivera was
 5:02  13   the owner of the boat Negrita; is that correct?
15:02  14       A.   Yes.
15:02  15       Q.   And that was the boat that was being worked on
15:02  16   at the time that Mr. Lopez had this accident; is that
15:02  17   correct?
15:02  18       A.   Yes.
15:02  19       Q.   Mister -- Mr. Rivera, had he brought his boats
15:03  20   there to your yard for a haul out before this occasion?
15:03  21       A.   Yes.
15:03  22       Q.   And in the past occasions that Mr. Rivera had
15:03  23   been there, was the same four and a half percent
15:03  24   insurance charge made on his bills like it was on the
15:03  25   May 11 bill?
```

Hill & Romero
*Certified Court Reporters*

15:03  1      A.    Yes.

15:03  2      Q.    And that same charge was made on bills for

15:03  3  other customers; is that correct?

15:03  4      A.    Yes.

15:04  5      Q.    And is this insurance that he was being charged

15:04  6  for, did you understand that that was to protect him in

15:04  7  case anything happened to his boat or on his boat?

15:04  8            MR. PEREZ:   Objection, form.

15:04  9      A.    Well, yes.   Because as I said before, the

15:04  10  Chaparral was paid for, and it was in order to cover

15:04  11  whatever might happen.

15:04  12     Q.    All right.   Now, it is -- is it correct -- is

5:04  13  it my understanding of your testimony that at the time

15:04  14  of Mr. Lopez's accident and death that the company did

15:04  15  not have workers' compensation insurance?

15:05  16            MR. RODRIGUEZ:   Objection, form.

15:05  17     A.    Correct.

15:05  18     Q.    And do you know what workers' compensation

15:05  19  insurance is for?

15:05  20     A.    Yes.

15:05  21     Q.    Okay.   What would you tell -- tell the jury

15:05  22  what this kind of insurance covers.   What is it for?

15:05  23            MR. RODRIGUEZ:   Objection, form.

15:05  24     A.    In order to protect the worker.

15:05  25     Q.    Prior to -- for how long did the company not

HILL & ROMERO
*Certified Court Reporters*

1

CAUSE NO. 2000-02-758-D

| | | |
|---|---|---|
| PETRA LOPEZ, INDIVIDUALLY, )( | IN THE DISTRICT COURT | |
| AND AS REPRESENTATIVE OF )( | | |
| THE ESTATE OF ERNESTO )( | | |
| LOPEZ, DECEASED, AND AS )( | | |
| NEXT FRIEND OF PERLA IVON )( | | |
| LOPEZ and ERNESTO LOPEZ, )( | | |
| MINORS )( | | |
| Plaintiffs )( | | |
| )( | | |
| VS. )( | CAMERON COUNTY, TEXAS | |
| )( | | |
| BORDER SHIPYARDS, INC., )( | | |
| JORGE GONZALEZ, RUBEN )( | | |
| BARRERA, and CARL GAYMAN, )( | | |
| RICK RIVERA, INDIVIDUALLY )( | | |
| and D/B/A LA NEGRITA )( | | |
| Defendants )( | 103RD JUDICIAL DISTRICT | |

ORAL AND VIDEOTAPED DEPOSITION OF

JORGE GONZALEZ

JANUARY 9, 2001

ORAL AND VIDEOTAPED DEPOSITION OF JORGE

GONZALEZ, produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on JANUARY 9, 2001, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the offices of Rodriguez, Colvin & Chaney,

L.L.P., 1201 East Van Buren, Brownsville, Texas,

pursuant to the Texas Rules of Civil Procedure.

Exhibit

"R-6"

**BRYANT & STINGLEY, INC.**

Case 1:99-cv-00019  Document 32  Filed in TXSD on 07/03/2001  Page 43 of 47

## Page 82

1     MR. MOORE: Objection, nonresponsive,
2 form.
3     MR. GONZALEZ: Let me finish my question.
4    Q. What you're saying is basically, because there
5 was no shock when somebody got on board afterwards to
6 go help Ernesto that the machine couldn't have given
7 out the voltage or shocked?
8     MR. MOORE: Objection, leading, form.
9     THE WITNESS: The machine -- I don't think
10 the machine is -- has enough voltage. I think the
11 highest voltage on that machine is 38 volts. It may be
12 36. And as far as I know, 36 volts of direct current
13 would not kill anybody. And if it did, then there
14 would be a bunch of people dead now by -- electrocuted
15 by welding or having a welding machine.
16    Q. Okay.
17    A. It would not perform right.
18    Q. Your explanation that you just gave us, would
19 that be consistent with this type of equipment on
20 Gayman Exhibit No. 2, that type of arc welding unit,
21 the Lincoln?
22     MR. MOORE: Objection, form.
23     THE WITNESS: Yes.
24    Q. Okay.
25    A. You can read in the -- or you can tell -- you

## Page 83

1 can read here the voltage is in the name -- in the
2 plate. You can find out the maximum voltage in the
3 name plate.
4    Q. Okay. One other thing I want to cover with you
5 before --
6     MR. GONZALEZ: Can we go -- let's go off
7 the record.
8    Q. Papa, I'll mark this as Exhibit No. 18, and
9 I'll represent to you that this is the hauling-out
10 invoice for the Negrita, the boat that Mr. Lopez was on
11 back on May 11th of 1998.
12     And Mr. Moore asked you questions about
13 marine insurance being charged to the customer. And
14 that's typical what you-all -- well, that's typical
15 what the shipyard would do there. They would charge a
16 premium to the boat owner as part of the cost for
17 hauling out their boat, right?
18     MR. RODRIGUEZ: Objection, form.
19     THE WITNESS: Actually, we pay the, you
20 know -- on a yearly basis a percentage of our whole --
21 our gross business. And in order for the company to
22 know how much to charge us, you know, they have to look
23 at last year's, you know, business report. If we gross
24 $300,000, they say, you know, "I'm going to charge you
25 a percentage."

## Page

1 But in order for us to get it back, we
2 charge it to each boat, because that's the normal
3 practice. Zimco Marine does the same thing. In fac
4 it costs us more than when charge the boat. But we
5 still, you know, in order to be competitive, we
6 charge -- I think it's 4 percent. I think, you know,
7 if you -- if you figure it out, you know, it's going to
8 be close to 4 percent.
9    Q. So it's a partial reimbursement of the
10 insurance premium that you-all pay, right?
11    A. And the idea is for them to be protected. You
12 know, it's -- each boat owner should be protected w
13 he's got his boat out of the water and on our proper
14    Q. And if something happens on one of the boats,
15 say, in this instance what happened on one of the bc
16 that's being hauled out at the yard, then it was your
17 all's understanding or intent that then because your
18 charging each boat owner insurance premium then i
19 would be covered under your policy?
20    A. Yes.
21     MR. RODRIGUEZ: Objection, form.
22     MR. MOORE: Same.
23     THE WITNESS: It should be covered und
24 our policy. It has happened, you know, before whe
25 boat caught on fire and we had $125,000 worth of

## Page

1 damages about 10, 12 years ago, and the insurance
2 company paid the owner the complete amount.
3    Q. And in this instance, St. Paul Insurance
4 Company then would be -- should be -- your all's
5 understanding would be that the insurance that you
6 buying with St. Paul's insurance at the time would
7 have -- would have covered anything that happened
8 the Negrita on May 11th of 1998.
9     MR. MOORE: Objection, form.
10     MR. RODRIGUEZ: Objection, form.
11     THE WITNESS: That is correct, because
12 there is a lawsuit against the owner of La Negrita,
13 we expect our insurance company to take care of i
14 because that's why the insurance is bought.
15    Q. That was your understanding before?
16    A. Right.
17    Q. Before May 11th of 1998, that was your
18 understanding and intent?
19    A. They had --
20     MR. MOORE: Objection, form.
21     THE WITNESS: -- they had covered two
22 lawsuits before and paid.
23    Q. Okay.
24     MR. MOORE: And leading.
25     THE WITNESS: So that was our

Page 86

1 understanding that was before.
2          MR. GONZALEZ: Okay. That's it. I'm
3 going to pass you. Thank you.
4          MR. RODRIGUEZ: No questions.
5               EXAMINATION
6 BY MR. MOORE:
7   Q. Mr. Gonzalez, you said that about 12 years ago
8 there was a fire on one of the boats, like 100 and
9 something thousand dollars of damage. Do you remember
10 making that statement?
11  A. Yes.
12  Q. Whose boat was that?
13  A. Mr. Barrera.
14  Q. The gentleman that's in this room right now,
15 right?
16  A. Yes.
17  Q. He's a shareholder?
18  A. Yes.
19  Q. And it was one of his boats that caught on
20 fire?
21  A. Yes. It was either his or his brother.
22  Q. Okay. And the claim was made on the insurance
23 carrier; is that right?
24  A. Yes. Yes.
25  Q. Did you have the same insurance company that

Page

1 know, they, you know, the lady, Perk English is well
2 known around the shrimp business.
3          She sells insurance for boats and for
4 everything. And I don't know what -- she said she ha
5 the liberty to go into the CPA's office and ask them
6 for whatever records she needed. And she always hac
7 the policy on Border Shipyards, all of it, workmen's
8 comp and general insurance and everything.
9   Q. How long had she had that? From the very
10 beginning?
11  A. From the very beginning.
12  Q. And English -- do you know whether or not
13 English Insurance knew that Border Shipyards was
14 charging the ship owners a fee for marine insurance?
15          MR. RODRIGUEZ: Objection, form.
16          THE WITNESS: I'm sure they did.
17  Q. Why do you say that?
18  A. Because they look at bills.
19  Q. Does Border Shipyards maintain a separate
20 account -- a separate account for the premiums they
21 collect through the work they perform and those
22 premiums would be marine insurance?
23  A. No, we don't.
24  Q. Okay. Does Border Shipyards keep a track
25 accountingwise as to all the premiums they collect fr

Page 87

1 y'all are using now? St. Paul?
2   A. I don't remember if it was St. Paul or who it
3 was 12 years ago.
4   Q. Who has Border Shipyards been using for
5 insurance coverage for the past -- since 1997?
6   A. The same company, English Insurance Company.
7   Q. Out of Harlingen?
8   A. Out of Harlingen.
9   Q. And at any time did English Insurance Company
10 come out to Border Shipyards and inspect y'all's
11 operations?
12  A. I'm sure they have.
13  Q. Did they ever go and inspect these receipts,
14 these invoices such as Gonzalez 6?
15  A. I don't know.
16          MR. RODRIGUEZ: Objection form.
17          THE WITNESS: I don't know if the agent --
18 but the agent was at the office -- at the Border
19 Shipyards office and also at the CPA's office. I don't
20 know what they were doing or what they were checking
21 on.
22  Q. But they were -- as far as you understood, they
23 were inspecting the business records?
24  A. At the port, I don't know if they were
25 inspecting the business records or not, because you

Page

1 work that they perform and charge to the customer?
2 you know if that accounting is done?
3          MR. RODRIGUEZ: Objection, form.
4          THE WITNESS: I don't know. Really don'
5 know.
6   Q. That's something we probably should talk to th
7 accountants about, right?
8   A. Yes.
9          MR. MOORE: Pass the witness.
10          MR. GONZALEZ: Nothing further.
11          MR. RODRIGUEZ: I'll reserve my questio
12 (Deposition concluded)
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 1:99-cv-00019   Document 32   Filed in TXSD on 07/03/2001   Page 45 of 47

1

CAUSE NO. 2000-02-758-D

| | |
|---|---|
| PETRA LOPEZ, INDIVIDUALLY, ) ( | IN THE DISTRICT COURT |
| AND AS REPRESENTATIVE OF ) ( | |
| THE ESTATE OF ERNESTO ) ( | |
| LOPEZ, DECEASED, AND AS ) ( | |
| NEXT FRIEND OF PERLA IVON ) ( | |
| LOPEZ and ERNESTO LOPEZ, ) ( | |
| MINORS ) ( | |
|     Plaintiffs ) ( | |
| ) ( | CAMERON COUNTY, TEXAS |
| VS. ) ( | |
| ) ( | |
| BORDER SHIPYARDS, INC., ) ( | |
| JORGE GONZALEZ, RUBEN ) ( | |
| BARRERA, and CARL GAYMAN, ) ( | |
| RICK RIVERA, INDIVIDUALLY, ) ( | |
| and D/B/A LA NEGRITA ) ( | |
|     Defendants ) ( | 103RD JUDICIAL DISTRICT |

---

ORAL AND VIDEOTAPED DEPOSITION OF
MORGAN GROSS
JANUARY 10, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF MORGAN GROSS,

produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on JANUARY 10, 2001, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the offices of Royston, Rayzor, Vickery &

Williams, 55 Cove Circle, Brownsville, Texas, pursuant

to the Texas Rules of Civil Procedure.



Exhibit
" R-7 "

**BRYANT & STINGLEY, INC.**

Case 1:99-cv-00019   Document 32   Filed in TXSD on 07/03/2001   Page 46 of 47

## Page 138

1  Q. Okay. So you would have something there,
2 right? I mean, there might be something somewhere?
3  A. It's possible, yes.
4  Q. And where would you have kept the invoice
5 itself?
6  A. The invoice itself will be at the bookkeeper,
7 Garcia, Marren & Company.
8  Q. Okay. And where would you normally have kept
9 the worksheet from which you prepared that?
10  A. Normally, the worksheet would have been kept at
11 Border Shipyards.
12  Q. Okay. But you don't know -- you have not seen
13 it or you have not looked for it?
14  A. I haven't looked for it.
15  Q. Okay. In that invoice -- and I forget. What's
16 the exhibit number for that invoice?
17    MR. MOORE: It's Gonzalez 18.
18    MR. CARINHAS: Gonzalez what?
19    MR. RODRIGUEZ: 18.
20  Q. Gonzalez 18, would you take a look at that.
21  A. Sure.
22  Q. In that invoice, was there a charge made for
23 insurance?
24  A. Yes, there was.
25  Q. And how much is the -- what is it -- would you

## Page 139

1 read the item from -- into the record?
2  A. Marine Insurance, 158.13.
3  Q. Okay. And that's the premium -- part of the
4 premium that you charged to Mr. Rivera for -- as part
5 of the job?
6  A. Yes, sir.
7  Q. And is it -- was it the practice to charge all
8 customers a premium for haul-outs?
9  A. Yes, sir.
10  Q. And do you continue to do that today?
11  A. Yes, sir.
12  Q. All right. At the time that the accident
13 occurred and at the time this boat the Negrita was
14 being worked on, it's my understanding that the
15 carrier's name was St. Paul Mercury Insurance Company.
16  A. I'm not for sure.
17  Q. Well, do you know if that same company
18 continued as the carrier when you took over?
19  A. Yes.
20  Q. All right. And who is the agent for that
21 coverage?
22  A. Ms. English.
23  Q. Perk English?
24  A. Perk English, yes, sir.
25  Q. All right. English Insurance Agency?

## Page 140

1  A. Yes.
2  Q. Okay. Is that who you -- did you deal with her
3 in any way regarding the insurance coverages for the
4 yard?
5  A. After when the next premium was due, yes, we
6 used Perk English also.
7  Q. And did you participate in renewing that
8 policy?
9  A. Yes.
10  Q. Okay.
11  A. I participated.
12  Q. You told her go ahead and renew it, I guess?
13  A. Yes.
14  Q. Was it the same company that continued on?
15  A. I think it was different.
16  Q. It was different?
17  A. Yes.
18  Q. Do you know who the name of the present carrier
19 is?
20  A. I -- really I don't, Mr. Carinhas.
21  Q. Okay. But it basically is the same coverage
22 that you had before?
23  A. It's the same coverage. It's through the same
24 insurance saleslady. She's always done the insurance
25 for us.

## Page 141

1  Q. Now, in connection with your duties there with
2 regard to insurance, were you given any instructions
3 from the agent or from any -- from the insurance
4 company as to what was required --
5  A. No.
6  Q. -- in order to put a customer on policy?
7  A. No.
8  Q. The agent never said anything to you about
9 that?
10  A. No. Everything -- everyone that's up there is
11 covered.
12  Q. Okay. What did you understand you were
13 supposed to do with regard to making sure that a
14 customer has his coverage in place?
15  A. If the boat is on the railway, it is covered.
16  Q. And that was what you were told?
17  A. It's still that way today.
18  Q. And you were told that that was automatic?
19  A. Yes, that's automatic.
20  Q. You don't have to report anything to them?
21  A. No.
22  Q. You don't have to send anything in writing to
23 them?
24  A. No.
25  Q. You don't have to ask for an endorsement on the

## Page 142

1 policy?
2    A. No.
3    Q. And as far as you know, it was an automatic
4 deal?
5    A. Yes, sir.
6    Q. And the insurance agent never told you
7 otherwise?
8    A. No.
9    Q. With regard to Mr. Abrego, was he there on the
10 premises when you took over, or was he already gone?
11       MR. RODRIGUEZ: Objection, form.
12       THE WITNESS: He was going out as I was
13 walking in.
14    Q. He was going out. So he was there actually
15 when you were going in?
16    A. He was, you know, maybe getting his stuff and
17 so on and so forth.
18    Q. All right. Did you have any participation in
19 connection with his termination?
20    A. No.
21    Q. I'd like to know exactly what effort you had to
22 do with regard to the OSHA investigation. What did --
23 did you have anything at all to do in connection with
24 the OSHA investigation from the yard standpoint?
25    A. Like -- I don't understand.

## Page 143

1       MR. RODRIGUEZ: I'm going to object to the
2 form of the question.
3    Q. Well, I'm asking you did you in any way
4 communicate with the OSHA investigators?
5    A. I did. Yes, I did.
6    Q. Okay. Well, that's what I want to know. Tell
7 us in your own words what you did in connection with
8 the OSHA investigation.
9       MR. RODRIGUEZ: Objection, form.
10       THE WITNESS: I just made repairs that
11 they suggested that we make.
12    Q. Did you have anything at all to do with the --
13 in answering any questions that they had regarding any
14 of the alleged violations involving the yard?
15    A. I think they were about to leave as I came in,
16 so I inherited the violations when I went there.
17    Q. In other words, did they ask you for any
18 information?
19    A. No.
20    Q. Okay. Do you recall the name of the
21 investigator?
22    A. Not right offhand, but I talked to him several,
23 several times.
24    Q. Okay. And can you tell us what you talked to
25 him about?

## Page 144

1    A. Well, when I would have a question on how he
2 wanted this and what were his recommendations and so on
3 and so forth.
4    Q. All right. Can you tell us in your own words
5 what you recall of what the OSHA investigator required
6 you to do?
7    A. Under what --
8    Q. Generally speaking, what did he -- what were
9 you asked to do at the yard?
10    A. Well, there was several different things.
11    Q. Tell us in your own words briefly what --
12    A. We were just asked to make repairs that he had
13 suggested that we make.
14    Q. And what I want to try to do is, can you
15 identify some of those repairs?
16    A. We worked on the scaffolding, the frames to put
17 the scaffolding on, so on and so forth.
18    Q. Okay.
19    A. A lot of little things is what it amounted to.
20    Q. Okay. And can you -- I wasn't here when you
21 testified about Mr. Sterling. What was Mr. Sterling's
22 job or what was he supposed to be doing there?
23    A. He was there with OSHA to get a feel for what
24 we needed to do.
25    Q. Okay. But he was an employee of the yard?

## Page 145

1    A. He was hired by the yard, yes.
2    Q. Okay. And did he -- did you replace him or was
3 he just in addition to you?
4    A. I think Mr. Gayman hired him. That was
5 before -- he was there before I was there.
6    Q. Okay. And did Mr. Rivera -- to your knowledge,
7 did Mr. Rivera -- Mr. Rivera paid his bill to the yard?
8    A. He paid it right away, yes, sir.
9       MR. CARINHAS: Okay. That's all the
10 questions I have. Thank you.
11       EXAMINATION
12 BY MR. RODRIGUEZ:
13    Q. Mr. Gross, my name is Patrick Rodriguez, and I
14 have a few questions for you today.
15    A. Okay, sir.
16    Q. Very few questions for you today.
17    A. Okay.
18    Q. The first one that I have is, you mentioned
19 earlier, I believe, that with respect to the boats
20 owned by corporations of which the shareholders own
21 shares in that corporation, those boats are treated the
22 same way as a boat from any third party; is that
23 correct?
24       MR. MOORE: Objection, leading, form.
25       THE WITNESS: Yes.